IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re RADIAN SECURITIES | : | CIVIL ACTION |
| LITIGATION | : | |
| | : | NO. 07-3375 |
| This document relates to: | : | |
| All Actions | : | MASTER FILE |

MEMORANDUM AND ORDER

McLaughlin, J.                                          April 9, 2009

          In this consolidated class action, the plaintiffs

allege that the defendants, Radian Group, Inc. ("Radian"),

Sanford A. Ibrahim, C. Robert Quint, and Mark A. Casale,

committed securities fraud in violation of sections 10(b) and

20(a) of the Securities Exchange Act of 1934 ("Exchange Act"),

and Securities and Exchange Commission ("SEC") Rule 10b-5, 17

C.F.R. § 240.10b-5.  The action is brought on behalf of

purchasers of Radian securities between January 23, 2007, and

August 7, 2007.[1]

          Radian provides credit protection products and

financial services to financial institutions, including mortgage

lenders.  Credit-Based Asset Servicing and Securitization

---

          [1] Initially, two separate actions were filed against the
defendants.  The plaintiffs in those actions are John Cortese,
individually and on behalf of all others similarly situated,
in the case numbered 07-3773, and William Maslar, individually and
on behalf of all others similarly situated, in the case numbered
07-3375.  The Court consolidated these actions on January 30,
2008.  See Docket No. 29.  The lead plaintiffs for the
consolidated class action are Iron Workers Local No. 25 Pension
Fund and City of Ann Arbor Employees' Retirement System.

("C-BASS"), a corporation in which Radian held a 46% equity interest during the class period, invested in the credit risk of subprime residential mortgages.  The plaintiffs allege that the defendants made false and misleading statements about C-BASS's profitability and liquidity position and thus, the value of Radian's investment in C-BASS, during the class period.  These statements are alleged to have artificially inflated Radian's stock price, which led to losses to shareholders when Radian announced an impairment of its investment on July 30, 2007.

The defendants have moved to dismiss the consolidated class action complaint ("CCAC").  Their main arguments for dismissal of the plaintiffs' § 10(b) claim are:  (1) that the plaintiffs' allegations of fraud do not satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, particularly with respect to the required showing of a "strong inference of scienter"; and (2) that the defendants' statements constitute forward-looking statements that are nonactionable under the PSLRA's safe harbor provision, 15 U.S.C. § 78u-5(c).  They further argue that because the plaintiffs have not stated an independent securities violation under § 10(b), they have also failed to state a § 20(a) claim.  Because the Court finds that the plaintiffs have not carried their burden of showing a strong inference of scienter, the Court will grant the defendants' motion.

I.    <u>Facts as Alleged in the Complaint</u>[2]

Radian is a credit enhancement company that offers mortgage insurance and other financial services and products to mortgage lenders and other financial institutions.  Sanford A. Ibrahim, at all relevant times, was Radian's CEO, and a member of Radian's Board of Directors.  C. Robert Quint was Radian's CFO and Executive Vice President.  Mark A. Casale served as President of Radian Guaranty, Inc., a Radian subsidiary, and was also a member of C-BASS's Board of Managers during the class period. CCAC ¶¶ 2, 12, 13.[3]

---

[2] In deciding this motion to dismiss, the Court must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on motions to dismiss, including documents incorporated into the complaint by reference and matters of which a court may take judicial notice.  <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 127 S. Ct. 2499, 2509 (2007).  The United States Court of Appeals for the Third Circuit has decided that courts may take judicial notice of properly authenticated public disclosure documents filed with the SEC. <u>Oran v. Stafford</u>, 226 F.3d 275, 289 (3d Cir. 2000).  The defendants have attached to their motion to dismiss a supplemental appendix containing copies of various publicly filed documents.  The Court will take judicial notice of several of these documents, as explained herein.  The Court will refer to the defendants' Motion to Dismiss as "Defs.' Mot." and will refer to the attached documents as "Defs.' Mot. Ex. ___."  It will also use the defendants' page numbering system to provide citations to these documents (e.g., "A-___").

[3] The CCAC treats the individual defendants as a group for pleading purposes, and "presume[s] that the false, misleading and incomplete information conveyed in the company's public filings, press releases and other publications as alleged herein are the collective actions" of the individual defendants.  CCAC ¶ 15.

During the class period, Radian's operations were divided into three business segments:  (1) mortgage insurance; (2) financial guaranty; and (3) financial services.  In 2006, the mortgage insurance segment represented 49% of Radian's net income, and 55% of its equity; the financial guaranty segment represented 23% of Radian's net income, and 34% of its equity; and the financial services segment represented 28% of Radian's net income, and 11% of its equity.  Id. ¶ 44.

During the class period, Radian's financial services segment consisted mainly of interests held in Sherman Financial Services Group, LLC ("Sherman"), and C-BASS.  Sherman purchases and services charged-off and bankruptcy plan consumer assets at discounts from national financial institutions and major retail corporations.  Sherman also originates nonprime credit card receivables through a subsidiary.  Id. ¶ 48.

C-BASS, on the other hand, is a mortgage investment and servicing company that specializes in subprime residential mortgage assets and mortgage-backed securities ("MBS").  During the class period, Radian held a 46% equity interest in C-BASS, and had invested approximately $500 million in it.  C-BASS was a joint venture between Radian and MGIC Investment Corporation ("MGIC"), another provider of private mortgage insurance that

4

also held a 46% interest in C-BASS.[4]  During the class period,
C-BASS serviced loans through a wholly owned subsidiary, Litton
Loan Servicing, LP ("Litton").  Id. ¶¶ 4, 49, 51.


    A.    Radian, C-BASS, and the Subprime Market

        The CCAC alleges that prior to and during the class
period, the MBS securitized by C-BASS became particularly risky
because they were backed by subprime loans, which themselves had
become risky.  In addition, the largest proportion of mortgages
that had been purchased by C-BASS were located in California and
Florida, two locations which the New York Times had reported as
accounting for about 21% of all mortgages nationally, and 30% of
new foreclosures.  Further compounding the riskiness and
volatility of C-BASS's assets was the fact that C-BASS did not
originate the loans it serviced and securitized, which, according
to the plaintiffs, increased the risk that these loans were
fraudulently originated.  C-BASS also retained the most risky
interests in the securitizations it created, including, for
example, by accepting the first risk of payment default.  Id.
¶¶ 52, 56, 57, 61, 63.

        Prior to the class period, interest rates began to rise
nationally, which adversely affected subprime borrowers' ability

---

    [4] The remaining 8% of C-BASS was owned by current or former
members of C-BASS's management.  CCAC ¶ 51.

to pay and increased the default risk of subprime mortgage loans.[5]  According to the plaintiffs, the deterioration of the subprime market gave rise to a material increase in mortgage loan defaults, thus significantly impairing the value of C-BASS's subordinated securitized interests.  Because C-BASS had been heavily dependent on bank credit lines for its liquidity, the impaired value of C-BASS's subordinated securitized interests, which had served as the collateral for its bank loans, caused "a monumental liquidity crisis" for C-BASS.  Id. ¶¶ 65-67.

        The CCAC lists additional factors that it claims contributed to "an increasingly difficult operating environment at C-BASS."  First, it states that C-BASS began to experience an increase in early payment defaults by borrowers, indicating that the borrowers of the loans purchased by C-BASS had not been

---

        [5] As support for this allegation, the plaintiffs cite news articles from August, November, and December 2006 stating, among other things, that "[m]ore sub-prime borrowers are defaulting in the early months of their home loans"; that "UBS Securities issued a report . . . [finding] that sub-prime loans made this year are 'going' bad at a rate that is 50% faster than the rate for those made last year"; that a director at UBS Securities stated that "the industry is seeing 'a steady increase of delinquencies'; and that "[d]elinquency rates in the third quarter [of 2006] were considerably higher for 'sub-prime' borrowers."  CCAC ¶¶ 71-75.  The CCAC also alleges that by early 2007, "some of the top mortgage lenders with sub-prime mortgage exposure started to reveal enormous losses and warned of future volatility in the market"; that The Wall Street Journal reported on February 9, 2007, that foreclosure rates on subprime mortgage loans in 2006 more than doubled from 2005; and that by early March 2007, at least two other lenders exited the subprime residential lending business completely, with one later filing for Chapter 11 bankruptcy protection.  Id. ¶¶ 75-77.

properly qualified.  Second, there was an increase in investor
rejections of loans that C-BASS sought to securitize, which was
primarily the result of defective appraisals, incorrect credit
reports, and missing documentation.  This forced C-BASS to find
other investors, who often offered less attractive terms for the
loans, or to place the loans in its own portfolio.  C-BASS
further experienced an increase in mortgage delinquency rates,
but also purchased "increasingly risky mortgage products."
Finally, the subprime market had become increasingly competitive,
as evidenced by shrinking margins between the interest rates on
purchased loans and the rates offered to the purchasers of C-
BASS's securitizations.  Id. ¶ 78.

          According to the CCAC, a number of former employees of
C-BASS and Radian Guaranty, a Radian subsidiary, stated that the
deteriorating conditions experienced generally by subprime market
participants prior to and during the class period caused the
quality of the subprime mortgage pools securitized by C-BASS to
decline.[6]  CW 3, a former C-BASS employee, said that default

_____

          [6] The plaintiffs have identified five such "confidential
witnesses."  The first, "CW 1," was a C-BASS employee from 2005
to late October 2007 who worked as a Senior Fraud Analyst and
whose duties involved examining and writing detailed written
reports on the residential mortgage loans purchased by C-BASS.
The second, "CW 2," worked at C-BASS from January to October 2007
as a Loan Underwriting Risk Assessment Analyst, and was primarily
responsible for evaluating the quality of loans C-BASS acquired.
The third, "CW 3," worked at C-BASS from May 2006 to May 2007 as
an IT Analyst.  A fourth witness, "CW 4," worked at Radian
Guaranty as a Vice President for Credit Risk and Structured

rates increased during 2006 into 2007.  CW 2, another former C-BASS employee, stated that there was a continuous decline in the quality of loans C-BASS purchased beginning in 2005, and that from 2005 to 2007, C-BASS purchased increasing amounts of high-risk loans.  Id. ¶¶ 79-81.

The CCAC further claims that C-BASS's management knew how poor its mortgage pools were performing during the class period because Litton's website states that "Litton services every C-BASS issued deal."  Nonetheless, C-BASS was intent on securitizing defective mortgages so that it could procure the liquidity necessary to purchase more subprime loans.  CW 1 also stated that C-BASS was so eager to purchase mortgages that, in many instances, C-BASS would "eat" bad loans it purchased even though it had the right to "put" loans back to the originators. Id. ¶¶ 82, 87.

CW 1, a former C-BASS employee, "indicated" that Radian was "knowledgeable" about loans in C-BASS's portfolio because it maintained a systematic process for monitoring instances when borrowers defaulted on mortgage loans.  CW 4, a former Vice President of Radian Guaranty, stated that beginning in 2006, he and other senior members of Radian's management readily witnessed

---

Products from July 2002 to July 2007.  Finally, a fifth witness, "CW 5," also worked at Radian Guaranty in the role of Vice President/Risk Operations Manager from 1998 to January 2007. CCAC ¶¶ 27-32.

a higher rate of loan delinquencies.  CW 5, another former Vice President of Radian Guaranty, acknowledged an increase in riskier residential mortgage loans in the market in 2006 and stated that Radian was hesitant to insure such loans.  CW 5 further recalled that defaults and foreclosures began to rise in the 2005-2006 time frame, which resulted in an increase in claims filed against Radian.  Id. ¶¶ 84-86.

The plaintiffs claim that the combination of adverse subprime conditions and high-risk operations resulted in margin calls to C-BASS from its creditors.  These calls significantly drained C-BASS of liquidity, leaving C-BASS without sufficient cash to operate and impairing the value of Radian's investment in C-BASS.  The CCAC further alleges that the defendants knew or recklessly ignored the situation at C-BASS based on the fact that Radian and C-BASS maintained a close business relationship.  Id. ¶¶ 93-94.

Various statements made by the defendants are alleged in support of the CCAC's contention that Radian and C-BASS maintained a close business relationship.  These statements include:  (1) a statement in a letter from Ibrahim to Radian's shareholders in the Company's 2005 Annual Report, which stated that "[i]n holding board seats . . . Radian maintains an active involvement in strategic activities at both C-BASS and Sherman Financial"; (2) another statement in the 2005 letter that "Mark

9

[Casale], who sits on the boards of C-BASS and Sherman Financial
. . . , has the additional responsibility of driving growth for
the mortgage credit risk business"; (3) a statement by Ibrahim in
a letter in the Company's 2006 Annual Report that Radian's
"relationships with C-BASS and Sherman . . . provide timely and
valuable insights into the consumer-credit marketplace."  The
defendants also point to a statement on Litton's website that
Litton aims to "ensur[e] the interests of C-BASS, Litton,
Litton's customers, and . . . investors are aligned.  This
integration of what were traditionally separate mortgage business
lines is what makes [Litton] unique . . . ."  Id. ¶¶ 94-97.


        B.   Allegedly Misleading Statements Made During the
             Class Period

        The class period begins on January 23, 2007.  On that
date, Radian issued a press release announcing its financial
results for the fourth quarter and fiscal year of 2006.  For
fiscal year 2006, the company reported a net income of $582.2
million and diluted net income of $7.08 per share.  Ibrahim
commented:


            Radian delivered record net income and grew book
            value by 16.1 percent, despite a challenging
            operating environment . . . This performance
            demonstrates that our strategy to focus on
            diversification while maintaining a strict risk
            management culture continues to deliver long-term
            value.

> . . . .
>
> Forecasts for interest rate stability, strong
> employment and improved persistency bode well for
> the mortgage insurance industry.  In this
> environment, we believe we are well positioned to
> benefit over the long term from both cyclical and
> structural opportunities in the mortgage market.

Id. ¶ 131.  With respect to C-BASS, Ibrahim further stated that

"[i]n the Financial Services segment, both C-BASS and Sherman

continued to be important and steady contributors to Radian's

results."  Id.

The next day, January 24, 2009, Radian held a

conference call with analysts and investors to discuss Radian's

earnings and operations.  During the call, Quint stated:

> During the fourth quarter, C-BASS recovered most
> of the hedge losses that had been booked in prior
> quarters.  While the subprime origination business
> is in a state of uncertainty, an environment like
> this typically creates opportunities for C-BASS to
> purchase mispriced assets.  We feel good about
> C-BASS's prospects for 2007, although there is
> clearly some uncertainty around these
> expectations.

Id. ¶ 132.  Following the statements on January 23 and 24, the

price of Radian stock rose to $60.18 per share.  Id. ¶ 133.

On February 6, 2007, Radian and MGIC announced that they had

agreed to merge.  They also announced that they had agreed to

sell half of their combined interest in C-BASS.  According to CW

1 - a C-BASS employee - the sale of C-BASS would add greatly to

11

the value of MGIC and Radian shares because C-BASS's financial statements would not have to be consolidated with the combined entity, thereby excluding its debt from the combined entity's balance sheet.  Id. ¶ 121.

On March 1, 2007, Radian filed its form 10-K for the fiscal year ending December 31, 2006.  This form reported that Radian's net income attributable to its financial services segment was $257.0 million for 2006, of which C-BASS accounted for $133.9 million.  The form further reported that:

> As a holder of credit risk, our results are subject to macroeconomic conditions and specific events that impact the credit performance of the underlying insured assets.  We experienced generally positive results throughout the business for the year ended December 31, 2006, led by strong credit performance and good production despite the challenging business production environment for mortgage insurance and financial guaranty insurance.
>
> . . . .
>
> For 2006, the financial services segment showed another year of strong earnings and return on investment, which was, in part, a result of the relatively low interest rate and favorable credit environment . . . In addition, both C-BASS and Sherman were positively impacted in the fourth quarter of 2006 . . . and C-BASS recovered most of the hedge losses that had been incurred in prior quarters.  Despite the significant credit spread widening that has occurred in the subprime mortgage market during the first quarter of 2007, which could produce . . . losses for C-BASS during the first quarter, we expect that both C-BASS's and Sherman's results for 2007 will remain fairly consistent with their 2006 results, as both companies stand to benefit from recurring sources

> of earnings . . . and, while the sub-prime
> origination business is currently uncertain,
> C-BASS typically looks for opportunities to
> purchase mispriced assets in such an environment.

<u>Id.</u> ¶ 134.   Included in this filing was a certification that
Radian's CEO and CFO had "evaluated the effectiveness" of the
company's disclosure controls," and that "there was no change in
[Radian's] internal controls over financial reporting that
occurred during the fourth quarter of 2006 that has materially
affected, or is reasonably likely to materially affect,
[Radian's] internal control over financial reporting."   <u>Id.</u>
¶¶ 126-27.[7]

On April 24, 2007, Radian issued a press release
announcing its financial results for the first quarter of 2007,
ending March 31, 2007.   The company reported net income of $113.5
million and diluted net income per share of $1.42.   Ibrahim
commented:

> Our primary book was not significantly
> affected by the disruptions in the subprime market
> in recent months.   I believe this is a validation
> of our long-term approach to risk management in
> all areas, including sub-prime and Alt A, where we
> have remained disciplined in diversifying our book
> of business across geographies, products, clients
> and origination years.

---

[7] The complaint alleges that such a certification was also
included in the company's Forms 10-Q filed during the class
period.   CCAC ¶ 128.

Id. ¶ 136.  With regard to C-BASS, the company stated that "In the financial services segment, net income was $10.8 million, down from . . . the same period last year, primarily as a result of an operating loss at C-BASS."  Id.

The next day, April 25, 2007, Radian held a conference call with analysts and investors.  During the call, Ibrahim stated:

> C-BASS reported a disappointing first quarter.  As most of you learned from Bruce Williams, co-founder and CEO of C-BASS, who joined the MGIC earnings call earlier this month, C-BASS reported a pre-tax loss for the first quarter.  As Bruce mentioned, the company expects a return to profitability in the second quarter and a pre-tax return for the year of 15% to 20%, which translates into $150 to $200 million in pre-tax earnings for the full year, of which Radian's share is 46%.  The full transcript of Bruce's remarks is available on our website in the SEC filings.

Id. ¶ 138.  During the call, Quint also remarked:

> You have obviously heard a lot about C-BASS's first quarter, along with the expectation for improvement over the rest of the year as they expect the market to stabilize at current levels.  We have started to see some evidence of this stabilization in the second quarter.

Id.  In addition, the following exchange took place between the individual defendants and Bruce Harting, an analyst from Lehman Brothers:

14

HARTING:  On the C-BASS, understanding that
Bruce Williams said that, but is it just
simply that the inventory of loans had to be
repriced; and now we move forward at a
tighter bid?  I didn't quite follow the logic
on why the immediate return to profitability.

QUINT:  The portfolio is marked-to-market
based on the changed spread.  So at this
point, they are comfortable that they can
resume profitability.

HARTING:  Have they seen real-time signs of
bids for their securitizations?

CASALE:  Oh, yes.  Remember, Bruce, they
executed securitizations through that, even
through the turmoil, which is a testament to
their name and reputation in the market.  It
is just when, at the end of the quarter, when
they had to mark this stuff it was at an all-
time wide.  Spreads were at an all-time wide.

IBRAHIM:  Again, Bruce, as you know, when
these kind of market conditions occur, while
everybody gets hurt, the most respected
players in the market enjoy better executions
than the others.  The differentiation widens.
So being the best player in a tough group of
peers means you get hurt, but you also get
hurt less.

Id. ¶ 140.

On May 10, 2007, Radian filed its Form 10-Q for the
first quarter of 2007, the period ending March 31, 2007.  This
form reported that Radian's net income attributable to the
financial services segment for the first quarter of 2007 was
$10.0 million and that "equity in net income of affiliates"

decreased 61% to $22.8 million for the quarter, which was driven by a $6.8 million loss related to C-BASS.  The form stated:

> As a holder of credit risk, our results are subject to macroeconomic conditions and specific events that impact the production environment and credit performance of our underlying insured assets.  We experienced mixed results during the first quarter of 2007.  Positively, we had strong production in both mortgage insurance and financial guaranty insurance.  However, mortgage insurance losses incurred were higher than expected and our financial services segment results were negatively impacted by the subprime mortgage market disruption which significantly affected C-BASS' financial performance in the quarter.
>
> . . . .
>
> For the quarter ended March 31, 2007, the financial services segment had mixed results. Sherman continued its consistent strong earnings; however, C-BASS incurred a loss of approximately $15 million as credit losses and credit spread widening in the subprime mortgage market impacted their results. . . . C-BASS is expected to return to profitability over the balance of the year, assuming the subprime mortgage stabilizes at current levels.

Id. ¶ 142.  The report also deemed the fair value of C-BASS to be greater than $967 million.  The CCAC alleges, however, that the decline in the value of C-BASS's securitizations and other assets, which had collateralized C-BASS's loans, resulted in massive margin calls from lenders that left C-BASS on the "verge of bankruptcy" by March 31, 2007.  The fair value of Radian's

investment in C-BASS at that point, according to the CCAC, was "materially less" than the $445 million carrying value reported by the May 10, 2007, Form 10-Q.  This filing also stated:  "We have presented our condensed consolidated financial statements on the basis of accounting principles generally accepted in the United States of America."  Id. ¶¶ 109, 113, 117, 118.

On July 24, 2007, Radian issued a press release announcing its financial results for the second quarter of 2007. The company reported net income of $21.1 million and diluted net income per share of $0.26.  Ibrahim commented:

> Our second quarter results clearly illustrate the credit challenges in today's mortgage market, but I believe they also reflect long-term positive trends for our business.  Market conditions, particularly in California and Florida, led to an increase in defaults that impacts our results.

Id. ¶ 144.  The next day, July 25, 2007, Radian held a conference call with investors.  During this call, when questioned by an analyst about C-BASS's liquidity situation, Quint replied:

> [B]ecause they are in a - the sale process that we're in right now it's not really appropriate to discuss the specific liquidity situation.  But I think we should reiterate that the whole market is going through a tough challenge with regard to liquidity and that includes C-BASS.

Id. ¶ 145.  Another analyst asked whether C-BASS was liquidating
some of its assets at depressed values, in particular, certain
bonds.  Quint and Casale replied as follows:

> QUINT:  I don't know where you got that
> information.  I'm not - I don't think that was
> ever spoken about.
>
> CASALE:  And they are not selling any bonds . . . .

The questioner further asked whether, "to the extent [C-BASS was]
forced to . . . cover margin cost . . . are they in that position
right now where they are forced to liquidate some of these
positions?"  Casale replied, "No, they are not."  Id. ¶ 145.[8]


> C.   Announcement of Impairment and Subsequent Events

On July 30, 2007, Radian issued a press release
announcing that the value of its investment in C-BASS had been
"materially impaired."  The press release announced that "[s]ince
February 2007, the market for subprime mortgages has experienced
turmoil."  The company further disclosed that its investment in
C-BASS consisted of approximately $468 million of equity as of
June 30, 2007, and an additional $50 million drawn on July 20 and
23, 2007, under a $50 million unsecured credit facility that
Radian provided to C-BASS.  The company also represented that

_____

[8] The complaint does not allege that C-BASS actually was
selling or actually did sell bonds during this period.

although it had not determined the level of the impairment

charge, it "could be Radian's entire investment, less any

associated tax benefit."  Ibrahim commented:

> While this action clearly reflects the
> continuing credit challenges in today's
> mortgage market, we are moving forward, as
> planned, with our proposed merger with MGIC,
> which we expect to close late in the current
> quarter, or early in the next.

Id. ¶ 147.  After this announcement, the price of Radian stock

declined from $40.20 per share to $33.71 per share.  Id. ¶ 148.

On July 31, 2007, C-BASS issued a press release, which

stated:

> While nothing fundamentally has changed at C-BASS,
> like many other firms in the industry, the
> current severe state of disruption in the credit markets
> has caused C-BASS to be subject to an
> unprecedented amount of margin calls from our
> lenders.  The frequency and magnitude of these
> calls have adversely affected our liquidity.  To
> address this, C-BASS is in advanced discussions
> with a number of investors to provide increased
> liquidity and is exploring all options to mitigate
> the liquidity risk in this difficult market.
>
> At the beginning of 2007, we had $302 million
> of liquidity, representing greater than 30% of our
> capital of $926 million.  During the first 6
> months of 2007, a very tumultuous time in the
> subprime mortgage market, C-BASS' disciplined
> liquidity strategy enabled the company to meet
> $290 million in lender margin calls.  During the
> first 24 days of July alone, C-BASS met an
> additional $260 million of margin calls,
> representing greater than a 20% decline in the
> lender's value.  We believe that nothing justifies
> this substantial amount of margin calls received

>     in such a short period of time, particularly as
>     there has been no change in the underlying
>     fundamentals of our portfolio.

Id. ¶ 149.  After this announcement, the price of Radian stock fell from $33.71 to $27.51 per share.  Id. ¶ 150.

On August 7, 2007, MGIC issued a press release stating that, in light of the C-BASS impairment, MGIC was not required to complete its pending merger with Radian.  According to the press release, Radian told MGIC that it disagreed with MGIC's assessment of the merger obligations.  After this announcement, the price of Radian common stock declined from $23.23 to $20.62 per share.  Id. ¶¶ 151-52.

On September 5, 2007, Radian and MGIC jointly announced that they had agreed to terminate the pending merger.  According to the press release they issued, the "current market conditions have made combining the companies significantly more challenging. Both MGIC and Radian believe it is in their best interests to remain independent companies at this time."  Id. ¶ 153.

On October 2, 2007, Radian filed a Form 8-K with the SEC, announcing that Deloitte & Touche LLP ("Deloitte"), who had previously served as Radian's independent auditor, declined to stand for reappointment for 2007.  According to the Form:

>     Deloitte . . . is the independent registered
>     public accountant for Radian Group Inc. (the
>     "Company").  Deloitte's present engagement with
>     the Company had been expected to terminate on or

20

about the filing of the Company's Quarterly Report
on Form 10-Q for the third quarter of 2007 (the
"Termination Date") had the Company completed its
merger with [MGIC].  As previously disclosed,
Radian and MGIC mutually terminated their proposed
merger on September 5, 2007.  On September 26,
2007, Deloitte declined to stand for reappointment
as the Company's independent auditors for the 2007
audit and its engagement will end shortly
following the Termination Date.

. . . .

During the Company's two most recent fiscal years
and the subsequent interim periods preceding
September 26, 2007:  (i) there were no "reportable
events" . . . and (ii) there was no "disagreement"
. . . between the Company and Deloitte on any
matter of accounting principles or practices,
financial statement disclosure, or auditing scope
or procedure, which disagreement, if not resolved
to the satisfaction of Deloitte, would have caused
Deloitte to make reference to the subject matter
of the disagreement in connection with its report,
except as follows:  As previously reported on a
Form 10-Q/A dated August 13, 2007 (the "10-Q/A"),
on August 9, 2007, the Company filed its Quarterly
Report on Form 10-Q for the quarter ended June 30,
2007 (the "Second Quarter 10-Q"), before Deloitte
had completed its review of the interim financial
statements included in the Second Quarter 10-Q.
As reported in the 10-Q/A, Deloitte needed to
review additional documentation supporting the
conclusion that the impairment charge relating to
the Company's interest in [C-BASS] occurred after
June 30, 2007.  Members of the Company's
management discussed the events surrounding the
filing of the Second Quarter 10-Q with Deloitte on
August 9, 2007, and the Chairman of the Company's
Audit and Risk Committee discussed these events
with Deloitte on August 10, 2007.  On August 14,
2007, the Company filed a second amendment to its
Second Quarter 10-Q to state that the matters
related to the impairment had been resolved
without changes or amendments to the interim
financial statements included in the Second
Quarter 10-Q.  The Company has authorized Deloitte
to respond fully to the inquiries of any successor

21

accountant concerning this matter or any other
matter.

Id. ¶ 154.[9]

According to the CCAC, throughout the class period, the
"defendants" sold 161,804 shares of their Radian stock,
generating proceeds of approximately $10.2 million.  Ibrahim is
alleged to have sold 1,095 shares on February 14, 2007, and 5,040
shares on May 14, 2007, representing a total of $384,000 in stock
sales.  Quint is alleged to have sold 129,000 shares of Radian
stock on February 8, 2007, representing a sale of approximately
$8,105,070.  Id. ¶ 162.[10]


II.  Discussion

The CCAC presents two claims against the defendants:
(1) securities fraud under § 10(b) of the Exchange Act; and (2)
control person liability under § 20(a) of the Exchange Act.  The

---

[9] Although not referenced in the CCAC, attached as an
exhibit to the Form 8-K was a letter from Deloitte in which
Deloitte certified that it read this portion of Radian's Form 8-K
and agreed with the statements referenced in this opinion, with
the exception of the third sentence of the first paragraph, with
which Deloitte had "no basis on which to agree or disagree."  See
Letter from Deloitte & Touche LLP, Oct. 2, 2007, available at
http://www.sec.gov/Archives/edgar/data/890926/000119312507211979/
dex161.htm.

[10] The CCAC does not suggest any sales on the part of
Casale.  It does claim sales on the part of individuals named
"John Calamari" and "Roy Kasmar," but does not further identify
these individuals.

plaintiffs argue that during the class period, the defendants
materially misled the investing public by issuing false and
misleading statements that failed to notify shareholders of the
margin calls that C-BASS had received, to state a proper value of
Radian's investment in C-BASS, or to write down that investment
in a timely fashion.  Rather than disclose this impairment, the
defendants downplayed C-BASS's liquidity crisis, and deceptively
stated that C-BASS was expected to return to profitability.  As a
result of these statements, the plaintiffs claim, Radian's common
stock traded at artificially inflated prices during the class
period, which ultimately led to losses when Radian finally
announced an impairment of its investment in July 2007.

     The defendants have moved to dismiss the CCAC, arguing:
(1) that the plaintiffs fail to allege facts giving rise to a
strong inference of "scienter," a necessary element of a § 10(b)
violation;[11] (2) that the plaintiffs do not allege with
sufficient particularity that the statements at issue were false
when made; and (3) that, in any event, the statements were
forward-looking statements and are thus nonactionable under the
PSLRA's safe-harbor provision, 15 U.S.C. § 78u-5(c).  As for the
plaintiffs' § 20(a) claim, the defendants argue that there can be

---

     [11] The defendants do not contest the existence of any other
element of a § 10(b) claim.

no violation of § 20(a) without an independent federal securities violation.

The Court finds that the allegations of the CCAC do not raise a strong inference that any of the defendants acted with scienter, as required by the PSLRA. The Court will therefore dismiss the plaintiffs' § 10(b) claim.[12] The Court will also dismiss the plaintiffs' § 20(a) claim for failure to allege an independent violation of the securities laws.

A.   <u>Section 10(b) Claim</u>

Section 10(b) of the Exchange Act forbids the use or employment of any deceptive device in connection with the purchase or sale of any security. 15 U.S.C. § 78j(b). Rule 10b-5 forbids the making of any "untrue statement of a material fact" or the omission of any material fact needed to make the statements not misleading. 17 C.F.R. § 240.10b-5.

Courts have implied a private damages action from the statute and the rule, and Congress has imposed statutory requirements on that private action. The basic elements of the action are: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a

---

[12] Because the Court finds the absence of a strong inference of scienter to be an adequate ground for dismissal of the complaint, it need not address the defendants' other arguments at this time.

security; (4) reliance on the misrepresentation; (5) economic loss; and (6) loss causation - a causal connection between the material misrepresentation and the loss. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).

Rule 10b-5 claims are governed by the PSLRA. The PSLRA heightened the pleading requirements in private securities actions. In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002). It requires securities plaintiffs to specify with particularity at the outset of litigation all facts upon which they base their allegations or upon which they form their belief (if an allegation is made on information and belief). They must also specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading. 15 U.S.C. § 78u-4(b)(1)(B); Winer Family Trust v. Queen, 503 F.3d 319, 326 (3d Cir. 2007). Where there are multiple defendants, the plaintiffs must specify the role of each defendant, demonstrating each defendant's connection to the misstatements or omissions. Winer, 503 F.3d at 336.

On a motion to dismiss, a § 10(b) claim must satisfy the heightened pleading requirements of both the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires, at a minimum, that the plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany "the first paragraph of any

25

newspaper story" - that is, the "who, what, when, where and how" of the events at issue.  In re Rockefeller, 311 F.3d at 217. Rule 9(b) also requires plaintiffs to show that the person responsible for the alleged misstatement or omission had knowledge that the misstatement or omission was false or misleading.  Id. at 216.

The PSLRA also heightened the standard for pleading scienter.  15 U.S.C. § 78u-4(b)(2).  With respect to each act or omission, a plaintiff must:  (1) specify each statement alleged to have been misleading and the reasons why it is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.  Tellabs v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2507-08 (2007).  Under Tellabs, the strong inference standard requires an inference of scienter to be more than merely reasonable or permissible.  The Court held that a complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference that could be drawn from the facts alleged. Id. at 2509.

The Tellabs Court outlined a three-step process for considering motions to dismiss under § 10(b):  First, a district court must accept all factual allegations as true, as with any motion to dismiss.  Next, the court must consider the complaint

in its entirety, including documents incorporated into the complaint by reference and matters of which the court may take judicial notice, and examine whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter. Finally, the court must consider plausible opposing inferences to determine whether the pleaded facts meet the PSLRA's strong inference standard.  <u>Id.</u>

Prior to <u>Tellabs</u>, a line of cases decided by the United States Court of Appeals for the Third Circuit held that a strong inference of scienter can be established by alleging either (1) facts to show that the defendants had the motive and opportunity to commit fraud; or (2) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. <u>In re Suprema Specialties, Inc. Sec. Litig.</u>, 438 F.3d 256, 276 (3d Cir. 2006); <u>In re Alpharma Sec. Litig.</u>, 372 F.3d 137, 148 (3d Cir. 2004); <u>GSC Partners CDO Fund v. Washington</u>, 368 F.3d 228, 237 (3d Cir. 2004).

In <u>Tellabs</u>, the Supreme Court specifically reserved the question of whether recklessness could give rise to civil liability under 10b-5.  It noted, however, that every court of appeals to consider the issue has held that a plaintiff can meet the scienter requirement by showing that a defendant acted intentionally or recklessly.  Nonetheless, the question of whether a showing of recklessness satisfies the scienter

requirement was not presented in <u>Tellabs</u>.  127 S. Ct. at 2507 n.3.

The relationship between <u>Tellabs</u> and the standard for establishing a strong inference of scienter in the Third Circuit is clarified by the <u>Winer</u> decision.  In that case, the court of appeals affirmed the district court's finding that the pleaded facts did not support a strong inference of reckless or intentional conduct.  <u>Id.</u> at 331.  "Stated differently, Winer's purported inference, that the statements . . . were knowingly false, was not as compelling or as strong as the opposing inference cited by the District Court.  Thus, Winer's inference is neither cogent, nor compelling, nor strong in light of competing inferences."  <u>Id.</u>  Under <u>Winer</u>, then, a plaintiff's inference that a defendant's alleged actions are reckless or intentional must be compared to any nonculpable inference offered by the defendant, and must be cogent and at least as compelling as any such nonculpable inference in order for the complaint to give rise to a strong inference of scienter.

In examining the allegations of the complaint in this case, the Court must first accept all the allegations of the complaint as true.  Next, considering the complaint in its entirety, as well as documents of which the Court may take judicial notice, the Court must decide whether all of the facts alleged, taken collectively, give rise to a strong inference of

scienter - i.e., whether they establish either (1) motive and opportunity or (2) conscious misbehavior or recklessness. Finally, with respect to each of those standards for establishing a strong inference of scienter, the Court must also consider plausible opposing inferences to determine whether the pleaded facts meet the PSLRA's strong inference standard.

The Court concludes that the plaintiffs' allegations, taken collectively and in conjunction with matters of which the Court may take judicial notice, do not establish either motive and opportunity or conscious misbehavior or recklessness on the part of the defendants.  The plaintiffs therefore have not raised a strong inference of scienter.  Even if these allegations were sufficient to establish either motive and opportunity or conscious misbehavior or recklessness, however, the Court also concludes that an inference of scienter with respect to the plaintiffs' allegations is neither cogent nor at least as compelling as the plausible opposing inferences suggested by the defendants.

1.  <u>Motive and Opportunity</u>

Plaintiffs alleging motive and opportunity must support their assertions with facts stated with particularity.  Bare allegations that the defendants "knew" or "must have known" that statements were fraudulent are insufficient.  <u>GSC Partners</u>, 368

29

F.3d at 239.  Blanket assertions of motive and opportunity also do not suffice; nor do "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme."  Id. at 237.  Motives that are generally possessed by most corporate directors and officers are also inadequate to satisfy the scienter requirement; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud.   Id.

        In every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers usually will reap financial benefits from a successful transaction.  If allegations that a corporate defendant desired to retain his position or realize gains on company stock were sufficient to raise a strong inference of scienter, the directors of virtually every company would be forced to defend securities transactions every time a company effected a merger or acquisition.  GSC Partners, 368 F.3d at 237-38 (citing Phillips v. LCI Int'l, Inc., 190 F.3d 609, 623 (4th Cir. 1999)); see also Chill v. Gen. Elec. Co., 101 F.3d 263, 268 n.5 (2d Cir. 1996) ("If we accept . . . as motive that every publicly-held corporation desires its stock to be priced highly by the market . . . the motive requirement becomes meaningless.").

        In support of their claim that the defendants had the motive to commit fraud, the plaintiffs assert that the defendants

misrepresented and concealed information related to C-BASS in order to (1) consummate the merger with MGIC and (2) to allow the defendants and "other insiders" to sell off approximately $10.2 million of their personal holdings in Radian.  Pls.' Opp. 32. These alleged motives do not establish a strong inference of scienter.[13]  In addition, the Court finds that the plausible opposing inferences offered by the defendants with respect to the defendants' alleged insider trading are more compelling than an inference of scienter.

a.   <u>The MGIC Merger</u>

The plaintiffs allege that the defendants delayed recognizing the C-BASS impairment because doing so might have jeopardized the pending merger between Radian and MGIC, as Radian was required to sell its interest in C-BASS to complete the merger.  The sale of C-BASS, they argue, would increase the value of MGIC and Radian shares because C-BASS's financial statements would not have to be consolidated with those of the combined entity.  CCAC ¶¶ 121, 164; <u>see also</u> Pls.' Opp. 33-34.

---

[13] The plaintiffs state that the defendants, "as high-ranking corporate officers, had the opportunity to commit the fraudulent acts alleged."  Pls.' Opp. to Defs.' Mot. to Dismiss 32 ("Pls.' Opp.").  The defendants do not dispute this.  The Court's inquiry here will be limited to whether the plaintiffs have pled that the defendants had the motive to commit fraud.

These allegations are insufficient to establish motive on the part of the defendants and therefore do not give rise to a strong inference of scienter.  The plaintiffs insist that their allegations are not of "the type of corporate transactions that most corporate directors and officers are motivated to complete, but are distinctively unique to Radian."  The plaintiffs fail to point out why these motivations are "distinctively unique," however.  Although not every merger may hinge upon the sale of a particular investment, the motive itself that is alleged by the plaintiffs - the desire to complete a merger and realize the attendant gains on company stock - is among the motives that have been found to be generally possessed by most corporate directors. See GSC Partners, 368 F.3d at 237-38.

In addition, the plaintiffs have not alleged any "concrete and personal" benefit to any individual defendant beyond whatever synergies might have resulted from the merger with MGIC.  Instead, they allege that the "defendants" were motivated to complete the merger and to artificially inflate the price of Radian stock.  CCAC ¶ 164.  Not only are these goals generally possessed by most corporate directors, but the plaintiffs also fail to plead motive as to each particular defendant, as required by the PSLRA.  See Winer, 503 F.3d at 337. The plaintiffs' allegations regarding the MGIC merger therefore do not raise a strong inference of scienter.

32

b.   Insider Trading

The plaintiffs' allegations regarding insider trading are also insufficient to establish motive on the part of the defendants.  Although sales of company stock by insiders that are "unusual in scope or timing" may support an inference of scienter, courts must not infer fraudulent intent from the mere fact that some officers sold stock.  In re Suprema, 438 F.3d at 277; In re Advanta Corp. Sec. Litig., 180 F.3d 525, 540 (3d Cir. 1999) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1424 (3d Cir. 1997)).

Whether a sale is "unusual in scope" depends on factors such as the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved.  In re Suprema, 438 F.3d at 277.  Other relevant factors are whether the sales were "normal and routine" and whether the profits were substantial relative to the seller's ordinary compensation.  Id. (citing In re Burlington Coat, 114 F.3d at 1423); see also In re Party City Sec. Litig., 147 F. Supp. 2d 282, 313 (D.N.J. 2001) ("Low aggregate sales and large retained aggregate holdings rebut an inference of motive, even where some defendants have sold significant percentages." (citing In re Advanta, 180 F.3d at 541)).

33

During the class period, Ibrahim, Quint, and two other individuals - who are not named as defendants in this action - are alleged to have sold 161,804 shares of Radian stock, generating proceeds of approximately $10.2 million.[14]  During a period of approximately three months, it further alleges, Radian "insiders" received proceeds from the sale of Radian stock exceeding more than 56% of the stock sale proceeds they received during the twelve months prior to the beginning of the class period.  CCAC ¶¶ 162-63.[15]  These allegations do not establish motive on the part of the individual defendants - Casale, Ibrahim, and Quint.

First, as to defendant Casale, no mention is made of any sales whatsoever, or of his trading history.  This omission raises doubt as to whether the sales were "motivated by an intent

_____

[14] The defendants cite a number of cases holding that the trading practices of non-defendants are legally "irrelevant" in evaluating the scienter of named defendants.  See Defs.' Mot. 23 n.13.  Without reaching such a holding here, the Court finds that the allegations regarding alleged insiders "John Calamari and Roy Kasmar" are irrelevant in this case.  The plaintiffs have not identified these individuals or their roles at Radian; nor do they identify these individuals' prior trading practices or compare their sales to their overall compensation.  Although the Court can consider "the number of insiders involved" in making its determination of motive, the plaintiffs do not state whether there are other corporate "insiders" who did or did not sell stock during the class period.  The Court thus will not consider the sales of Calamari and Kasmar as contributing to a strong inference of scienter on the parts of Ibrahim, Quint, or Casale.

[15] As the defendants point out, the plaintiffs do not clarify which "insiders" are included in this group.  Defs.' Mot. 25 n.16.

to profit from inflated stock prices before the upcoming losses were reported."   In re Advanta, 180 F.3d at 540; In re Burlington Coat, 114 F.3d at 1423; see also Tellabs, 127 S. Ct. at 2511 (counting omissions and ambiguities in the complaint against an inference of scienter).

          To the contrary, two Forms 4 filed by Casale with the SEC show that Casale more than tripled his investment in Radian stock over the course of the class period.   Compare Defs.' Mot. Ex. 16 at A-685 with Defs.' Mot. Ex. 17 A-688.[16]   Such behavior, the defendants offer, is more consistent with an inference of nonculpability than with a strong inference of scienter.   Upon consideration of these publicly filed documents - which is appropriate on a motion to dismiss - and the plaintiffs' failure to state why Casale's trading, or lack thereof, was suspicious in scope or in timing, the Court finds that an inference of scienter is not cogent or at least as compelling as an inference of nonculpability.

          Second, as for Ibrahim, the plaintiffs omit to state that defendant Ibrahim's sales of 1,095 shares on February 14,

---

[16] According to the plaintiffs, public documents reveal that Casale's acquisition of 15,000 Radian shares at $0 when the stock was trading at "around $60 per share" caused Casale to realize "immediate profits of $900,000."   Pls.' Opp. 35 n.30.   However, as the defendants point out, it is inaccurate to state that Casale made "immediate profits" - the fact remains that the plaintiffs have not alleged that Casale made any sales of Radian stock during the class period.   See Defs.' Mot. 29-30; Defs.' Reply 3.

2007, and 5,040 shares on May 14, 2007, represented less than 1% and approximately 2.7% of his total shares and options owned on those respective dates.  This fact is confirmed by two Forms 4 filed by Ibrahim with the SEC, the accuracy of which the plaintiffs have not contested.  <u>See</u> Defs.' Mot Ex. 19 at A-694; <u>id.</u> Ex. 20 at A-697.  Although the size of Ibrahim's sales is not itself dispositive, it is significant that even in May of 2007, nearly two months after C-BASS is alleged to have been on the brink of insolvency, Ibrahim continued to hold a "sizable percentage" of his stock.  <u>See</u> <u>In re Advanta</u>, 180 F.3d at 540 (declining to find a strong inference of scienter where two corporate defendants sold "only" five and seven percent of their stock holdings, and noting that such facts suggested that the defendants had "every incentive" to keep Advanta profitable).

The defendants argue that Ibrahim's Forms 4 themselves also state nonculpable reasons for the stock trades made by Ibrahim.  In particular, the February 14, 2007, sale represented "a portion of the vested shares from a Restric[t]ed Stock grant," indicating that the stock was a portion of Ibrahim's overall compensation package.  <u>See</u> Defs.' Mot. 28 & Ex. 19 at A-694.  As the United States Court of Appeals for the Third Circuit has recognized, many corporate executives receive stock and stock options as a portion of their compensation.  It follows, then, that these individuals will trade those securities in the normal

course of events.  In re Burlington Coat, 114 F.3d at 1424.  The plaintiffs have not otherwise alleged that this sale was unusual in scope.

As for the May 14, 2007, transaction, the Form 4 for that transaction states that the 5,040 shares Ibrahim sold were sold "to cover taxes on a traunch of restricted stock that vested."  Defs.' Mot. Ex. 20 at A-697.  Other federal courts have found such sales - i.e., sales to cover tax liabilities - as weighing against an inference of scienter.  See In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004); Ressler v. Liz Claiborne, Inc., 75 F. Supp. 2d 43, 59-60 (S.D.N.Y. 1999).  Moreover, the public record of Ibrahim's stock trades reveals that on May 11, 2006, approximately one year earlier, Ibrahim sold 5,468 shares of Radian stock.  See Defs.' Mot. Ex. 18 at A-691.

Considering the omissions in the CCAC, Ibrahim's significant remaining stock holdings, and his trading history, the plaintiffs have not established that Ibrahim's sales are unusual in scope or in timing.  They therefore fail to establish motive on Ibrahim's part.  In addition, the Court finds that an inference of scienter with respect to Ibrahim is neither cogent nor at least as compelling as the competing nonculpable inferences offered by the defendants.

Finally, the CCAC alleges that Quint sold 129,000 shares of common stock on February 8, 2007, representing 68% of his holdings, and generating gross proceeds of $8,105,070.[17]  As the defendants point out, however, the plaintiffs do not point to any information to show whether or not this sale was unusual in scope or in timing, other than that it occurred during the class period.  The plaintiffs fail to present allegations relating to Quint's trading history or allegations describing how this sale relates to his overall compensation.  Again, such omissions count against an inference of scienter.

In addition, the defendants have proffered a nonculpable explanation for Quint's February 8, 2007 sale, an explanation which is supported by documents of public record.  On February 6, 2007, Radian issued a news release, attached to its Form 8-K, which announced the merger with MGIC, and which also identified the persons who would comprise the merged corporation's management team.  Quint, who had been the CFO at Radian, was not listed as among the management team.  Instead, the CFO of MGIC was designated as the CFO of the merged company.  See Defs.' Mot. Ex. 4 at A-305.[18]

---

[17] According to a Form 4 filed by Quint with the SEC on February 8, 2007, this transaction represented an exercise of 129,000 options by Quint, followed by a sale of those options. See Defs.' Mot. 24 n.15 & Ex. 14 at A-679.

[18] The plaintiffs have not asserted that the information contained in this news release is false.  Although they state

It was in this context, the defendants argue, that Quint made his stock sale; and, as the defendants point out, other courts have found sales by corporate insiders in anticipation of their departures from a company not to be suspicious.  See Greebel v. FTP Software, Inc., 194 F.3d 185, 206 (1st Cir. 1999) ("It is not unusual for individuals leaving a company . . . to sell shares.  Indeed, they often have a limited period of time to exercise their company stock options."); see also Provenz v. Miller, 102 F.3d 1478, 1491 (9th Cir. 1996); In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 898 (W.D.N.C. 2001).  Given that Quint made his sale only two days after a public disclosure indicated that he would not be a member of the senior management of the new corporation, the Court does not find the timing of his sale suspicious.

Even if the sale were not in keeping with Quint's previous trading history - of which the plaintiffs make no mention - the sale does not meet the pleading standards under the

---

that this issue raises a factual question that cannot be considered on a motion to dismiss, on a motion to dismiss a securities fraud complaint, the Court must consider competing inferences offered by the defendants.  See Tellabs, 127 S. Ct. at 2510; see also Winer, 503 F.3d at 328-29.  The inference here offered by the defendants, though it references facts outside the complaint, is drawn from documents of which the Court may take judicial notice.  Accordingly, the plaintiffs' objection to the inference the defendants would have the Court draw here is incorrect.

PSLRA.  Rather, again, the plaintiffs' explanation is not cogent or at least as compelling as the defendants' explanation.

Although the Court finds that none of the individually alleged stock sales adds to a strong inference of scienter with respect to any individual defendant, the Court reaches the same conclusion with respect to the defendants' collective sales.  The CCAC alleges that "Calamari, Kasmar, and Quint sold 95%, 39% and 68% of their Radian common stock holdings."  CCAC ¶ 163.  It is not entirely clear who defendants Calamari and Kasmar are, the reason for their inclusion, or whether there were other corporate insiders who either did or did not sell stock during the class period.  See supra n.14.  Nevertheless, even considering the timing and quantity of the defendants' aggregate sales, public documents reveal that the individual defendants actually retained a combined 88.6% of their Radian securities holdings during the class period.  See documents cited in Defs.' Mot. 24 n.14.  This fact, which the plaintiffs have not contested, further undermines a strong inference of scienter based on the alleged insider trading by the defendants.

Neither the plaintiffs' allegations regarding the MGIC merger nor their allegations of insider trading sufficiently establish a motive on the part of the defendants to commit fraud. The plaintiffs thus have not raised a strong inference of scienter through motive and opportunity.  In addition, a strong

40

inference of scienter is neither cogent nor at least as compelling as the plausible nonculpable inferences offered by the defendants.

### 2.   Conscious Misbehavior or Recklessness

A plaintiff alleging conscious misbehavior or recklessness must show <u>specific</u> facts that constitute "strong circumstantial evidence." <u>GSC Partners</u>, 368 F.3d at 238. Conscious misbehavior involves "intentional fraud or other deliberate illegal behavior." <u>In re Advanta</u>, 180 F.3d at 535. Reckless conduct, on the other hand, requires a material representation or omission involving not merely simple, or even inexcusable, negligence, but an "extreme departure" from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is "so obvious" that the defendant "must have been aware of it." <u>GSC Partners</u>, 368 F.3d at 239.  This standard requires a misrepresentation to be "so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception." <u>In re Digital Island Sec. Litig.</u>, 357 F.3d 322, 332 (3d Cir. 2004).

The plaintiffs' claim, essentially, is that Radian's failure to take an impairment charge on its investment in C-BASS earlier than it did constitutes recklessness or conscious

41

misbehavior.  More specifically, generally accepted accounting principles ("GAAP") required Radian to report an impairment charge no later than March 31, 2007, at which point C-BASS is alleged to have been on the brink of insolvency.  According to the plaintiffs, C-BASS had held the riskiest subprime securities; the decline in value of these securities led to a multitude of margin calls, the "frequency and magnitude" of which left C-BASS on the brink of insolvency.  Pls.' Opp. 2.  As a result, the fair value of Radian's investment in C-BASS was much less than the reported value, and this decline in value was "other than temporary," thus requiring a write-down under GAAP - in particular, Accounting Principles Board Opinion No. 18.  CCAC ¶ 116.

In support of their charge of recklessness, the plaintiffs argue that because Radian maintained an active role in monitoring its investment in C-BASS, the defendants knew or should have known that their actions throughout the class period presented a danger of misleading buyers or sellers.  According to the plaintiffs, that the defendants knew or must have known of this danger is evidenced by the defendants' positions at Radian and C-BASS, by the fact that Radian's involvement with C-BASS was one of Radian's core activities, and by the defendants' knowledge of the risky nature of C-BASS's business and the deteriorating conditions of the subprime industry.  The plaintiffs further

argue that their claim of conscious misbehavior or recklessness
is supported by the size of the eventual impairment charge taken
by Radian, by the resignation of Casale from his position at
Radian, and by Deloitte's decision to decline to stand for
reappointment as Radian's auditor.

The Court concludes that the CCAC fails to allege
specific facts constituting strong circumstantial evidence that
the individual defendants' actions involved not merely simple, or
even inexcusable, negligence, but an extreme departure from the
standards of ordinary care.  Because the plaintiffs have failed
to allege such facts, and because the defendants have provided
plausible nonculpable inferences that are more compelling than a
strong inference of scienter, the plaintiffs have not met their
pleading burden under the PSLRA.

a.   The C-BASS "Impairment" and GAAP

The Supreme Court has acknowledged that GAAP are "far
from being a canonical set of rules that will ensure identical
accounting treatment of identical transactions."  Thor Power Tool
Co. v. Commissioner, 439 U.S. 522, 544 (1979).  To the contrary,
GAAP tolerate a range of "reasonable" treatments, leaving the
choice among alternatives to management.  Id.; see also In re
Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 352 (D.N.J. 2007)
(noting that courts give weight to GAAP violations "only where

the provisions of GAAP so coincide with conclusions obvious to any business person . . . that a violation of this type . . . equates to a self-evident business nonsensicality which cannot be made by a defendant with a nonculpable state of mind").

To accept the plaintiffs' argument that the decision not to report the C-BASS impairment before July 30, 2007, was an extreme departure from the range of reasonable treatments under GAAP, the Court must first accept that the CCAC sufficiently states that Radian's investment in C-BASS was actually impaired at some point before March 31, 2007, the date by which C-BASS is alleged to have been on the "brink of insolvency."  However, apart from the plaintiffs' bald assertions that the value of Radian's investment in C-BASS was impaired at an earlier date, and that a write-down should have been made no later than March 31, 2007, the CCAC fails to allege any such impairment with sufficient particularity.  To the contrary, both the allegations of the CCAC and the public record of C-BASS's margin calls lead the Court to the opposite inference, advanced by the defendants: that C-BASS was not on the brink of insolvency on March 31, 2007.

According to the CCAC, in late July 2007, Radian announced that C-BASS could no longer meet its margin calls.  It was at that point that both Radian _and_ MGIC wrote down their investments in C-BASS.  Although the CCAC alleges that C-BASS faced a liquidity crisis that left it on the brink of insolvency

44

by March 31, 2007, it also acknowledges, without disputing or
contradicting, C-BASS's statement that during the first six
months of 2007, a "disciplined liquidity strategy" enabled the
company to meet $290 million in lender margin calls, and that
during the first twenty-four days of July alone, C-BASS met an
additional $260 million of margin calls.  CCAC ¶ 149; see also
Pls.' Opp. 7.[19]

Even if an impairment of Radian's investment did occur
at some point earlier than Radian ultimately stated, the
plaintiffs do not allege facts to show that Radian's decision not
to report whatever impairment may have existed until July 2007
involved not merely simple, or even inexcusable negligence, but
an extreme departure from the range of reasonable business
treatments permitted under GAAP.  The defendants point out, for
example, that Deloitte, Radian's auditor during the class period,
did not dispute Radian's decision to write down its investment in
C-BASS when it did.

---

[19] At oral argument in this case, the plaintiffs argued that
the lender margin calls were not the cause of the impairment of
Radian's investment in C-BASS, but rather, evidence that C-BASS's
underlying assets - and thus, Radian's investment - had
experienced a decline in value that was "other than temporary."
See Oral Arg. Tr. 46-47, Dec. 19, 2008.  To the extent that the
margin calls did not "cause" the impairment, however, the
plaintiffs do not otherwise allege when, how, or by how much C-
BASS's assets were impaired, other than by alleging a general
connection between the value of C-BASS's assets and the state of
the market in general.

As support, the defendants offer a letter from Deloitte attached to Radian's Form 8-K, filed October 2, 2007, in which Deloitte "agree[d]" with Radian's statement that any issues relating to the filing of Radian's Form 10-Q/A for the second quarter of 2007 were resolved without any changes to Radian's interim financial statements.[20]  Even if, as the plaintiffs suggest, this evidence does not specifically establish that Deloitte "agreed" with Radian's treatment of the C-BASS write-down, the fact remains that Deloitte and Radian resolved the matter without further amendments to Radian's SEC filings.[21]

---

[20] An explanatory note to Radian's Form 10-Q/A filed on August 14, 2007, stated that:

On August 9, 2007, Radian Group, Inc. ("the Company") filed its Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2007 ("the Prior 10-Q").  On August 13, 2007, the Company filed an amendment on Form 10-Q/A, which amendment included an explanatory note concerning documentation supporting the conclusion that the impairment charge relating to the Company's interest in [C-BASS] occurred after June 30, 2007.

This amendment on Form 10-Q/A is being filed to report that the matters discussed in the explanatory note included in the amendment filed on August 13, 2007 have been resolved without changes or amendments to the interim financial statements included in the Prior 10-Q as filed on August 9, 2007.

See Defs.' Mot. Ex. 1 at A-3.

[21] The plaintiffs again object that this issue is a disputed issue of fact that the Court cannot consider on a motion to dismiss.  Pls.' Opp. 37.  As the Court has explained, the Court must take into account competing nonculpable inferences offered

Rather than supporting a strong inference of scienter, this fact more plausibly suggests that Radian's report was not viewed by Deloitte as an extreme departure from the range of reasonable treatments permitted under GAAP.[22]

As further evidence that the defendants' decision to take an impairment charge in July 2007 was not an extreme departure from the range of reasonable business decisions, the defendants offer that MGIC also chose not to report an impairment earlier than Radian, and, like Radian, reported the C-BASS impairment as a third-quarter event in its 10-Q filed November 21, 2007.  See Defs.' Ex. 25, at A-767-68.  The plaintiffs respond that the fact that another company may conceal material information or make fraudulent statements cannot absolve the defendants of liability.  Pls.' Opp. 19.  Leaving aside the lack of allegations regarding whether MGIC also concealed material information or made fraudulent statements, the timing of MGIC's report nonetheless adds to the Court's conclusion that the plaintiffs have not shown strong circumstantial evidence that the

_____

by the defendants.  See supra n.18.  Because the documents upon which the defendants' theory is based are publicly filed SEC documents, the Court can consider the evidence offered here by the defendants in support of their inference of nonculpability.

[22] The defendants also point out that PricewaterhouseCoopers LLP, Radian's new auditors, later certified that Radian's Form 10-K for 2007 - which reported the C-BASS impairment as a third quarter event - conformed with GAAP.  Defs.' Mot. Ex. 30 at A-881, 1017-18.

defendants' actions constitute an extreme departure from the standards of ordinary care.

> b.   Allegations That the Defendants "Knew" or "Must Have Known" of the C-BASS Impairment

The plaintiffs argue that because Radian maintained an active role in monitoring its investment in C-BASS, the defendants knew or must have known that their statements or omissions during the class period - including their representations that their interim financial statements had been prepared in accordance with GAAP and the Sarbanes-Oxley Act ("SOX") - presented a danger of misleading buyers or sellers.

As a preliminary matter, the sufficiency of the allegations offered by the plaintiffs to show that the defendants knew or must have known that their statements presented a danger of misleading buyers or sellers necessarily hinges upon the sufficiency of the plaintiffs' allegations regarding when and whether C-BASS's assets were impaired, and their position that the decision to report the impairment as a third-quarter event was an extreme departure from the standards of ordinary care.

However, leaving this issue aside for the moment, the allegations of the CCAC do not establish with sufficient particularity that the defendants knew or must have known that their statements presented an obvious danger of misleading the investing public.  Nor do these allegations support an inference

of culpability that is cogent and at least as compelling as the nonculpable inference offered by the defendants.

The plaintiffs point to the defendants' positions as corporate officers to argue that the defendants were or must have been aware that their actions presented a danger of misleading buyers or seller.  This argument fails.  "Generalized imputations of knowledge" are insufficient to establish scienter, "regardless of the defendants' positions within the company."  In re Alpharma, 372 F.3d at 149-50; see also In re Advanta, 180 F.3d at 539 ("[A]llegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts] . . . have determined to be inadequate to withstand Rule 9(b) scrutiny.'").

Although the plaintiffs allege that Radian maintained an "active involvement in strategic activities at C-BASS," the plaintiffs have not alleged, specifically, that the defendants knew of any accounting irregularities at C-BASS or that C-BASS's own representations that it was meeting margin calls in the regular course of business were false, such that their behavior was an extreme departure from the standards of ordinary care.

Some courts in this circuit have taken the position that even if knowledge that a statement was false or misleading cannot be imputed to a defendant simply because he or she held a

49

certain position within a company, knowledge of the "core
activities of a business may be imputed to its highest officials
in some circumstances." See, e.g., In re RAIT Financial Trust
Sec. Litig., No. 07-3148, 2008 WL 5378164, at *12 (E.D. Pa. Dec.
22, 2008); In re Stonepath Group, Inc. Sec. Litig., No. 04-4515,
2006 WL 890767, at *12 (E.D. Pa. Apr. 3, 2006).  However, even
those courts that have been willing to impute knowledge to high-
ranking officers and directors state that courts should not do so
"absent particularized allegations showing that defendants had
ample reason to know of the falsity of their statements.  Thus,
while courts will impute knowledge of core activities in some
cases, they do so cautiously." In re Stonepath, 2006 WL 890767,
at *12; see also In re RAIT Financial, 2008 WL 5378164, at *13.

        Here, the plaintiffs argue that "[g]iven that C-BASS
was part of Radian's financial services segment, which comprised
28% of Radian's net income, Defendants are presumed to have had
knowledge of C-BASS's operating and liquidity problems." Pls.'
Opp. 27 (internal citation omitted).  However, the CCAC only
establishes that Radian's financial services segment as a whole -
not C-BASS in particular - constituted 28% of Radian's net income
in 2006, and 11% of its equity.  The plaintiffs do not further

explain why C-BASS's operations and assets in particular are core activities for Radian.[23]

The plaintiffs also argue that the defendants must have known that their statements or omissions during the class period presented a danger of misleading buyers because of adverse trends in the subprime industry, as well as the high-risk nature of C-BASS's business.  See CCAC ¶ 94.  These generalized allegations do not support a charge of conscious misbehavior or recklessness.

In In re Advanta, an issuer of credit cards was sued after it announced a quarterly loss of $20 million six months after it had predicted a large increase in revenues.  According to the complaint, the loss was caused by the issuer's decision to implement "aggressive techniques" to attract new customers, including issuing cards with lower rates and longer introductory periods than was standard industry practice.  The plaintiffs claimed that these practices resulted in riskier customers and, ultimately, a decrease in revenues.  In re Advanta, 180 F.3d at 528.

---

[23] The Court has found that the allegations of the CCAC do not sufficiently establish that the defendants' statements were false because it does not state with sufficient specificity when, how, or to what extent C-BASS's assets were impaired.  Thus, even if the Court were to find that managing and monitoring C-BASS's operations and assets are core activities for Radian, the plaintiffs' case would fail on the issue of whether the defendants had "ample reason to know" of the falsity of their statements.

In opposing the defendants' motion to dismiss, the
Advanta plaintiffs argued that even if the defendants did not
intentionally mislead investors, they recklessly disregarded
negative trends in the credit card industry and in Advanta's
customer base, which had also become increasingly risky, and
therefore possessed the requisite scienter.  In particular, they
argued that certain "positive portrayals" of Advanta's business
were reckless in light of industry-wide increases in personal
bankruptcies and charge-offs, especially as exacerbated by
Advanta's aggressive and risky business techniques.  Id. at 540.

The United States Court of Appeals for the Third
Circuit disagreed and affirmed the district court's dismissal of
the complaint.  In doing so, it reaffirmed that recklessness, in
the securities fraud context, involves not merely simple, or even
inexcusable negligence, but an "extreme departure" from the
standards of ordinary care, and which presents a danger of
misleading buyers or sellers that is either known to the
defendant or is so obvious that the defendant must have been
aware of it.  Id. at 539-40.

The court of appeals concluded that the plaintiffs'
allegations regarding the nature of Advanta's business and market
trends, even if true, did not show an extreme departure from the
standards of ordinary care.  At most, the complaint showed that
Advanta "embarked on a business strategy of aggressively

52

recruiting new customers without adequately accounting for the increased risk this endeavor posed." Id. at 540.  The complaint did not show that this strategy represented an "egregious departure from the range of reasonable business decisions, as opposed to simple mismanagement." Id.  "But," the court of appeals noted, "claims essentially grounded on corporate mismanagement are not cognizable under federal law." Id. (internal quotation marks omitted).

Similar to the plaintiffs in In re Advanta, the plaintiffs here are attempting to show that the defendants recklessly ignored trends in the subprime industry, as well as C-BASS's risky business, and that therefore they possessed the requisite scienter.  However, nothing in the CCAC establishes that Radian's failure to report an impairment of its investment in C-BASS was an egregious departure from the range of reasonable business decisions, even in light of the deteriorating subprime market.[24]

The CCAC describes the rise of interest rates nationally, the increasing volatility of securities backed by subprime loans, and an increase in the risk of default, as

---

[24] The defendants here are also further removed from the alleged risky business decisions than the defendants in In re Advanta.  In that case, the corporation being sued was the corporation that was actually alleged to have pursued a risky business strategy; here, the defendants are officers of a corporation that invested in the corporation that is alleged to have pursued a risky business strategy.

evidenced by various news articles and by problems experienced by various lending institutions. CCAC ¶¶ 56, 57, 65, 67, 71-77. In this market, the CCAC alleges, the MBS securitized by C-BASS had become particularly risky, as the largest proportion of mortgages were in California and Florida, and because C-BASS did not originate the loans it serviced and securitized, thus increasing the risk that these loans were fraudulently originated. The CCAC further alleges that C-BASS retained the most risky interests in the securitizations it created, including, for example, by accepting the first risk of payment default. Id. ¶¶ 52, 56, 57, 61, 63. Finally, the CCAC alleges that C-BASS began to experience increases in early payment defaults by borrowers, an increase in investor rejection of loans that C-BASS sought to securitize, and C-BASS's purchase of "increasingly risky mortgage products." Id. ¶ 78.

Although these allegations, if true, might be sufficient to establish declining conditions in the subprime market and at C-BASS, they are not particularized evidence that the defendants knew or must have known that their statements and omissions presented a danger of misleading buyers or sellers. Rather, these are facts that were known by the plaintiffs and by the market at large, and the CCAC itself establishes that Radian publicly disclosed its knowledge of these facts and their

potential effect on Radian's investment in C-BASS, throughout the class period.

For example, on the January 24, 2009, conference call, Quint stated that "the subprime origination business is in a state of uncertainty."  CCAC ¶ 132.  In addition, in Radian's March 1, 2007, Form 10-K, the company acknowledged that "[a]s a holder of credit risk, our results are subject to macroeconomic conditions and specific events that impact the credit performance of the underlying insured assets."  Id. ¶ 134.  That document further identified "the challenging business production environment for mortgage insurance and financial guaranty insurance," and "the significant credit spread widening that has occurred in the subprime mortgage market during the first quarter of 2007, which could produce . . . losses for C-BASS during the first quarter."  Id.

In Radian's April 24, 2007, press release, it further identified the "disruptions in the subprime market in recent months," and stated that income was down from the previous year in the financial services segment "primarily as a result of an operating loss at C-BASS."  Id. ¶ 136.  On the April 25, 2007, conference call, Ibrahim also stated that C-BASS itself had reported "a disappointing first quarter."  Id. ¶ 138.

In addition, in its May 10, 2007, Form 10-Q, Radian disclosed that in the second quarter of 2007, "results were

55

negatively impacted by the subprime mortgage market disruption which significantly affected C-BASS' financial performance in the quarter."  Id. ¶ 142.  Radian also revealed that "C-BASS incurred a loss of approximately $15 million as credit losses and credit spread widening in the subprime mortgage market impacted their results."  Id.

The plaintiffs' allegations regarding the condition of the subprime industry and the nature of C-BASS's business, especially when considered together with the defendants' related disclosures, are not specific evidence that individual defendants knew or must have known their actions presented a danger of misleading buyers or sellers.  These allegations thus fail to support a conclusion that the defendants' decision to report the write-down as a third-quarter event was an egregious departure from the range of reasonable business decisions.[25]

Third, the confidential witness testimony offered by the plaintiffs is not particularized evidence of what the defendants knew or must have known, and therefore does not add to

---

[25] As the defendants argue, "[i]t is hardly surprising when shareholder suits are filed after a major market event . . . [b]ut such attempts to hold defendants responsible for market forces out of their control - and outside of their realm of prediction - cannot succeed."  Defs.' Mot. 21-22 (citing, e.g., First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 1994) ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases.")).

the plaintiffs' claim of conscious misbehavior or recklessness. In determining whether the testimony of confidential witnesses meets the heightened pleading standard of the PSLRA, the Court must examine such factors as "the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." Cal. Publ. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 147 (3d Cir. 2004).

The plaintiffs argue that the testimony of the confidential witnesses here establishes that the defendants "not only had access to information about C-BASS's operating and liquidity problems, but also had direct knowledge of the problems C-BASS was facing during the period." Pls.' Opp. 28. CW 1, a former C-BASS employee, "confirmed" that "Radian" knew about loans in C-BASS's portfolio and maintained a systematic process for monitoring instances when borrowers defaulted on mortgage loans. CW 4, a former Radian Guaranty Vice President, stated that "senior members" of Radian's management personally witnessed a higher rate of loan delinquencies. CW 5, another former Radian Guaranty Vice President, "verified" that Radian was aware that C-BASS faced an increasingly difficult operating environment. See id. (citing CCAC ¶¶ 84-86).

This testimony does not establish that the defendants knew or must have known that their statements presented a danger of misleading buyers or sellers.  At best, this testimony only further establishes the declining conditions at C-BASS and in the market generally.  Although part of the testimony is that "senior members" of Radian's management personally witnessed a higher rate of loan delinquencies, such an allegation does not establish with specificity what the defendants knew at the times that they made particular statements.

In addition, none of these witnesses was an employee of Radian Group, Inc. - each was either a former employee of C-BASS or Radian Guaranty, a Radian subsidiary.  Although the CCAC asserts that each witness "served in positions at Radian or C-BASS which provided them with access to the information they are alleged to possess," none establishes what Ibrahim, Casale, or Quint knew at the particular times when they made particular statements, and, as the defendants point out, none states that he or she was in a position to know anything about Radian's accounting for its C-BASS investment.  See CCAC ¶ 27; Defs.' Mot. 31-32; see also Chubb, 394 F.3d at 149 (noting that the court should not be "left to speculate whether the anonymous sources obtained the information they purport to possess by firsthand

knowledge or rumor").[26]  This alleged testimony is thus insufficient to support the plaintiffs' theory of recklessness.

Finally, the mere representation that a filing was prepared in compliance with GAAP does not imply culpability. Rather, to create a strong inference of scienter, a GAAP violation must be accompanied by something more - i.e., evidence of reckless or conscious misbehavior on the defendants' part in committing the violation.  See In re Suprema, 438 F.3d at 280; In re Burlington Coat, 144 F.3d at 1421-22; see also Greebel, 194 F.3d at 203; In re Intelligroup, 527 F. Supp. 2d at 286.

Similarly, courts addressing the issue of whether SOX certifications contribute to scienter have found that SOX certifications themselves are not actionable, and that to support an inference of scienter, something more is needed.  See Zucco Partners, LLC v. Digimarc Corp., No. 06-35758, 2009 WL 311070, at *18 (9th Cir. Feb. 10, 2009); Garfield v. NDC Health Corp., 466 F.3d 1255, 1265-66 (11th Cir. 2006) (finding a SOX certification probative of scienter only if plaintiffs show that the person signing the certification was "severely reckless" in certifying the accuracy of its financial statements); In re Intelligroup,

---

[26] In addition, none of the plaintiffs' confidential witnesses offers information to suggest that the margin calls received by C-BASS were of such a magnitude that an impairment was required before July 30, 2007, under the relevant accounting principles.  Indeed, only one of the witnesses even mentions margin calls, and in doing so fails to state when C-BASS received such calls and in what amount.  See CCAC ¶ 92.

527 F. Supp. 2d at 356-57 (stating that SOX certifications establish scienter only if the complaint asserts facts indicating that, at the time of certification, the defendants actually knew or at least turned a "blind eye" to information indicating that the certifications were erroneous).

To the extent that allegations regarding GAAP or SOX certifications can support a strong inference of scienter, they do not do so in this case.  The Court has concluded that the defendants have not presented allegations to support an inference of conscious misbehavior or recklessness.  Nothing in the CCAC otherwise specifically suggests that the defendants knew or turned a "blind eye" to the fact that Radian's accounting or disclosure practices were insufficient or that the boilerplate certifications signed by the defendants were actually erroneous. The mere fact that the defendants signed GAAP and SOX certifications, accordingly, does not support the plaintiffs' claim that the defendants knew or must have known that their actions presented a danger of misleading buyers or sellers.

c.   <u>Reliance on After-the-Fact Evidence</u>

The plaintiffs' allegations regarding the size of the eventual impairment, Casale's resignation from Radian, and Deloitte's decision not to stand for reappointment as Radian's

auditor also do not support the plaintiffs' theory of conscious misbehavior or recklessness.

First, the plaintiffs argue that the size of the eventual impairment charge "alone" supports an inference that the defendants knew a problem was "brewing" and thus contributes to a strong inference of scienter. Pls.' Opp. 30. "Such assets," they state, "do not go from being unimpaired to fully impaired overnight." Id. at 15. Given the plausible inferences the defendants have offered, which are drawn from public documents, the Court disagrees. The CCAC itself acknowledges C-BASS's statement that it met $260 million of margin calls in the first twenty-four days of July alone, and that it was only at the end of July, when C-BASS received an "unprecedented" number of margin calls, that it no longer possessed the liquidity to make ends meet. The plaintiffs have not argued that this statement by C-BASS was false.

In addition, both Radian and MGIC provided an additional $50 million to C-BASS in mid-July 2007. As the defendants argue, if Radian and MGIC had indeed known the size of the losses they had already sustained as a result of their respective investments in C-BASS, it makes little sense to suggest that they would have further provided additional funds, particularly in the form of an unsecured credit facility.

With respect to Casale's resignation, the plaintiffs raise this issue for the first time in their opposition, the CCAC containing no such allegations.[27]  This resignation, however, as demonstrated by documents of public record, took place on October 30, 2007, approximately three months after the end of the class period.  The plaintiffs seem to suggest that the timing of Casale's departure is suspicious.  However, it is unclear, and the plaintiffs have provided no allegations or evidence to suggest, that the resignation was at all related to any fraudulent conduct on Casale's part or on the part of Radian or the other defendants.

Absent any allegations linking the resignation to the alleged fraud, Casale's resignation does not reveal anything about the defendants' knowledge or mental states during the class period, and thus does not support an inference of conscious misbehavior or recklessness.  Accord Abrams v. Baker Hughes Inc., 292 F.3d 424, 434 (5th Cir. 2002); In re Stonepath, 2006 WL 890767, at *16; In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 448 (S.D.N.Y. 2005); In re Interpool, Inc. Sec. Litig., No. 04-321, 2005 WL 2000237, at *17 (D.N.J. Aug. 17, 2005) (citing The Great

---

[27] The plaintiffs state in their opposition that "the fact that Defendant Casale left Radian, coupled with Deloitte's voluntarily resigning after Radian filed its June 30, 2007 Form 10-Q, add to the overall pleading of circumstantial evidence of fraud."  Pls.' Opp. 32 (internal citation and quotation marks omitted).  There are no additional statements or allegations regarding Casale's departure.

<u>Atl. & Pac. Tea Co., Inc. Sec. Litig.</u>, 103 F. App'x 465, 470 (3d Cir. 2004) (non-precedential)).

Deloitte's decision to decline reappointment as Radian's auditor is also not evidence of conscious misbehavior or recklessness.  As the defendants point out, other courts have found resignations of auditors insufficient to support an inference of scienter, in the absence of allegations linking the resignation to an alleged fraud.  <u>See, e.g.</u>, <u>Zucco Partners</u>, 2009 WL 311070, at *16; <u>In re Intelligroup</u>, 527 F. Supp. 2d at 348-49.

The plaintiffs here do not provide any information to suggest that Deloitte declined to stand for reappointment because of accounting irregularities or other conscious misbehavior or reckless conduct on Radian's part, other than the fact that Radian filed its Form 10-Q for the second quarter of 2007 before Deloitte had completed its review of the relevant interim financial statements.  However, even after taking additional time to investigate the timing of the C-BASS impairment charge, Deloitte did not require Radian to file an amended 10-Q. Instead, it wrote a letter on behalf of Radian, in which it did not disagree with Radian's amended 10-Q.[28]

---

[28] The plaintiffs state that a plausible inference from Deloitte's decision to decline reappointment is that it "questioned the integrity of Radian's accounting practices." Pls.' Opp. 38.  However, they also argue that "[e]ven if Deloitte actually did agree that Radian's investment in C-BASS was not impaired until July 2007, an auditor's unqualified opinion does not necessarily exonerate a company."  <u>Id.</u> 38 n.5.  The Court

The defendants also offer a plausible nonculpable explanation for the end of the relationship between Deloitte and Radian.  The announcement that Deloitte would not stand for reappointment was made on October 2, 2007, in a Form 8-K filed with the SEC.  That filing stated that Deloitte's engagement with Radian "had been expected to terminate on or about the filing of the Company's Quarterly Report on Form 10-Q for the third quarter of 2007 . . . had the Company completed its merger with MGIC. . . ."  That the merger would not occur was announced on September 5, 2007; Deloitte declined to stand for reappointment on September 26, 2007, a fact which Radian announced in its Form 8-K filed October 2, 2007.  The Court finds that the timing of these events is further consistent with the theory of the case and the inferences proposed by the defendants, rather than a strong inference of scienter.

The standard for "conscious misbehavior or recklessness" requires misrepresentations to be "so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception." In re Digital Island, 357 F.3d at 332.  In view of this stringent standard, the CCAC's failure to allege specific facts

declines to draw the inference suggested by the plaintiffs with regard to Deloitte's resignation while at the same time ignoring the fact that Deloitte did not require further amendment to Radian's SEC filings.  The plaintiffs may not have it both ways.

constituting strong circumstantial evidence of an "extreme departure" from the standards of ordinary care, and the plausible nonculpable inferences suggested by the defendants, the Court concludes that the plaintiffs have not ~~established~~ carried their burden under the PSLRA by showing conscious misbehavior or recklessness.  Because the CCAC also fails to establish motive and opportunity, the plaintiffs have not satisfied their burden of raising a strong inference of scienter.  Their § 10(b) claim will therefore be dismissed.

        B.    Section 20(a) Claim

        Section 20(a) of the Securities and Exchange Act imposes joint and several liability on any person who controls any person liable under any provision of the Exchange Act.  In re Alpharma, 372 F.3d at 153.  Thus, a necessary predicate for § 20(a) liability is an independent violation of the federal securities laws.  Accordingly, in this case, if there is no § 10(b) liability for Radian, there is also no § 20(a) liability for the individual defendants.  Because the Court has found that the plaintiffs have not stated a claim under § 10(b), there is also no § 20(a) violation, and this claim will be dismissed.

IV.  Conclusion

The plaintiffs have not met their burden under the PSLRA of alleging a strong inference of scienter.  The allegations of the CCAC, taken collectively, do not establish that the defendants had the motive and opportunity to engage in securities fraud or that they engaged in conscious misbehavior or recklessness.

Moreover, the defendants have offered plausible nonculpable explanations for, among other things, the timing of the C-BASS write-down, the stock sales made by the defendants, and Deloitte's decision not to stand for reappointment.  These explanations are consistent with the documents of public record of which the Court has taken notice, and are more compelling than the alternative explanations offered by the plaintiffs.[29]

The plaintiffs' inference of scienter is neither cogent, nor compelling, nor strong in light of competing inferences, and a reasonable person would not deem the inference of scienter cogent and at least as compelling as any nonculpable

---

[29] Because the public documents of which the Court has taken notice include filings not only by Radian, but also by C-BASS, MGIC, Deloitte, and PricewaterhouseCoopers, the plaintiffs' theory of the case would only be plausible if each of these parties was somehow "in on" or contributed to Radian's fraud. The plaintiffs have not made such allegations, and the Court declines to make such a finding on its own on the basis of the plaintiffs' allegations or the evidence offered by the defendants.

inference.  Accordingly, the plaintiffs have not satisfied the requirements of <u>Tellabs</u> and the PSLRA, and the CCAC is dismissed.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re RADIAN SECURITIES         :   CIVIL ACTION
LITIGATION                      :
                                :   NO. 07-3375
This document relates to:       :
All Actions                     :   MASTER FILE

ORDER

AND NOW, this 9th day of April, 2009, upon
consideration of the defendants' Motion to Dismiss the
Consolidated Class Action Complaint (Docket No. 33), the
plaintiffs' opposition and the defendants' reply thereto, as well
as the supplemental authorities submitted by the parties, and
upon further consideration of the arguments made by the parties
at oral argument on December 19, 2008, IT IS HEREBY ORDERED that,
for the reasons stated in the accompanying memorandum of law, the
defendants' motion is GRANTED, and this case is DISMISSED.

BY THE COURT:

/s/ Mary A. McLaughlin
MARY A. McLAUGHLIN, J.