UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re RADIAN SECURITIES LITIGATION | ) | Master File No. 2:07-cv-03375-MAM |
| | ) | |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) | |
| | ) | |
| ALL ACTIONS. | ) | |
| | ) | |

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT .................................................................................1

II. NEW ALLEGATIONS IN THE AMENDED COMPLAINT .......................................4

    A.  Allegations from Confidential Witnesses .........................................................5

    B.  Allegations Concerning C-BASS's Ability to Survive the Adverse
        Conditions in the Subprime Market ..................................................................6

    C.  Additional Allegations Demonstrating Defendants' Motive.................................8

    D.  Additional Insider Trading Allegations .............................................................9

III. ARGUMENT ......................................................................................................10

    A.  Applicable Legal Standard .............................................................................10

    B.  The Amended Complaint Raises a Strong Inference of Scienter .........................11

    C.  The Amended Complaint Sufficiently Alleges Actionable
        Misrepresentations and Omissions and Alleges Fraud with Particularity ............27

    D.  The Amended Complaint Adequately Alleges a Claim for Control Person
        Liability Under Section 20(a) ..........................................................................28

IV. CONCLUSION ....................................................................................................29

# TABLE OF AUTHORITIES

Page

CASES

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
  554 F.3d 342 (3d Cir. 2009) ............................................................................12

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................10

*City of Hialeah Emples. Ret. Sys. & Laborers Pension
  Trust Funds for N. Cal. v. Toll Bros. Inc.*,
  No. 07-1513, 2008 U.S. Dist. LEXIS 66906
  (E.D. Pa. Sept. 2, 2008) ..................................................................................28

*DeBenedictis v. Merrill Lynch & Co.*,
  492 F.3d 209 (3d Cir. 2007) ...........................................................................10

*EP Medsystems, Inc. v. Echocath, Inc.*,
  235 F.3d 865 (3d Cir. 2000) ...........................................................................28

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir. 2004) ...........................................................................24

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999) ...........................................................................14

*In re Allied Prods. Corp. Inc. Sec. Litig.*,
  No. 99 C 3597 (HDL), 2000 U.S. Dist. LEXIS 16781
  (N.D. Ill. Nov. 15, 2000) ................................................................................20

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002).........................................................................24, 25

*In re Cell Pathways, Inc. Sec. Litig.*,
  No. 99-752, 2000 U.S. Dist. LEXIS 8584
  (E.D. Pa. June 21, 2000)..................................................................................19

*In re JPMorgan Chase & Co. Sec. Litig.*,
  MDL No. 1783, 2007 U.S. Dist. LEXIS 93877
  (N.D. Ill. Dec. 18, 2007).................................................................................25

*In re Loewen Group Inc. Sec. Litig.*,
  No. 98-6740, 2004 U.S. Dist. LEXIS 16601
  (E.D. Pa. Aug. 18, 2004) .................................................................................20

*In re MoneyGram Int'l, Inc. Sec. Litig.*,
  626 F. Supp. 2d 947 (D. Minn. 2009) .............................................................18

**Page**

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ......................................................................27

*In re Par Pharm. Sec. Litig.,*
   No. 06-03226 (PGS), 2009 U.S. Dist. LEXIS 90602
   (D. N.J. Sept. 30, 2009) ................................................................................20

*In re Radian Sec. Litig.,*
   612 F. Supp. 2d 594 (E.D. Pa. 2009).................................................... 2, 3, 19, 27

*In re RAIT Fin. Trust Sec. Litig.*,
   No 2:07-cv-03148-LDD, 2008 U.S. Dist. LEXIS 103549
   (E.D. Pa. Dec. 22, 2008).............................................................. 11, 21, 22

*In re Revlon, Inc. Sec. Litig.,*
   No. 99 Civ. 10192 (SHS), 2001 U.S. Dist. LEXIS 3265
   (S.D.N.Y. March 27, 2001) ............................................................................20

*In re Scholastic Corp. Sec. Litig.,*
   252 F.3d 63 (2d Cir. 2001) ............................................................................16

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006) ................................................................ 14, 26, 29

*In re Tel-Save Sec. Litig.,*
   No. 98-CV-3145, 1999 U.S. Dist. LEXIS 16800
   (E.D. Pa. Oct. 19, 1999) ...............................................................................19

*In re Unisys Corp. Sec. Litig*.,
   No. 99-5333, 2000 U.S. Dist. LEXIS 13500
   (E.D. Pa. Sept. 21, 2000) .........................................................................11, 26

*In re Van Der Moolen Holding N.V. Sec. Litig*.,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005) ..............................................................18

*In re Viropharma, Inc., Sec. Litig.*,
   No. 02-1627, 2003 U.S. Dist. LEXIS 5623
   (E.D. Pa. Apr. 7, 2003) .................................................................................15

*Institutional Investors Group v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ("*Avaya*")..........................................................*passim*

*Katz v. Image Innovations Holdings, Inc.*,
   542 F. Supp. 2d 269 (S.D.N.Y. 2008) ..............................................................17

**Page**

*Semerenko v. Cendant Corp.*,
  223 F.3d 165 (3d Cir. 2000) ..............................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ("*Tellabs*") ..................................................... 11, 12, 27

*Weiner v. Quaker Oats Co.*,
  129 F.3d 310 (3d Cir. 1997) ..............................................................................11

STATUTES, RULES AND REGULATIONS

15 U.S.C.
  §78u-4 ..........................................................................................................*passim*

17 C.F.R.
  §240.10b-5 .................................................................................... 4, 11, 29

Federal Rules of Civil Procedure
  Rule 9(b) ....................................................................................... 10, 28
  Rule 10(c) ...............................................................................................27

Pennsylvania Rules of Professional Conduct
  Rule 4.2 .................................................................................................21

Lead Plaintiffs Iron Workers Local No. 25 Pension Fund and City of Ann Arbor Employees' Retirement System (collectively, the "Lead Plaintiffs" or the "Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' Radian Group Inc. ("Radian" or the "Company"), S.A. Ibrahim ("Ibrahim"), C. Robert Quint ("Quint") and Mark A. Casale ("Casale") motion to dismiss the Consolidated Amended Class Action Complaint (the "Amended Complaint"), dated July 10, 2009.

## I.    PRELIMINARY STATEMENT

This is a securities class action brought on behalf of purchasers of Radian common stock between January 23, 2007 and August 7, 2007 (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  In short, Plaintiffs allege that Defendants made materially false and misleading statements regarding Radian's $500 million investment in Credit Based Asset Servicing and Securitization LLC ("C-BASS") and that this deception caused Radian's shares to lose 36% of their value when Radian finally revealed that its entire investment in C-BASS would have to be written down.

In response to the Court's April 9, 2009 Memorandum and Order (the "Order") granting Defendants' Motion to Dismiss the Consolidated Class Action Complaint ("First Complaint"), Plaintiffs have added over 20 pages of primarily new factually specific allegations to the Amended Complaint.  These allegations raise a strong inference that Defendants knowingly made false statements and omissions about C-BASS's liquidity, declining asset value and ability to survive the worsening subprime mortgage environment.

Plaintiffs have strengthened their allegations that Defendants' failure to disclose information about C-BASS's financial condition was an extreme departure from the standards of ordinary care constituting recklessness.  The Amended Complaint alleges that Defendants could not have been oblivious that the combination of: (i) C-BASS's business model of deliberately investing in high-

risk, low quality subprime loans and using those loans as collateral for bank financing; (ii) the adverse effect of the subprime market on the quality and performance of C-BASS's loan portfolio; (iii) C-BASS's declining liquidity and cash flow; and (iv) C-BASS's increasing margin calls, made it simply impossible for C-BASS to survive the subprime mortgage crisis. Defendants also could not have been ignorant of the fact that C-BASS's deterioration and failure was other than a temporary loss for Radian and would require the Company to write off the value of its investment in C-BASS.

In response to the Court's concern that the First Complaint did not allege "that the defendants knew of any accounting irregularities at C-BASS or that C-BASS's own representations that it was meeting margin calls in the regular course of business were false" (*In re Radian Sec. Litig.,* 612 F. Supp. 2d 594, 616 (E.D. Pa. 2009)), the Amended Complaint clarifies that it was not Radian's failure to disclose C-BASS's accounting irregularities or C-BASS's failure to make payments on past margin calls that constituted Defendants' reckless or conscious misbehavior, but Defendants' failure to reveal, as soon as it became obvious at the beginning of 2007, that C-BASS's business was devastated by the subprime mortgage crisis which exposed C-BASS to enormous amounts of continuous margin calls that it would not be able to pay. Accordingly, it is of no moment that C-BASS was able to scrape enough cash to meet the $290 million in margin calls by exhausting all of its resources during the first six months of 2007, because Defendants knew that, as C-BASS's loan portfolio continued to decline in value, C-BASS would continue to receive more frequent and increasing margin calls which it did not have the liquidity or cash resources to satisfy. In other words, at the start of the Class Period, Defendants knew that C-BASS's "house of cards" was doomed to fall.

Defendants' knowledge is corroborated by new information from several confidential witnesses, including a former member of Radian's management team, who explained that executives at Radian (including Defendants Ibrahim, Quint and Casale) met regularly during the Class Period to

discuss C-BASS.  ¶130.[1]  According to the witness, the Defendants were "familiar with what C-BASS was doing and why they were doing it."  *Id.*  Defendants Quint and Casale were especially knowledgeable about C-BASS because they sat on C-BASS's Board of Members.  ¶¶132-133.  The witness also confirmed that Defendants received quarterly reports and monthly earning reports for C-BASS and that there were executive management calls that occurred twice per month among C-BASS, Radian and MGIC Investment Corporation ("MGIC").[2]  ¶130.

Other former Radian or C-BASS employees described the declining value of C-BASS's loan portfolio and noted that Defendants had direct knowledge about the loans in C-BASS's portfolio because Radian provided mortgage insurance on those loans and maintained a systematic process for monitoring instances when borrowers defaulted.  ¶¶105-109, 112, 114.  The confidential witnesses also explained that Defendants knew that, by early 2007, the situation was "dire" for C-BASS because there were so many defaulted loans in C-BASS's loan portfolio and Defendants knew that C-BASS would not be able to survive the increasing margin calls because it did not have enough liquidity in its reserves to pay them all.  ¶¶113, 123.  The declining cash flow resulting from non-performing loans, made it a certainty that C-BASS could not replenish the reserves.

In addition to the new scienter allegations demonstrating Defendants' actual knowledge or severe recklessness, the Amended Complaint further alleges that Defendants were motivated to conceal the truth about C-BASS's failing business because the sale of C-BASS was a condition to a merger between Radian and MGIC.  The Amended Complaint now alleges that Defendants' motive to merge with MGIC was distinctively unique to Radian because Radian itself desperately sought to

---

[1]     "¶__" refers to paragraphs of the Amended Complaint.

[2]     On May 22, 2008, a similar class action complaint was filed against MGIC and several of its executives, as well as several C-BASS executives, in the United States District Court for the Eastern District of Wisconsin for violations of Sections 10(b) and 20(a) of the Exchange Act.  ¶214.

reinforce its capital base to satisfy an increase in mortgage insurance claims resulting from rising default rates of the subprime loans the Company insured. The Amended Complaint also identifies the concrete and personal benefit to Defendants Ibrahim and Casale of gaining lucrative and esteemed positions as Chief Executive Officer ("CEO") and Head of the Capital Markets division of what would be the largest mortgage insurance company in the United States. The dire state of the mortgage market and, specifically, the expectation in the market in early 2007 that without capital infusion, Radian itself may collapse, made those positions at the merged entity even more significant for Defendants.

Finally, the Amended Complaint adds specific facts regarding insider trading. These allegations make clear that the insider trading was unusual and suspicious because it occurred within a three month period, at high prices, exceeding more than 56% of the stock sale proceeds received during the prior year and were substantial relative to the insiders' compensation for 2007.

Taken collectively, all of the facts alleged give rise to a cogent inference of scienter that is at least as strong as any opposing inference offered by the Defendants. Accordingly, it is respectfully submitted that the Amended Complaint remedies the deficiencies noted in the Order and sufficiently alleges claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## II.    NEW ALLEGATIONS IN THE AMENDED COMPLAINT[3]

In addition to the allegations already described in the First Complaint, the Amended Complaint adds new detailed allegations of Defendants' scienter in concealing C-BASS's financial

---

[3]    Because the Court is already familiar with the facts of this case (as detailed in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint, filed on July 25, 2008 ("OppMTD I") at 3-8), for purposes of brevity, Plaintiffs will summarize only the new allegations in the Amended Complaint.

condition and misrepresenting C-BASS's ability to survive the downturn in the subprime mortgage market.

### A.    Allegations from Confidential Witnesses

The Amended Complaint sets forth detailed additional facts provided by several former Radian and C-BASS employees that support a strong inference of Defendants' scienter. As alleged by Confidential Witness 6 ("CW 6"), former Executive Vice President of Human Resources at Radian, Defendants were "familiar with what C-BASS was doing and why they were doing it." ¶130. CW 6 explained that "C-BASS and C-BASS's financials were routine topics in Radian's executive meetings" and Defendants regularly received information about C-BASS in connection with Radian's quarterly financial forecasts and budget updates. *Id.* The discussions regarding C-BASS became more frequent at the beginning of the Class Period when Radian announced the merger with MGIC and, during that time, Radian's executive team meetings were "almost exclusively focused on . . . Radian's ownership of C-BASS and how that impacted the merger." ¶131. Defendants also received monthly earnings reports for C-BASS and participated in bi-monthly executive management calls with C-BASS and MGIC. ¶130. Moreover, two of the highest level executives at Radian, Defendants Quint and Casale, sat on C-BASS's Board of Members, which gave them direct access to undisclosed information about C-BASS and its business. ¶133.

The new allegations supplied by the confidential witnesses also demonstrate that Defendants knew, or were extremely reckless in ignoring, that C-BASS's loan portfolio was performing poorly by the start of the Class Period and that, as a result, it would be impossible for C-BASS to withstand the declining conditions in the subprime mortgage market. For example, according to CW 2, a former C-BASS loan Underwriting Analyst who specialized in evaluating the quality of loans that C-BASS acquired, and several other former C-BASS employees, C-BASS purchased loans from the very same loan originators that were severely affected by the downturn in the subprime market,

including Ameriquest Mortgage Co., Fremont General Corp., Countrywide Financial Corp., New Century Financial Corp., HSBC Mortgage Services, American Home Mortgage, Bear Stearns Mortgage, Wells Fargo, Delta Financial Corp., Option One Mortgage Corp., Accredited Home Lenders Holding Co., IndyMac Bank and Ownit Mortgage Solutions. ¶¶92, 96, 101-102. CW 8, a former Assistant Vice President of C-BASS's credit surveillance department, confirmed that the number of defaulting loans in C-BASS's portfolio were "definitely increasing" around December 2006 and 2007. ¶106. CW 7, a former Senior Forensic Underwriting Analyst at C-BASS, stated that by, December 2006, the "fraud aspect" of C-BASS's loan portfolio "went off the wall" and that approximately 75% of the defaulting loans in C-BASS's portfolio were fraudulent loans that contained fabricated or exaggerated information. ¶108. According to CW 7, once C-BASS started receiving an increasing amount of margin calls, it was known that C-BASS would be unable to meet them all because it did not have sufficient liquidity in its reserves. ¶123. CW 4, a former Radian Vice President, confirmed that senior members of Radian's management knew that, by the start of the Class Period, the situation was dire for C-BASS because there were so many defaulted loans in C-BASS's loan portfolio.

### B. Allegations Concerning C-BASS's Ability to Survive the Adverse Conditions in the Subprime Market

The Amended Complaint also clarifies that, given the circumstances of C-BASS's business and the failing subprime market, Defendants' misrepresentations regarding C-BASS's stability amounted to an extreme departure from the standards of ordinary care. As alleged in the Amended Complaint, by the start of 2007, C-BASS was experiencing significant problems as unfolding economic events caused C-BASS's core assets – collateralized subprime mortgages – to decline in value at increasing rates. ¶¶3, 74, 105-106. To make matters worse, most of the loans in C-BASS's portfolio were fraudulent loans that were issued to borrowers that did not meet the maximum debt-to-income ratio purportedly required by the lender and did not have the income or assets required by

the disclosed guidelines necessary to afford the required mortgage loan payments.  ¶¶3, 107-109.

Although these bad loans failed to meet investor guidelines and were rejected by C-BASS's own

underwriting loan analysts, the loans were included in loan pools that were securitized by C-BASS

and used as collateral for its bank financing.  ¶119.

C-BASS's business model of deliberately taking a first-loss position in high-risk, low quality

subprime loans and using those loans as collateral for bank financing was not well-suited for the

impending crash in the subprime market.  ¶¶68, 70, 72-74.  As a result of the unfolding economic

events, by the start of the Class Period, C-BASS was subject to significant liquidity risk and margin

calls, as its assets had declined so much in value that lenders sought repayment on the financing

collateralized by C-BASS's subprime assets.  ¶¶74-75, 123, 125.  Once the margin calls started

rolling in during the first few months of 2007, it became apparent to Defendants that there was no

possible way that C-BASS would survive the continuing margin calls because of the highly

leveraged nature of C-BASS's business and the lack of liquidity in C-BASS's reserves - *i.e.,* only

$302 million at the start of the Class Period.  ¶¶123, 204.  As a result, the margin calls were a death

knell to C-BASS because C-BASS was forced to deplete its entire liquidity to pay off the increasing

margin calls while, at the same time, having little to no cash flow.  ¶¶72-75, 125, 136-138.  No

reasonable person with knowledge of C-BASS's business and financials could reasonably believe

that a business model based entirely on satisfying margin calls without incoming cash flow can

survive more than a couple of months.

In the face of overwhelming evidence that the subprime mortgage market was in trouble and

that C-BASS's business model essentially guaranteed that it would not survive the downturn - *i.e.,*

(i) the collapse in housing prices; (ii) the increase in mortgage defaults; (iii) severe financial

difficulties experienced by the mortgage originators who sold C-BASS its subprime loans; (iv) the

fraudulent loans in C-BASS's portfolio; (v) news reports revealing a trend of rising delinquency

rates on home loans and foreclosures; (vi) the downgrading of C-BASS's securitizations by rating agencies; (vii) an increase in investor rejections of loans that C-BASS sought to securitize; and (viii) C-BASS's receipt of hundreds of millions of dollars of margin calls – Defendants failed to disclose C-BASS's liquidity and cash flow problems and misrepresented C-BASS's ability to survive the effects of the collapsing economic climate. ¶¶76-96, 98-99, 101-104,108-109, 115, 119, 123, 125, 136, 166.

### C.    Additional Allegations Demonstrating Defendants' Motive

The Amended Complaint adds additional allegations regarding Defendants' motive to conceal C-BASS's financial and liquidity problems in order to sell C-BASS as part of Radian's merger transaction with MGIC. In particular, the Amended Complaint now alleges that Radian and MGIC were eager to merge their operations in order to strengthen their capital base. ¶6. In 2005 and 2006, Radian and MGIC had insured numerous subprime mortgage loans. ¶¶6, 114. By the start of the Class Period, these loans were defaulting at increasing rates and it was clear to both companies that they would require additional capital to satisfy a substantial increase in claims. ¶6. The consolidation of the companies' ownership in C-BASS, however, would negatively impact the balance sheet of the combined entity because it would be forced to recognize C-BASS's massive debt. ¶145. Therefore, as a condition to the merger, Radian and MGIC agreed to sell a portion of their joint interests in C-BASS so that the merged company would hold less than a 50% interest in C-BASS. *Id.*

The Amended Complaint further alleges that Defendants Ibrahim and Casale were especially incentivized to conceal information regarding C-BASS in order to consummate the merger with MGIC because they both had a strong stake in the new, larger mortgage insurance company. ¶225. As Radian announced in a press release issued on February 6, 2007, Defendant Ibrahim was to serve as CEO of the merged company and Defendant Casale was to assume responsibility as Head of

Capital Markets. *Id.* These executive and senior management positions at the new mortgage insurance giant would have offered Defendants pecuniary benefit as well as significant industry recognition in what was to become the largest mortgage insurance company in the United States. *Id.* These positions were particularly important to Defendants Ibrahim and Casale because, in light of the mortgage market and Radian's need for capital infusion, it was unclear how much longer Defendants' positions at Radian would exist.

Defendants were thus motivated to conceal C-BASS's liquidity problems for as long as possible in order to sell Radian's interest in C-BASS to unwitting investors so that Radian would be infused with much needed capital and Defendants Ibrahim and Casale would personally profit from their positions at the merged entity. ¶¶6, 224-225. In fact, in order to help C-BASS stay artificially afloat, Radian and MGIC each provided C-BASS with a $50 million unsecured credit facility. ¶142. Defendants were so desperate to sell C-BASS that, around May or June of 2007, when it became apparent that Radian would not get the price they wanted for C-BASS, Defendants were willing to sell C-BASS for any price. ¶146. Eventually, when Defendants were forced to reveal the truth about C-BASS and its liquidity problems, Radian was unable to unload its interest in C-BASS and, as a result, on August 7, 2007, MGIC announced that it was not required to complete its pending merger with Radian. ¶¶207-208.

### D. Additional Insider Trading Allegations

The Amended Complaint adds the following new facts regarding the suspicious trading of Radian insiders:

- The high-level positions of non-defendant Radian insiders, including John Calamari, who served as Senior Vice President, Corporate Controller for Radian and sold 95% of his holdings during the Class Period and Roy Kasmar, who served as President and Head of International Mortgage and Strategic Initiatives of Radian and sold 39% of his Radian common stock holdings during the Class Period. ¶223(a).

- The amount of common stock holdings that the insiders retained at the end of the Class Period. ¶222.

- The substantial proceeds of the insider stock sales relative to the insiders' compensation for 2007, including Defendant Quint's proceeds of $8,105,070 compared to his salary of $370,000 and Defendant Ibrahim's proceeds of $384,162 compared to his salary of $791,346. ¶223(c).

## III.    ARGUMENT[4]

### A.    Applicable Legal Standard

In ruling on a motion to dismiss, a court must view the facts alleged in the complaint in the light most favorable to the plaintiff, assume the truth of the allegations and draw all reasonable inferences in plaintiff's favor. *See DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 215 (3d Cir. 2007). The purpose of a motion to dismiss is not to determine "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000). Consequently, "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007).

Securities fraud actions are subject to the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4, *et seq.*, and Federal Rule of Civil Procedure 9(b), which require plaintiffs to identify "with particularity" the circumstances constituting the alleged fraud. To satisfy the particularity requirement, the complaint must: (1) "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the

---

[4]    Citations and internal quotations are omitted, and emphasis is added, unless otherwise noted.

required state of mind." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252-53 (3d Cir. 2009) ("*Avaya*"). Even in light of these heightened pleading standards, however, a plaintiff is still not required to plead "all of the evidence and proof thereunder supporting their claim." *In re Unisys Corp. Sec. Litig.*, No. 99-5333, 2000 U.S. Dist. LEXIS 13500, at *10 (E.D. Pa. Sept. 21, 2000). As the Third Circuit cautions, "focusing exclusively on the particularity requirement is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 319 (3d Cir. 1997).

**B.    The Amended Complaint Raises a Strong Inference of Scienter**

To state a claim under §10(b) and Rule 10b-5, a plaintiff must allege facts providing a strong inference that the defendants acted with scienter, *i.e.*, a mental state embracing intent to deceive, manipulate or defraud. *See In re RAIT Fin. Trust Sec. Litig.*, No 2:07-cv-03148-LDD, 2008 U.S. Dist. LEXIS 103549, at *42 (E.D. Pa. Dec. 22, 2008). In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ("*Tellabs*"), the Supreme Court provided a three part test for the analysis of scienter on a motion to dismiss, holding that in determining whether a strong inference of scienter has been alleged, a court must: (1) "accept all factual allegations in the complaint as true"; (2) "consider the complaint in its entirety"; and (3) "take into account plausible opposing inference[s]." *Id.* at 322-23. The Court cautioned, however, that "[t]he inference that the defendant acted with scienter need not be irrefutable . . . or even the most plausible of competing inferences." *Id.* at 324. It must merely be "*at least as likely* as any plausible opposing inference." *Id.* at 328 (emphasis in original).

The Third Circuit recently clarified the scienter pleading requirement in light of *Tellabs*, noting that courts must no longer separate their analysis of motive and opportunity from their analysis of conscious misbehavior or recklessness, but must consider motive "along with all the other allegations in the complaint." *Avaya*, 564 F.3d at 277. Indeed, a court must consider "whether

- 11 -

*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 272 (quoting *Tellabs,* 127 S. Ct. at 2509 (emphasis in original)); *see also Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 351 (3d Cir. 2009) (finding scienter after examining the complaint "as a whole"). The analysis must be "case specific" and should "ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya,* 564 F.3d at 269.

Here, the Amended Complaint's allegations, taken as a whole, paint a picture of a strong and compelling inference of scienter that is *at least as likely* as any opposing inference of non-culpable intent. As detailed in the Amended Complaint, Radian needed to sell its interest in C-BASS as part of a merger transaction with MGIC. The Radian-MGIC merger was important for both companies because they urgently needed an infusion of capital to satisfy mounting insurance claims. It was, therefore, essential for Defendants to conceal C-BASS's severe financial and liquidity problems until they sold the entity to third-party investors and finalized the merger with MGIC. Defendants not only concealed C-BASS's problems from the market, but boasted about C-BASS's ability to withstand the subprime mortgage crisis and its "expected [] return to profitability." *See* ¶¶188, 192, 196. Defendants, however, knew what the market did not: that C-BASS held a large number of poorly underwritten and fraudulent loans; that C-BASS was receiving an enormous amount of margin calls throughout the Class Period; and that C-BASS's business model and decrease in asset value made survival impossible. Beginning July 30, 2007, Defendants were forced to reveal that, as a result of C-BASS's "inability to meet an accelerating amount of margin calls, as well as the withdrawal of any potential buyers," Radian's entire investment in C-BASS was materially impaired. ¶207.

Contrary to Defendants' assertion that C-BASS fell victim to an unexpected "tsunami of unprecedented margin calls" that "overwhelmed C-BASS (*see* Def. Mem. at 16),[5] neither the margin calls, nor C-BASS's inability to meet them, was a surprise to Defendants. Defendants knew that C-BASS was severely affected by the subprime mortgage crisis because C-BASS's entire business was based on investing in and repackaging the riskiest subprime loans. These very same assets that plummeted in value as the subprime borrowers defaulted on their loans, served as collateral for C-BASS's financing from banks. The falling value of the subprime collateral C-BASS held on its books triggered a wave of margin calls that hit C-BASS at the start of the Class Period. Throughout 2007, the subprime crisis was getting worse by the month, which meant that C-BASS's assets were further depleting in value and would lead to only more margin calls from lenders that wanted additional cash to compensate for the assets that were quickly becoming worthless. At the same time, C-BASS had very little liquidity to satisfy the margin calls – only $302 million by the start of 2007. Throughout the Class Period, C-BASS exhausted the little liquidity it had by, among other things, paying $290 million in margin calls during the first six months of 2007. Not only did C-BASS use most of the cash resources it had to pay off margin calls, it also had little (if any) cash flow to pay its liabilities because it took a first-loss position in its subprime mortgage backed securities. Under these circumstances, where the value of C-BASS's assets continued to decline, prompting the margin calls to escalate, C-BASS was just barely surviving and Defendants cannot feign surprise that C-BASS did not have sufficient liquidity to withstand additional margin calls or further deterioration in the mortgage market.

---

[5] "Def. Mem. at __" refers to pages of the Memorandum of Law in Support of the Motion to Dismiss the Consolidated Amended Class Action Complaint filed by Defendants on August 24, 2009.

At the very least, Defendants' failure to disclose C-BASS's precarious financial condition and liquidity problems amounted to "an extreme departure from the standards of ordinary care." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006). The fact that it would be only moments before C-BASS – a company with only $302 million in liquidity - would collapse was "so obvious" that Defendants "must have been aware of it." *Id.* A company with such little liquidity and barely any cash flow cannot survive after being hit with $290 million in margin calls received in the first six months of 2007.[6] The subprime crisis was a catastrophic event for C-BASS and the situation was only getting worse. However, rather than disclose C-BASS's dire condition, Defendants led Radian investors to believe that, despite the problems in the subprime mortgage market, C-BASS was performing well and weathering through the storm while knowing that the opposite was true – that C-BASS's business model and investments in bad loans precluded survival. Indeed, while downplaying the effects of the declining mortgage market on C-BASS's business, Defendants falsely and repeatedly claimed that C-BASS was "expected to return to profitability," had "opportunities to purchase mispriced assets," and stood "to benefit from recurring sources of earnings." ¶¶182, 184, 188, 190, 192. Defendants also distinguished C-BASS's purportedly

---

[6]     The blatancy of C-BASS's inability to subsist in an environment of limited liquidity, weakened cash flow and continuing margin calls makes this case factually distinguishable from *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999). In *Advanta*, the plaintiffs brought securities fraud claims against the defendants who allegedly failed to disclose "deterioration in credit quality allegedly caused by [the company's] aggressive efforts to attract new customers." *Id.* at 538. The plaintiffs alleged that they experienced significant losses as a result of defendants' reckless disregard of negative trends in the credit card industry and in the company's customer base. *Id.* at 539. The Third Circuit held that such allegations at most demonstrated that the company "embarked on a business strategy of aggressively recruiting new customers without adequately accounting for the increased risk this endeavor posed." *Id.* at 540. In sharp contrast to *Advanta*, here, it was not Defendants failure to disclose C-BASS's risky business strategy that constituted fraud, but their failure to disclose C-BASS's failing liquidity position and increasing margin calls that made it a certainty that C-BASS would soon collapse. In other words, this was more than just a bad business decision; it was an extreme departure from the standards of ordinary care in failing to see that a company cannot run a business predominantly on paying margin calls.

superior business from those of its failing peers, misleadingly suggesting that C-BASS's loan portfolio continued to be profitable despite the subprime crisis. ¶¶190, 196. Defendants' statements about C-BASS's strength and profitability created a false impression about C-BASS's business that differed materially from the truth. *See In re Viropharma, Inc., Sec. Litig.*, No. 02-1627, 2003 U.S. Dist. LEXIS 5623, at *32 (E.D. Pa. Apr. 7, 2003) (finding a strong and reasonable inference of scienter where defendants were aware of information that contradicted their statements).

The most incriminating statements, however, were made on the July 25, 2007 conference call that Radian held with analysts and investors – just four days prior to Defendants' decision to write down Radian's entire investment in C-BASS as materially impaired. On that call, Defendants were specifically asked if C-BASS was "looking for additional liquidity or . . . experiencing more margin calls." *See* Radian's Second Quarter 2007 Conference Call Transcript (July 25, 2007), attached hereto as Exhibit A. Defendant Quint first tried to avoid the question by responding that "[t]here are a variety of ways that they are working on to improve their liquidity." *Id.* When the analyst pressed further asking, "[i]s there a need for additional liquidity at the moment?" Defendant Casale expressly denied such a need "stating "[w]e said last week *their cash resources are fine at the moment*." *Id.* Later in the call, when another analyst asked whether C-BASS was in a "position right now where they are forced to liquidate some of the[ir] positions" in order to cover margin cost, Defendant Casale responded that "they are not." ¶199. These statements were made in spite of Defendants' access to contradictory information. Specifically, that C-BASS had exhausted its cash resources and liquidity and was continuing to receive enormous amounts of margin calls by the day. In fact, from

July 1 – July 25 alone, C-BASS received $160 million in margin calls.  ¶137.  At no point during the July 25, 2007 conference call, however, did Defendants mention these margin calls.[7]

The temporal proximity of these statements to the disclosure at the end of the Class Period further contributes to a strong inference of scienter.  *See Avaya*, 564 F.3d at 271 (finding that the temporal proximity of the defendant's denials to the release of the Company's disappointing results strengthens the inference of scienter).  C-BASS cannot go from having a sufficient amount of cash resources and not being in a situation where they are forced to liquidate some of their positions, to (***only four days later***) being so impaired that Radian had to write down its entire $500 million investment, without Defendants being extremely reckless in disregarding C-BASS's condition.[8] There simply is no other, more compelling non-fraudulent inference.[9]

The Third Circuit addressed a remarkably similar situation in *Avaya,* where the plaintiffs alleged that while defendants assured investors that there were no significant changes to the company's business pricing environment, defendants knew or recklessly disregarded that there were

---

[7]    Defendants' argument that they disclosed the $290 million in margin calls received between July 26th and July 29th on August 2, 2007 (within the Class Period) misinterprets the allegations in the Amended Complaint.  *See* Def. Mem. at 7.  First, Plaintiffs allege that Defendants failed to disclose the $290 million in margin calls received ***during the first six months*** of the Class Period, as well as the $160 million in margin calls received prior to the July 25, 2007 conference call and not, as Defendants contend, the margin calls received during the last few days in July.  *See* ¶136. Moreover, the fact that Defendants disclosed C-BASS's lack of liquidity and increasing margin calls on August 2, 2007 is irrelevant because the damage had already been done on July 30-31 when the price of Radian stock dropped as a result of Defendants' disclosure that Radian's investment in C-BASS was impaired.

[8]    As alleged in the Amended Complaint, MGIC made the determination to take a material impairment charge for its interest in C-BASS only one day after Defendants' statements regarding C-BASS's cash resources and liquidity position.  ¶206.

[9]    The size of the $500 million impairment eventually taken for Radian's investment in C-BASS was so large that it is simply inconceivable that it occurred entirely within four days.  *See In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 73 (2d Cir. 2001) (finding strong inference of scienter where "the size of the special charge" incurred by the defendant company after the class period was so large it likely did not develop in only one "month, but throughout the class period").

external pressures in the market causing large price discounts.  *Id.* at 268.  Holding that "the totality of the facts alleged by [plaintiffs] establishes a strong inference of scienter" the court noted that "[a]mong the facts alleged by [plaintiffs], ***the most powerful evidence of scienter is the content and context of [defendant's] statements themselves***."  *Id.* at 269 (emphasis added).  As Defendants did here, the defendant in *Avaya* did not simply make inconsistent statements regarding the price discounts, but "explicitly denied" the existence of such discounting by stating that "the pricing environment is not significantly different" and the "market itself has been fairly stable."  *Id.*  Even though the defendant "acknowledged that Avaya inhabited a competitive industry and offered discounts to some customers" the fact that the defendant denied "that Avaya engaged in massive discounting on an unusually large scale during the class period" supported a strong inference of scienter and showed that defendants were more than just "ignorant of the facts that made their statements false."  *Id.* at 270.  The Court further noted, that "[e]ven if [the defendant was] not aware of the full extent of the unusual discounting . . . he might be culpable as long as what he knew made obvious the risk that his confident, unhedged denials of unusual discounting would mislead investors."  *Id.*  The same analysis applies here where Defendants explicitly denied C-BASS's liquidity problems.[10]

Throughout the Class Period, Defendants were confronted with numerous red flags that demonstrated that the value of C-BASS's assets in its loan portfolio were deteriorating.  *See Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 275 (S.D.N.Y. 2008) (finding a strong

---

[10]    Defendants weakly attempt to distinguishing *Avaya* by arguing, that "here, none of the CWs provide any specific information as to contradictions between Radian's practices and their public statements."  Def. Mem. at 16.  However, the issue is not whether Defendants' statements contradicted Radian's practices, but whether Defendants' statements contradicted what was really happening at C-BASS.  The Amended Complaint provides specific allegations that while Defendants falsely portrayed C-BASS to be sufficiently stable to withstand the subprime mortgage crisis, in reality, C-BASS's assets were quickly becoming worthless and it was receiving margin calls that it was struggling to repay.

inference of scienter where "allegations in the complaint [went] well beyond simply alleging violations of accounting principles, but instead point to red flags that alerted or should have alerted [defendants], absent recklessness, to the [fraud]"); *In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 406 (S.D.N.Y. 2005) (scienter was adequately established where the complaint alleged that defendants ignored red flags).  At the very least, Defendants knew or had access to the following information:

- The collapse of housing prices and increased interest rates, which led to an increase in mortgage defaults in the residential mortgage market, particularly for subprime mortgage loans.  ¶¶76-86, 99, 106;

- Well publicized news reports that revealed a trend of rising delinquency rates on home loans and foreclosures.  ¶¶87-91, 94;

- The loans in C-BASS's portfolio were purchased from loan originators that were quickly going out of business in late 2006 and 2007.  ¶¶92-96, 101-104;

- C-BASS experienced an increase in investor rejections of loans that it sought to securitize, indicating that C-BASS was consistently purchasing loans that failed to meet accepted underwriting standards and investor guidelines.  ¶¶99, 108-109, 119;

- In March 2007, C-BASS's securitizations were downgraded by Fitch Ratings.  ¶¶115, 166;

- C-BASS received margin calls for hundreds of millions of dollars in the first few months of the Class Period, which further indicated that C-BASS's loan portfolio was impaired.  ¶¶123, 125, 136; and

- C-BASS's desperate need for cash to cover its escalating margin calls that prompted Radian to provide C-BASS with a $50 million credit facility.  ¶142.

In the face of these red flags that warned Defendants of the risks presented by the subprime market and threatened C-BASS's existence, Defendants continued to misrepresent and conceal C-BASS's liquidity situation and ability to survive the mortgage crisis.  Defendants' failure to respond to these red flags supports an inference of, at least, recklessness.  *See In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 983 (D. Minn. 2009) (finding that "defendants fully appreciated, or were severely reckless in not appreciating, the extent of the market turmoil's effect on the company's [p]ortfolio" because "by the beginning of the class period external 'red flags'

reflecting the failure of the subprime and Alt-A markets were so apparent that defendants . . . knew or should have known that the [company's asset backed securities] were substantially impaired").

Given the importance of C-BASS to the Company and the pending merger, it is incredible to suggest that Defendants did not know of C-BASS's liquidity position and the flood of margin calls that C-BASS received, indicating a severe deterioration in its subprime assets. *See Avaya,* 564 F. 3d at 271 ("The perceived importance of margins supports an inference that [the CFO] was paying close attention to these numbers."); *In re Cell Pathways, Inc. Sec. Litig.,* No. 99-752, 2000 U.S. Dist. LEXIS 8584, at *23 (E.D. Pa. June 21, 2000) ("where the alleged fraud relates to the core business of the company, knowledge of the fraud may be imputed to the individual defendants"); *In re Tel-Save Sec. Litig.,* No. 98-CV-3145, 1999 U.S. Dist. LEXIS 16800, at *14 (E.D. Pa. Oct. 19, 1999) ("Knowledge concerning a company's key businesses or transactions may be attributable to the company, its officers and directors.").

In considering the "core business" argument, this Court found that the First Complaint did not allege "particularized allegations showing that defendants had ample reason to know of the falsity of their statements." *In re Radian*, 612 F. Supp. 2d at 616. In particular, the Court noted that the First Complaint did "not [] explain why C-BASS's operations and assets in particular are core activities for Radian." *Id.* at 617. The Amended Complaint now remedies this deficiency noting that C-BASS's operations were an important component of Radian's business because it represented a $500 million investment that contributed to 16% of Radian's earnings in 2006. ¶¶58-59. Indeed, in Radian's public filings, Defendants repeatedly refer to C-BASS as "an important contributor to [Radian's] earnings" and state that C-BASS "has delivered a multitude of benefits to Radian, in the areas of earnings, franchise value, and diversified and recurring revenue streams." ¶¶59, 127, 181. Moreover, C-BASS and its perception as a financially stable company were essential in Radian's

plan to merge with MGIC.  ¶¶145, 147.  Accordingly, C-BASS was a matter of critical importance to Radian and within the core operations about which the Court may infer Defendants' knowledge.

The Amended Complaint also alleges that the Defendants closely monitored C-BASS and "held [] position[s] from which [they] would have been aware of the true facts and misleading disclosures."  *In re Loewen Group Inc. Sec. Litig.,* No. 98-6740, 2004 U.S. Dist. LEXIS 16601, at *67 (E.D. Pa. Aug. 18, 2004) (scienter was adequately pled where defendants' positions put them in a particular position to monitor the company's accounting methods and financial statements). Defendants' positions enabled them to have access to information regarding C-BASS, including its failing collateralized subprime mortgages, increase in margin calls and rapidly declining liquidity. As senior executive officers and directors, Defendants Ibrahim, Quint and Casale (as CEO, CFO and President of Radian Guaranty) were members of Radian's executive team and met regularly, if not weekly, to discuss C-BASS and its financials.  ¶¶129-130.  Defendants also received regular updates regarding C-BASS's financials, including quarterly reports and monthly earning reports, and participated in management calls with C-BASS and MGIC twice per month.  ¶130; *see also In re Par Pharm. Sec. Litig.,* No. 06-03226 (PGS), 2009 U.S. Dist. LEXIS 90602, at *23-*24 (D. N.J. Sept. 30, 2009) (allegations that senior executives received "daily reports" were sufficient to demonstrate defendants' knowledge of fraud or strong circumstantial evidence of conscious misbehavior or recklessness); *In re Revlon, Inc. Sec. Litig.,* No. 99 Civ. 10192 (SHS), 2001 U.S. Dist. LEXIS 3265, at *20 (S.D.N.Y. March 27, 2001) (inference of fraudulent intent where defendants received weekly reports detailing deteriorating inventory situation); *In re Allied Prods. Corp. Inc. Sec. Litig.,* No. 99 C 3597 (HDL), 2000 U.S. Dist. LEXIS 16781, at *15 (N.D. Ill. Nov. 15, 2000) (finding an inference of scienter where products were "critical part" of company's business and defendants "were daily and monthly appraised" of production and cost accounting

problems).  According to CW 6,[11] a non-defendant former member of Radian's management team, around February 2007, after Radian and MGIC announced their plans to merge, the executive team meetings were "almost exclusively focused on the recently announced merger with MGIC" and Radian's "ownership of C-BASS and how that impacted the merger."  ¶131.  CW 6 also noted that "C-BASS and C-BASS's financials were routine topics in Radian's executive meetings" and Defendants were "familiar with what C-BASS was doing and why they were doing it."  ¶130. Defendants Quint and Casale were especially knowledgeable about C-BASS's operations and liquidity because they sat on C-BASS's Board of Members and had access to the adverse non-public information about C-BASS's business.  ¶¶132-133, 221.  Indeed, Defendants *admit* that, by holding board seats at C-BASS, they "maintain[ed] an active involvement in [C-BASS's] strategic activities."  ¶126.  Thus Defendants' roles at C-BASS and Radian put them in a position to know that their statements regarding C-BASS were false.

In re RAIT is particularly instructive in this regard.  In *In re RAIT*, the court held that the plaintiffs sufficiently established a strong inference of scienter where the allegedly false statements regarding RAIT's exposure to the subprime real estate market as a result of its merger with another company and RAIT's compliance with Generally Accepted Accounting Principles ("GAAP") related

---

[11]    Defendants falsely accused Plaintiffs' counsel of violating Rule 4.2 of the Pennsylvania Rules of Professional Conduct by contacting CW 6.  However, as further described in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Sanctions, filed on September 22, 2009, counsel's contact with CW 6 was entirely proper.  Defendants also argue that the Amended Complaint "does not provide any specifics regarding CW 6 that would even indicate what level of understanding he, as a human resources manager, had of C-BASS's complex business, and what role he played in the C-BASS discussions."  Def. Mem. at 14, n.10.  What CW 6 presumably did or did not understand about C-BASS, however, is entirely irrelevant.  He is not a defendant in this case. Moreover, CW 6's position, as a former Executive Vice President of Human Resources, who was a member of Radian's executive team until May 2008, gave him access to information about the executive meetings that he attended and a reasonable basis to conclude that the Individual Defendants knew about, encouraged or recklessly disregarded adverse information regarding C-BASS.  *See Avaya,* 564 F. 3d at 263.

to RAIT's core business and operations and, therefore, the Defendants "had ample reason to know of the falsity of their statements." 2008 U.S. Dist. LEXIS 103549, at *50. In so holding, the court noted that "a company involved in the origination of real estate loans would be continuously aware of its exposure resulting from such lending practices." *Id.* at *48. The court also noted that the officer defendants were all members of RAIT's management investment committee, who met two times per week to monitor RAIT's credit risks and review its investment portfolio and "had access to both inside and public information." *Id.* at *48-*49.

Similarly, here, the Individual Defendants had ample reason to know of the falsity of their statements because they were all members of Radian's executive team, who met weekly during the Class Period to discuss C-BASS and had access to inside information about the entity. Moreover, Radian, a company involved in insuring mortgages, would be continuously aware of the subprime market and the effect the market had on Radian's investment in C-BASS. This is especially true because C-BASS's financial information was part of Radian's quarterly financial forecasts and budget updates. ¶130. It is simply inconceivable that Defendants – who met weekly to discuss C-BASS, reviewed C-BASS's financials and sat on C-BASS's Board – did not know that C-BASS was severely affected by the subprime market and was struggling to meet a flood of margin calls that were rapidly draining its liquidity. If Defendants truly did not know that, with the marginal (and quickly depleting) cash resources and liquidity that C-BASS had, it would soon become completely insolvent, their conduct could be described only as extreme recklessness.

Further, detailed information from former C-BASS and Radian employees establishes that Defendants knew, or were extremely reckless in ignoring, that their statements violated GAAP and omitted known information. For example, Defendants knew that C-BASS's loan portfolio was performing poorly by the start of 2007. According to CW 8, a former Assistant Vice President of C-BASS's credit surveillance department, the number of defaulting loans in C-BASS's portfolio

were "definitely increasing" around December 2006 and into 2007. ¶106. CW 7, a Senior Forensic Underwriting Analyst at C-BASS, elaborated that the "fraud aspect" of C-BASS's loan portfolio "went off the wall" by December 2006 and approximately 75% of the defaulting loans in C-BASS's portfolio were fraudulent liar loans. ¶108. CW 7 also noted that once C-BASS started receiving margin calls, it was known that C-BASS would not be able to meet them because it did not have enough liquidity in its reserves to pay them all. ¶123. In addition, as the Amended Complaint alleges, Defendants had direct knowledge of these facts, because Radian provided mortgage insurance on the loans in C-BASS's portfolio and maintained a systematic process for monitoring instances when borrowers defaulted on those loans. ¶¶112, 114. According to CW 4, a former Radian Vice President, senior members of Radian's management knew that, by late 2006 and into the first two quarters of 2007, the situation was "dire" for C-BASS. ¶113. This was because the non-performing loans in C-BASS's portfolio prevented C-BASS from replenishing its liquidity reserves and, as the market conditions worsened, it was impossible for C-BASS to survive the continuing margin calls and decline in the subprime market.[12]

To further support the strong inference that Defendants' statements were made with fraudulent intent, Plaintiffs plead detailed facts indicating that Defendants were motivated to make false and misleading statements about C-BASS's financial condition. The Amended Complaint alleges that Defendants were motivated to: (i) complete a necessary merger with MGIC in order to

---

[12]    Defendants challenge the accounts of the CWs, stating that "[n]one of these witnesses purport to have any information regarding Defendants' knowledge during the Class Period." Def. Mem. at 14-15. However, the Third Circuit recently rejected the same argument made by the defendants in *Avaya*, noting that while the plaintiffs "do not point to any particular document or conversation that would have informed" defendants of the alleged fraud, "plaintiffs' allegations of scienter need not be irrefutable, *i.e.*, of the smoking-gun genre" and "will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." 564 F.3d at 268-69.

pay off an increase in insurance claims related to the subprime mortgage market; (ii) keep C-BASS afloat long enough to sell Radian's interest in C-BASS; and (iii) benefit from their high profile and lucrative positions at the merged company. ¶¶6, 114, 144-149, 170, 224-225. These allegations are sufficient to raise a strong inference of scienter because they are not of the nature that courts routinely find are possessed generally by every executive, such as the desire to merely "complete the transaction" or "reap financial benefits from a successful transaction." *See GSC Partners CDO Fund v. Washington,* 368 F.3d 228, 237 (3d Cir. 2004).

As alleged in the Amended Complaint, Defendants were motivated to fortify their capital base and to satisfy an increase in insurance claims related to the numerous subprime mortgages that Radian and MGIC insured in 2005 and 2006. ¶6. However, because C-BASS's massive debt would negatively impact the balance sheet of the proposed combined entity, as part of the merger, Radian and MGIC agreed to reduce their joint interests in C-BASS. ¶145. Given the monumental decline in the credit quality of C-BASS's loan portfolio and its increasing margin calls, Defendants knew that the disclosure of problems associated with C-BASS would have undermined the planned merger because the sale of C-BASS was contingent on its perceived financial health. ¶224. Thus, Defendants were motivated to hide the problems with C-BASS for as long as possible in order to sell Radian's holdings to unwitting private investors and kept C-BASS artificially afloat with a $50 million credit facility in furtherance of their goal. ¶¶6, 142; *see also In re Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002) (crediting "concealment of the serious and worsening deterioration of Cabletron's financial health as a significant motive for the alleged fraud").

The Amended Complaint also now alleges "concrete and personal" benefits to Defendants, especially Defendants Ibrahim and Casale, who were motivated to conceal material information regarding C-BASS because they stood to personally gain from a completed merger with MGIC. ¶225. As a result of the merger, both Ibrahim and Casale would receive executive or senior

management positions in the merged mortgage guaranty insurance giant. *Id.* Specifically, Ibrahim was to serve as Chief Operating Officer and President and would succeed to CEO and Casale was to become the Head of Capital Markets. *Id.* These high-level positions not only offered potential pecuniary benefit to Defendants, but also significant industry recognition because the merged company combined two leading competitors in the mortgage insurance industry and was likely to dominate the market. *See, e.g., In re JPMorgan Chase & Co. Sec. Litig.*, MDL No. 1783, 2007 U.S. Dist. LEXIS 93877, at *24-*25 (N.D. Ill. Dec. 18, 2007) ("the fact that the pleadings allege that [the defendant] was motived to increase his incentive compensation and to guild his reputation are important considerations" and "go to show motive for engaging in the alleged fraud").

The motivating role of the merger with MGIC is underscored by the highly suspicious timing of the misrepresentations regarding C-BASS, which correlate with the February 2007 announcement made by Radian and MGIC that they had agreed to a stock-for-stock merger valued at $4.9 billion. ¶144. That Defendants were desperate to unload C-BASS in time for the scheduled merger (and before the truth came out about C-BASS's liquidity problems) is corroborated by CW 6, Radian's former Executive Vice President of Human Resources, who noted that, around May or June 2007, when the proposed merger with MGIC was approaching and it became apparent that Radian would not get the price they wanted for the sale of their interest in C-BASS, Defendants were willing to accept any price for C-BASS.[13]  ¶146.

Also supporting a strong inference of scienter is the fact that the Individual Defendants (except for Casale) and other Radian insiders acted to benefit from their possession of material non-

_____

[13]    Defendants' argument that "any price for C-BASS" could easily mean that "Radian could have wanted three times book value and was only being offered 150% of book" is nonsensical. *See* Def. Mem. at 13-14. The statement by CW 6 that "it was about getting any price for C-BASS" can only mean one thing – Defendants were so desperate to unload their interests in C-BASS that they were willing to accept a nominal value for the entity.

public information by engaging in suspicious insider trading.  Insider trading is unusual or suspicious where trading is timed to take advantage of the company's stock price as a result of undisclosed inside information or the trades are coordinated among insiders in a discernible pattern. *See In re Suprema,* 438 F.3d at 277 ("[S]ales of company stock by insiders that are unusual in scope or timing . . . may support an inference of scienter.").  Here, the Radian insiders, who occupied high-level positions at the Company,[14] engaged in sales that generated $10.2 million in proceeds and were timed to take advantage of the stock's favorable trading price before the disclosure of negative news beginning in July 2007.  ¶¶222-223.  Defendant Quint's proceeds alone were over $8 million as a result of his insider trading.  ¶222.  The sales, which occurred during a three month period, diverged from the insiders' previous trades and exceeded more than 56% of the stock sale proceeds received during the twelve months prior to the Class Period and were substantial relative to the insiders' compensation for 2007.[15]  ¶223.

Contrary to Defendants' assertions, the fact that Defendant Casale did not personally participate in the unusual trading perpetrated by the other insiders does not undermine the strong inference of scienter arising from those allegations.  *See, e.g., In re Unisys*, 2000 U.S. Dist. LEXIS 13500, at *20 (E.D. Pa. Sept. 21, 2000) ("The fact that defendant Weinbach was not alleged to have traded any stock during the Class period does not weigh against an inference of McHale and Gagliardi's fraudulent intent.").  Moreover, the mere fact that Defendant Ibrahim profited from the sale of some if his stock, as opposed to all of it, nevertheless indicates that he obtained a concrete

---

[14]    As directed by the Court, the Amended Complaint describes Joan Calamari as Senior Vice President and Corporate Controller and Roy Kasmar as President and Head of International Mortgage and Strategic Initiatives of Radian.  ¶223(a).

[15]    Defendant Quint's insider trading proceeds amounted to $8,105,070, compared to his salary of $370,000; Defendant Ibrahim generated $384,162 in proceeds, compared to his $791,346 salary; and Roy Kasmar generated $745,833 in proceeds as compared to his $455,000 salary.  ¶223.

benefit from the artificially inflated stock price. *See In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (holding that the retention of a large portion after realizing profit from stock sales does not vitiate insider trading liability).[16]

In sum, reviewing the allegations of the Amended Complaint in their entirety, it is respectfully submitted that the Amended Complaint sufficiently pleads a strong inference of scienter.

### C.    The Amended Complaint Sufficiently Alleges Actionable Misrepresentations and Omissions and Alleges Fraud with Particularity[17]

Although not considered by this Court in the Order, Defendants previously argued in their motion to dismiss the First Complaint that: (1) plaintiffs failed to allege with particularity that Defendants' statements were false when made and (2) Defendants' statements were forward-looking and nonactionable under the PSLRA's safe harbor provision. *See In re Radian Sec. Litig.*, 612 F. Supp. 2d at 606. To the extent that Defendants make the same arguments with respect to their motion to dismiss the Amended Complaint, Defendants arguments should be rejected.[18] *See Def. Mem.* at 19.

---

[16]    The Court's consideration of Defendants' Form 4s for the truth of their contents in the Order is inconsistent with *Tellabs* and *Avaya,* which require courts to "consider competing *inferences* from the allegations, but [] nonetheless assume the truth of the specific facts alleged." *Avaya,* 564 F.3d at 260 n.31 (emphasis in original). By considering Defendants' Form 4s or other public documents to show that: (i) "Casale more than tripled his investment in Radian stock"; (ii) Ibrahim's stock sale "was a portion of [his] overall compensation package"; (iii) Ibrahim's shares were sold "to cover taxes on a traunch of restricted stock that vested"; and (iv) that Quint made his stock sale in anticipation of his departure from Radian (*see In re Radian*, 612 F. Supp. 2d at 610-12), the Court went beyond considering Defendants' nonculpable competing inferences and, instead, accepted Defendants' interpretation of the facts as the truth.

[17]    These matters are discussed in greater detail in OppMTD I at 9-24. Plaintiffs adopt and incorporate by reference these arguments in their entirety as if fully set forth herein. *See Fed. R. Civ. P.* 10(c).

[18]    While Defendants make the general argument that the Amended Complaint should be dismissed for the reasons not reached by the Court in its Opinion, Defendants do not specifically argue that the Amended Complaint, as opposed to the First Complaint, fails to plead fraud with

First, the Amended Complaint sufficiently particularizes Defendants' false and misleading statements concerning Radian's investment in C-BASS and its financial results. *See* OppMTD I at 9-19 for discussion. As required by Rule 9(b) and the PSLRA, the Amended Complaint specifies the allegedly false or misleading statements, their speakers, when the statements were made, and why they were false. *See, e.g.*, ¶¶154-157, 158-168, 177-180, 181-182, 184-200. Nothing more is required. *See Avaya,* 564 F.3d at 253.

Additionally, Defendants' misstatements and omissions are actionable under Section 10(b) of the Exchange Act and are not entitled to the PSLRA's safe harbor provision. *See* OppMTD I at 19-24 for discussion. The safe harbor provision is inapplicable because many of the statements alleged to be false and misleading are not forward-looking and, even to the extent that some may be, they lacked sufficient cautionary language. *See EP Medsystems, Inc. v. Echocath, Inc.,* 235 F.3d 865, 874 (3d Cir. 2000). Even assuming that Radian's cautionary language was sufficient, the dangers that Radian purportedly warned of had already transpired, thereby excluding Defendants' statements from the safe harbor provision. *See City of Hialeah Emples. Ret. Sys. & Laborers Pension Trust Funds for N. Cal. v. Toll Bros. Inc.,* No. 07-1513, 2008 U.S. Dist. LEXIS 66906, at*11-*12 (E.D. Pa. Sept. 2, 2008) (finding that "[d]efendants' forward-looking statements at issue [] contained misrepresentations about then-existing facts, or facts and circumstances having already transpired" and therefore "cannot be eligible for protection under . . . the safe harbor provision").

### D.    The Amended Complaint Adequately Alleges a Claim for Control Person Liability Under Section 20(a)

Defendants do not dispute that Plaintiffs have adequately pled that Defendants Ibrahim, Quint and Casale are "control persons" of Radian for purposes of §20(a) of the Exchange Act.

---

particularity or that the additional misstatements and omissions alleged in the Amended Complaint were nonactionable forward-looking statements. *See* Def. Mem. at 18-19.

Rather, they assert that Plaintiffs fail to plead a primary violation of §10(b).  *See* Def. Mem. at 19.

As demonstrated throughout this brief, the Amended Complaint adequately pleads violations of

Section 10(b) and Rule 10b-5 of the Exchange Act against all Defendants.  Accordingly, because the

Amended Complaint adequately alleges underlying securities fraud violations, it also adequately

alleges a control person claim against each of the Individual Defendants, who controlled the

Company during the Class Period.  *See In re Suprema,* 438 F.3d at 286 (vacating dismissal of control

person claim).

## IV.    CONCLUSION

For the foregoing reasons, it is respectfully submitted that this Court should deny

Defendants' motion in its entirety.

DATED:  October 22, 2009                LAW OFFICES BERNARD M. GROSS, P.C.
                                        DEBORAH R. GROSS
                                        ROBERT P. FRUTKIN


                                        _____
                                               */s/ Deborah R. Gross - DG639*
                                                 DEBORAH R. GROSS

                                        Wanamaker Building, Suite 450
                                        100 Penn Square East
                                        Philadelphia, PA 19107
                                        Telephone:  215/561-3600
                                        215/561-3000 (fax)

                                        Liaison Counsel

                                        COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP
                                        SAMUEL H. RUDMAN
                                        DAVID A. ROSENFELD
                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)

                                        Lead Counsel for Plaintiffs

SULLIVAN, WARD, ASHER & PATTON, P.C.
CYNTHIA J. BILLINGS
25800 Northwestern Highway
1000 Maccabees Center
Southfield, MI  48075-1000
Telephone:  248/746-0700
248/746-2760 (fax)

VANOVERBEKE MICHAUD
  & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I, Deborah R. Gross, hereby certify that a true and correct copy of the Memorandum of Law in Opposition to Defendants' Motion to Dismiss The Consolidated Amended Class Action Complaint was served on the below listed counsel of record via the Court's CM/ECF notification system this 22nd day of October, 2009.

David Smith, Esq.
Theresa E. Loscalzo, Esq.
Schnader Harrison Segal & Lewis, LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103


Leslie J. Abrams, Esq.
Richard L. Brusca, Esq.
Skadden, Arps, Slate, Meager & Flom LLP
1440 New York Ave., NW
Washington, D.C. 20005-2111


*/s/ Deborah R. Gross – DG639*
DEBORAH R. GROSS