UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| IN RE: | : | CLASS ACTION |
| | : | |
| RADIAN SECURITIES LITIGATION | : | Master File No. 07-3375 |
| | : | |

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................5

I. *TELLABS* REQUIRES THE COURT TO WEIGH COMPETING INFERENCES ...........5

II. THE CACAC SHOULD BE DISMISSED WITH PREJUDICE .....................................6

    A. The Meager Allegations of Plaintiffs'
       Confidential Witnesses Remain Inadequate ...........................................................6

    B. Plaintiffs' Remaining Arguments Remain Uncompelling .....................................9

       1. Plaintiffs Continue to Attempt to Infer Scienter
          Based on Rapid, Unprecedented Market Upheaval ...................................9

       2. Defendants' Stock Sales Do Not
          Support a Strong Inference of Scienter ....................................................10

       3. C-BASS Was Not Part of Radian's Core Business ................................12

       4. Plaintiffs' New Spin on the
          Alleged Merger Motive Is Still Unavailing ............................................13

CONCLUSION ...................................................................................................................15

**TABLE OF AUTHORITIES**

**CASES** **PAGE(S)**

*GSC Partners CDO Fund v. Washington*,
368 F.3d 228 (3d Cir. 2004)....................13

*Institutional Investors Group v. Avaya*,
564 F.3d 242 (3d Cir. 2009)....................6, 7

*In re Moneygram Internat'l, Inc. Sec. Litig.*,
626 F. Supp. 2d 947 (D. Minn. 2009)....................10

*In re NAHC, Inc. Sec. Litig.*,
306 F.3d 1314 (3d Cir. 2002)....................8

*In re NutriSystem, Inc. Sec. Litig.*,
Civil Action No. 07-4215,
2009 WL 2776481, __ F. Supp. 2d __ (E.D. Pa. Aug. 31, 2009)....................8, 12

*In re NutriSystem, Inc. Derivative Litig.*,
Civil Action No. 07-4565,
2009 WL 3443401, __ F. Supp. 2d __ (E.D. Pa. Oct. 26, 2009)....................8, 2

*In re Radian Group Inc. Sec. Litig.*,
612 F. Supp. 2d 594 (E.D. Pa. 2009)....................*passim*

*In re RAIT Fin. Trust Sec. Litig.*,
Master File No. 2:07-cv-03148-LDD,
2008 WL 5378164 (E.D. Pa. Dec. 22, 2008)....................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
127 S. Ct. 2499 (2007)....................5, 6

*The Winer Family Trust v. Queen*,
503 F.3d 319 (3d Cir. 2007)....................5, 7

# INTRODUCTION[1]

Plaintiffs' Opposition serves only to highlight that the CACAC, like its predecessor, fails to meet the significant pleading requirements of the PSLRA. Notwithstanding this Court's earlier dismissal, Plaintiffs continue to make the same discredited arguments in attempting to convince this Court to ignore the law and precedent and to punish Defendants for their inability to predict the future. For example, despite this Court's clear rejection of Plaintiffs' naked assertion that C-BASS was on the "brink of insolvency" in early 2007, Plaintiffs repeat this theme, arguing that C-BASS's resources were "exhausted" during the first six months of 2007. However, as the Court found in its prior opinion, C-BASS was not on the brink of insolvency; nor did it exhaust its resources–until the final days of July, when it was hit with hundreds of millions in capital calls over a three-day period. *See* Radian, Current Report (Form 8-K), at A-418 (Aug. 2, 2007) (App. Ex. 8). Plaintiffs have not provided any facts creating a strong inference that Defendants knew or should have known, at the beginning, middle or toward the end of the Class Period, what would happen in those last few days of July. Rather, Plaintiffs continue to attempt to recover against Defendants because Defendants–along with Plaintiffs and the majority of the country–did not forsee the havoc that the subprime crisis would wreak on the economy in general and C-BASS in particular. Hindsight simply cannot provide the basis for a securities fraud action; yet, hindsight is all Plaintiffs have.

Plaintiffs assert *ad nauseam* that Defendants "must have known" something that was inherently unknowable. As this Court recently noted in dismissing another "fraud by hindsight" complaint, Plaintiffs "confuse[] the difference between fact and prediction." *In re*

---

[1] The abbreviations in this Reply are the same as in the previously-filed Motion to Dismiss. Citations to "App. Ex." refer to the exhibits in the Appendices filed with Defendants' original Motion to Dismiss.

1

*NutriSystem, Inc. Derivative Litigation*, Civil Action No. 07-4565, 2009 WL 3443401, __ F. Supp. 2d __, slip op. at 36 n. 8 (E.D. Pa. Oct. 26, 2009).  Here, the *facts* were disclosed: C-BASS securitized subprime loans, and the subprime market as a whole was experiencing serious turmoil.  But Defendants could not have "knowledge of exactly how[,]" or when or to what degree, that market turmoil would effect C-BASS, and in turn, the value of Radian's investment.  *Id.*  Simply put, Radian's eventual impairment of C-BASS was "not a 'fact' that could be known before it occurred."  *Id.*

        An abundancy of redundancy infects the CACAC.  This includes the repetition of demonstrably untrue claims regarding the state of C-BASS's affairs–even claims previously proven bogus by Defendants and rejected by this Court.  Although the Court clearly understood the facts below at the time of its initial dismissal, they are worth repeating here:

- C-BASS did not merely "scrape enough cash to meet the $290 million in margin calls by exhausting all of its resources during the first six months of 2007."  (Opp. at 2.)  As this Court has already recognized, C-BASS paid $290 million to satisfy margin calls during the first six months of 2007, and then paid $260 million *more* to satisfy additional margin calls during the first 26 days of July.  *See In re Radian Group Inc. Sec. Litig.*, 612 F. Supp. 2d 594, 614 (E.D. Pa. 2009) [hereinafter *Radian*]; *see also* C-BASS, News Release, at A-859 (July 31, 2007) (App. Ex. 29).  Accordingly, despite Plaintiffs' inability to grasp simple math, it is obvious that C-BASS was nowhere near exhausting its cash resources before the last few days of July.

- Plaintiffs' continued assertion that C-BASS had "little to no cash flow" (Opp. at 7) is also contradicted by the uncontested public record.  C-BASS began the first quarter of 2007 with $300 million in cash resources, and ended the quarter with $200 million "[a]fter absorbing margin costs of approximately $200 million."  MGIC, Merger Communications (Form 425), at A-718 (Apr. 13, 2007) (App. Ex. 24).  Again, logic dictates that if C-BASS had $300 million, spent $200 million, and still had $200 million, they had to have had cash flow.  ($300 - 200 \neq 200$.)

- Plaintiffs continue to argue that Defendants "falsely and repeatedly claimed that C-BASS was 'expected to return to profitability.'"  (Opp. at 14.)  The inconvenient, uncontested fact is that ***C-BASS did return to profitability*** during the second quarter of 2007.  *See* Radian, News Release (Form 8-K), at A-418 (Aug. 2, 2007) (App. Ex. 8); *see also* C-BASS, News Release, at A-860 (July 31, 2007) (App. Ex. 29).

2

- Plaintiffs' insistence that C-BASS could not "go from having a sufficient amount of cash resources . . . to (*only four days later*) being so impaired that Radian had to write down its entire $500 million investment" (Opp. at 16) ignores the fact that the amount of margin calls in the last four days of July eclipsed the total amount of calls in the first *six months* of 2007.  Moreover, this allegation blatantly ignores that "[g]iven the plausible inferences the defendants have offered," the Court disagreed with Plaintiffs' assertion that an asset cannot become impaired overnight.  *Radian*, 612 F. Supp. 2d at 621.

Plaintiffs' Opposition brief also fails to show, because it cannot, how the additional allegations made in the CACAC address–let alone cure–the significant, systematic failings of their previous complaint.  Rather, Plaintiffs continue to rely on the extremely weak allegations of confidential witnesses, none of whom offer insight into Defendants' state of mind.  Considering that Plaintiffs somehow managed to speak to a former Radian executive–who is also a defendant in a related ERISA case–the statements in the CACAC attributed to him are stunningly tepid and underwhelming.[2]  Quite obviously, Plaintiffs have not been able to come up with more specific facts to support their claims because *there simply are none*.

Finally, while the CACAC continues to assert that the Class Period begins on January 23, 2007, Plaintiffs focus this Court on statements made six months later during Radian's July 25th earnings call as creating the strong inference of scienter they need.  (*See* CACAC ¶¶ 137, 142, 143, 199; *see also* Opp. at 15-16.)  Plaintiffs' reliance on the transcript of the earnings call is clearly misplaced given that it was during this call that Defendants acknowledged the challenging subprime environment faced by C-BASS and explicitly noted that C-BASS was experiencing "continuing margin calls [that had] drained cash resources and challenged liquidity . . . ." Radian, Conference Call Transcript (July 25, 2007), at A-836 (App. Ex. 27).  Moreover, Plaintiffs' bald contention that Defendants had access to information which

---

[2]  Given that CW 6 was apparently never asked whether Plaintiffs could use his supposed statement–much less whether Plaintiffs accurately represented them in the CACAC–one wonders on what basis Plaintiffs chose to keep his identity confidential.

3

contradicted statements made during the earnings call is unsupported by facts presented in the CACAC and is contrary to any reasonable inference that could be drawn.

- Plaintiffs' cynical statement that Defendant Quint attempted to avoid answering a question posed during the earnings call is simply false. An analyst asked: "Does that mean that they are looking for additional liquidity or are they experiencing more margin calls or what is happening here?" *Id.* at A-851. Quint, who had stated during his opening remarks that C-BASS was experiencing continuing margin calls (*see id.* at A-836), replied that "[t]here are a variety of ways that they are working on to improve their liquidity." *Id.* at A-851. This response is a direct answer that C-BASS was, in fact looking for additional liquidity; and there are no particularized allegations in the CACAC that indicate that C-BASS was not doing so.

- In response to the next question as to whether there was a need for additional liquidity, Mr. Casale referenced statements made by C-BASS's executives during the MGIC earnings call the prior week. *See id.* at A-851. There are no particularized allegations presented in the CACAC showing that the statement made during MGIC's call was false or that, at the time of the Radian call, C-BASS had exhausted its cash resources.

- When asked if C-BASS was liquidating assets, Mr. Casale correctly stated that C-BASS was not doing so. *See id.* at A-844 to A-845. Defendants have failed to provide any particularized allegations in the CACAC that would indicate that this statement was untrue and that C-BASS was, in fact, selling assets.

- The insinuation that Defendants were aware of and failed to disclose $160 million in margin calls allegedly received between July 1st and July 25th is not only illogical and untrue, it is also not supported by any particularized allegation in the CACAC. In fact, given that the earnings call began at 9:00 a.m., it cannot be assumed that *any* of the margin calls made on July 25th were made before the call, let alone that Defendants knew about them. *See id.* at A-830. Indeed, it may well be that the negative questioning and candid answers provided by Defendants spurred some of the calls to be made.

Despite this new focus on events in July, the purported Class Period in this case is alleged to begin *six months* before that call, in *January*, 2007. Even assuming, *arguendo*, there was an actionable statement made on the July call–and there was not–such a statement would support a Class Period of only a few days. More significantly, it would compel the conclusion that Lead Plaintiffs lack standing to bring this action, because they purchased their shares well *before* the July call, in May and June, 2007. (*See* Iron Workers Local No. 25 Pension Fund's Cert. of Named Pl. Pursuant to Fed. Sec. Laws, at Schedule A (filed Oct. 15, 2007); City of Ann

4

Arbor Employees' Ret. Sys.'s Cert. of Named Pl. Pursuant to Fed. Sec. Laws, at Schedule A (filed Oct. 15, 2007).) Accordingly, as Lead Plaintiffs neither bought nor sold any shares between July 25, 2007 and the end of the Class Period, they would have no actionable claim. *See, e.g.*, *The Winer Family Trust v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007) ("The plaintiff class under Rule 10b-5 is limited exclusively to actual sellers or purchasers of securities. There is no private right of action . . . for mere holders of securities.") (internal citations omitted).

Accordingly, this Court should again find Plaintiffs' complaint lacking, and dismiss this action with prejudice.

## ARGUMENT

**I.    *TELLABS* REQUIRES THE COURT TO WEIGH COMPETING INFERENCES**

As a threshold matter, Plaintiffs misstate the standard for this Court's review of the CACAC. In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the Supreme Court unequivocally held that courts "must consider plausible nonculpable explanations for the defendant's conduct . . . ." 551 U.S. 308, 324 (2007). *See also Winer*, 503 F.3d at 327 ("The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative."). The Court stated that "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. Plaintiffs, however, argue that the Court is essentially precluded from considering any basis for a more plausible inference, and can only rely on what Plaintiffs assert in their complaint. (*See* Opp. at 27 n.16.)

Plaintiffs protest that "[t]he Court's consideration of Defendants' [public filings] for the truth of their contents in the Order is inconsistent with *Tellabs* and *Avaya*, which require courts to 'consider competing *inferences* from the allegations, but [] nonetheless assume the truth

5

of the specific facts alleged.'" (Opp. at 27 n.16.) However, Plaintiffs misconstrue the cited portion of *Institutional Investors Group v. Avaya*, which simply states that "[i]nsofar as Avaya's . . . reported financial results are in tension with the reports of the CWs and analysts, a jury could decide to discredit the latter. But in reviewing a district court's dismissal under Rule 12(b)(6), we do not resolve factual disputes . . . ." 564 F.3d 242, 260 n.31 (3d Cir. 2009). Neither *Tellabs* nor *Avaya* require the Court to accept as true conclusory allegations unsupported by any actual facts. Yet that is all Plaintiffs allege in the CACAC.

In keeping with *Tellabs*, this Court correctly took judicial notice of published filings which, as the Court repeatedly stated, were not contested by anyone. *See Radian*, 612 F. Supp. 2d at 611, 613; *see also Tellabs*, 551 U.S. at 322. Accordingly, this Court should continue correctly to apply *Tellabs* as it did in its prior opinion: By comparing the allegations of Plaintiffs' CACAC with Defendants' plausible competing inferences, as supported by uncontested facts contained in the public record.[3]

## II.   THE CACAC SHOULD BE DISMISSED WITH PREJUDICE

### A.   The Meager Allegations of Plaintiffs' Confidential Witnesses Remain Inadequate

Plaintiffs begin their opposition by trumpeting the allegations attributed to their new witness–CW 6. (*See* Opp. at 5.) Curiously, however, only weeks ago, in opposition to Defendants' Motion for Sanctions, Plaintiffs were struggling to play down their significance. Thus, they characterized these very same allegations as "not new, but merely add[ing] additional

---

[3]   Indeed, it is almost amusing for Plaintiffs to argue that this Court should not credit uncontested public documents which were filed with the SEC long before this action was instituted, but that the Court must accept as gospel hearsay information from anonymous witnesses–who allegedly spoke to an "investigator," who then relayed information to Plaintiffs' counsel, who then, without any verification of the alleged statements, put quotation marks around the investigator's information and inserted it in a complaint, all in an attempt to support a case that previously was dismissed.

6

detail to the original pleading." (Plaintiffs' Opp. to Mot. for Sanctions, at 21.) Plaintiffs were right the first time. Accordingly, even if this Court were to consider the CW 6 allegations, it should find that Plaintiffs have still failed to plead scienter, and as such, the CACAC should be dismissed.[4]

CW 6 allegedly told Plaintiffs' investigator that Radian's "executive team" received periodic reports from C-BASS. (CACAC ¶ 130.) Yet, he offers no particulars as to what information was allegedly included in these periodic reports or even any information about what involvement the Individual Defendants had in C-BASS's daily operations. He certainly does not provide any insight into what (or when) Defendants knew about C-BASS's supposed liquidity position. As was the case with Plaintiffs' original complaint, "plaintiffs have not alleged, specifically, that the defendants knew of any accounting irregularities at C-BASS or that C-BASS's own representations that it was meeting margin calls in the regular course of business were false, such that their behavior was an extreme departure from the standards of ordinary care."[5] *Radian*, 612 F. Supp. 2d at 616. CW 6 says nothing about margin calls or the accounting treatment of the C-BASS investment.

---

[4] Plaintiffs wait 21 long pages to acknowledge the inconvenient fact that Defendants have sought to strike the allegations relating to CW 6. Plaintiffs do not indicate how the potential striking of these allegations affects the propriety of their position. The reason for this is simple: with or without CW6, the CACAC does not pass muster.

[5] Plaintiffs baldly assert that "two of the highest level executives at Radian, Defendants Quint and Casale, sat on C-BASS's Board of Members, which gave them direct access to undisclosed information about C-BASS and its business." (Opp. at 5.) This type of generalized group pleading–which relies exclusively on a defendant's position to infer knowledge–is insufficient in light of the PSLRA's demand for particularity. *Winer*, 503 F.3d at 335-37.

Moreover, Defendants cite *Avaya* for the proposition that they need not "'point to any particular document or conversation that would have informed' defendants of the alleged fraud" because "'plaintiffs' allegations of scienter need not be irrefutable, *i.e.*, of the smoking-gun genre . . . .'" (Opp. at 23 n.12 (citing *Avaya*, 564 F.3d at 268-69).) As Defendants already pointed out in its motion to dismiss (Mot. to Dismiss the CACAC, at 15-16), however, in *Avaya*, multiple CWs in different departments all asserted that the company was offering unusually deep discounts, while at the same time, the company's CFO explicitly denied any unusual discounting. 564 F.3d at 269-70. That is to say that, in *Avaya*, the CWs had specific knowledge of company practices that were not consistent with the company's public statements. Here, the CWs have no such knowledge.

Recently, this Court had the occasion to address a similar fraud-by-hindsight complaint in *In re NutriSystem, Inc. Securities Litigation*, Civil Action No. 07-4215, 2009 WL 2776481, __ F. Supp. 2d __ (E.D. Pa. Aug. 31, 2009). In that case, this Court noted that the defendants received weekly internal reports with information regarding "'new memberships, sales, cancellations, competitive factors, and other information concerning the company and its operations.'" *Id*. slip op. at 24. Nevertheless, the Court found that there was insufficient evidence of scienter, because "the most plausible inference from the facts alleged is that the defendants were aware of the threat posed by [new competition in the market] . . . but genuinely believed that any effect on NutriSystem sales and financial performance would be short-lived . . . ." *Id*. slip op. at 29, 40. In the case at hand, CW 6 offers only generalized information about "periodic reports" of unknown content or frequency, which gives no indication of what specific information Defendants had, if any, about C-BASS's daily operations. But that aside, as in *NutriSystem*, when the CACAC is viewed as a whole, the most plausible inference is that Defendants believed what they said, to wit: the turmoil in the subprime market was a temporary situation through which C-BASS could successfully maneuver.[6] That might have been an error, but it was not fraud. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events . . . .").

Plaintiffs' other confidential witnesses require little discussion. Plaintiffs continue to argue that they "described the declining value of C-BASS's loan portfolio and noted that Defendants had direct knowledge about . . . C-BASS's portfolio because Radian provided

---

[6] This inference undermines Plaintiffs' assertion that, under Accounting Principles Board ("APB") Opinion No. 18, C-BASS's value experienced an other-than-temporary decline. (*See* CACAC ¶ 165 (citing APB Opinion No. 18).)

mortgage insurance on those loans and maintained a systematic process for monitoring instances when borrowers defaulted." (Opp. at 3.)  This Court already directly addressed, and dismissed, this contention.  *Radian*, 612 F. Supp. 2d at 619-20.  First, the Court noted that none of the CWs were Radian Group employees and, with the exception of CW 6, that remains accurate.  *Id*. at 620.  Second, this Court noted that the confidential witness testimony

> does not establish that the defendants knew or must have known that their statements presented a danger of misleading buyers or sellers.  At best, this testimony only further establishes the declining conditions at C-BASS and in the market generally.  Although part of the testimony is that "senior members" of Radian's management personally witnessed a higher rate of loan delinquencies, such an allegation does not establish with specificity what the defendants knew at the times that they made particular statements.

*Id*. at 619-20.  Plaintiffs' additions do nothing to correct this inherent deficiency.

Accordingly, because the allegations relating to confidential witnesses remain inadequate to support an inference of scienter, the Court should dismiss the CACAC.

### B.      Plaintiffs' Remaining Arguments Remain Uncompelling

Plaintiffs continue to rely on several other arguments that this Court has already addressed−and correctly found wanting.  Defendants urge this Court to again find these assertions insufficient to support an inference of scienter, and dismiss the CACAC with prejudice.

#### 1.      Plaintiffs Continue to Attempt to Infer Scienter Based on Rapid, Unprecedented Market Upheaval

In response to the Court pointedly disagreeing with their conclusion that assets do not become impaired overnight, *see Radian*, 612 F. Supp. 2d at 621, Plaintiffs again point to supposed "red flags" in the market place (Opp. at 17-18).  It is time, however, for Plaintiffs to waive the "white flag" over this argument.  Indeed, much of Plaintiffs' "over 20 pages of primarily new factually specific allegations" in the CACAC (Opp. at 1) consist of general

9

observations regarding trends in the sub-prime mortgage crisis and housing markets. (*See* CACAC ¶¶ 48, 76, 81-86, 88, 92, 96-98, 103-04.) Although Plaintiffs argue that these general market observations support an inference of scienter, Plaintiffs continue to ignore the unprecedented market upheaval and the overwhelming wave of margin calls which occurred in the last days of July, 2007. Without the benefit of hindsight, there is no way plausibly to argue that Defendants should have known, at the beginning of the Class Period, what would happen in the last few days of July.[7] Accordingly, the CACAC should be dismissed with prejudice.

### 2. Defendants' Stock Sales Do Not Support a Strong Inference of Scienter

Despite making very minor changes to their allegations regarding insider trading, Plaintiffs continue to make arguments that are in direct in conflict with this Court's previous findings. The Court should continue to reject them.

Once more, Plaintiffs point to the volume of Mr. Quint's February, 2007 stock sale. (Opp. at 26.) The Court has already rejected this allegation and found that Mr. Quint's planned departure from Radian supported the more plausible inference that he did not sell his stock with fraudulent intent. *See Radian*, 612 F. Supp. 2d at 612; *see also* Radian, Current Report (Form 8-K), A-303 (Feb. 6, 2007) (announcing the MGIC-Radian merger and the combined company's senior management, which excluded Mr. Quint). Likewise, the Court rejected Plaintiffs' argument that the fact that Mr. Casale did not trade any stock "does not

---

[7] Plaintiffs cite to *In re Moneygram International, Inc. Securities Litigation*, 626 F. Supp. 2d 947 (D. Minn. 2009). (*See* Opp. at 18.) Significantly, Plaintiffs incorrectly cite as the court's ***finding*** the court's ***summary of lead plaintiff's argument***. (Opp. at 18-19 (citing *In re Moneygram*, 626 F. Supp. 2d at 983).) The court's actual holding was much less generous than Plaintiffs would like to admit. *See In re Moneygram*, 626 F. Supp. 2d at 983. Even though the *Moneygram* court ultimately denied the defendants' motion to dismiss, that court also noted that the lead plaintiff improperly focused on "external market indicators, which alone [did] not permit an inference that defendants misrepresented the [company's portfolio's] financial condition . . . ." *Id.* at 974. Similarly, here, Plaintiffs rely almost exclusively on ***broad*** problems in the subprime market to show that ***these*** Defendants intended to defrauded ***Radian's*** investors. As this Court has previously found, this is simply insufficient.

undermine the strong inference of scienter." (Opp. at 26.) The Court clearly stated that, with regard to the fact that Mr. Casale sold no stock and, in fact, more than tripled his Radian investment during the Class Period,[8] "an inference of scienter is not cogent or at least as compelling as an inference of nonculpability." *Radian*, 612 F. Supp. 2d at 610-11. Finally, Plaintiffs argue that "the mere fact that Defendant Ibrahim profited from the sale of some if [sic] his stock, as opposed to all of it, . . . indicates that he obtained a concrete benefit from the artificially inflated stock price." (Opp. at 26-27.) This obstinately ignores the fact that the Court found that Mr. Ibrahim's significant remaining holdings[9] negated any inference arising out of his miniscule sales during the Class Period. *See Radian*, 612 F. Supp. 2d at 611.

Furthermore, Plaintiffs continue to rely on the stock sales of other non-defendant "Radian insiders" to buttress their claims–namely, John Calamari and Roy Kasmar. (*See* Opp. at 9, 26 n.14; CACAC ¶¶ 222-23.) In response to the Court's observation that Plaintiffs provided absolutely no information about these individuals in its previous complaint, *see Radian*, 612 F. Supp. 2d at 612, Plaintiffs have managed to provide titles for Mr. Calamari and Mr. Kasmar, but they have not suggested that they knew anything about C-BASS. Moreover, Plaintiffs have cynically neglected to mention that both of these individuals *resigned* from those positions at Radian fairly early in the Class Period. Mr. Kasmar, who Plaintiffs allege made two sales in *May, 2007* (CACAC ¶ 222), resigned as head of Radian's International Mortgage business in *January, 2007*–before the Class Period even began. *See* Radian, News Release (Jan. 10, 2007) (Ex. A). Mr. Calamari, who Plaintiffs allege made a sale in *February, 2007* (CACAC ¶ 222),

---

[8] *Compare* Radian, Form 4/A reported by M.A. Casale, at A-685 (Jan. 9, 2007) (App. Ex. 16), *with* Radian, Form 4 reported by M.A. Casale, at A-688 (May 8, 2007) (App. Ex. 17).

[9] *See* Radian, Form 4 reported by S.A. Ibrahim, at A-697 (May 14, 2007) (App. Ex. 20) (indicating that Mr. Ibrahim retained a total of 89,197 shares of stock and an additional 95,800 options).

11

resigned from Radian no later than **March, 2007**, when he was appointed Chief Financial Officer of J.G. Wentworth. *See* J.G. Wentworth, Press Release (Mar. 19, 2007) (Ex. B). Accordingly, the sales by Messrs. Calamari and Kasmar are in no way helpful to Plaintiffs' cause, since, as this Court has previously found with regard to Mr. Quint, it is not unusual or suspicious for an individual who is leaving a company to sell stock. *See Radian*, 612 F. Supp. 2d at 612.

Despite Plaintiffs' determination to ignore the Court's findings, nothing in the CACAC suggests that any other conclusion is warranted. Simply put, the Individual Defendants' stock sales cannot support any inference of scienter. Accordingly, the CACAC should be dismissed with prejudice.

### 3. C-BASS Was Not Part of Radian's Core Business

Plaintiffs' reliance on *In re RAIT Financial Trust Securities Litigation* (*see* Opp. at 21-22) is sorely misplaced because C-BASS was *not* a part of Radian's core business.[10] The core business theory "allows for scienter to be pleaded through the combination of an officer's position within the company and fraud allegations related to the corporation's core business." *In re NutriSystem Inc. Sec. Litig.*, slip op. at 11. In *RAIT*, the court inferred scienter as to the defendants because the statements at issue–regarding the company's exposure to the trouble real estate market–involved the company's core business. *See In re RAIT Fin. Trust Sec. Litig.*, Master File No. 2:07-cv-03148-LDD, 2008 WL 5378164, *13 (E.D. Pa. Dec. 22, 2008). Lest there be any confusion, however, Plaintiffs do not allege–and have never alleged–that C-BASS was part of Radian's core business. (*See generally* CACAC; CCAC.) Considering the undisputed facts, this particular omission is hardly surprising:

---

[10] *See* Defendants' previously-filed Consolidated Response to Plaintiffs' Notice of Supplemental Authority and Notice of Additional Supplemental Authority (Docket No. 51).

- Radian is a mortgage insurer.  (*See* CACAC ¶ 2.)  Mortgage insurance is its core business.

- C-BASS was an investment; a company which Radian did ***not*** control.  *See id.*

- By Plaintiffs' own admission, C-BASS constituted a small percentage of Radian's total equity:  only 11%.  (*See* CACAC ¶ 52.)

- While Defendants did (correctly) characterize C-BASS as an ***important*** contributor to Radian's earnings, the total earnings from Radian's entire financial services segment–including earnings from both C-BASS and another entity, Sherman Financial Services Group LLC–was less than 30% of Radian's overall earnings.  (*See* CACAC ¶¶ 52-57.)

- Clearly, the fact that C-BASS has not been operating for more than two years and Radian is still standing illustrates that C-BASS was not the core of Radian's business.  So does the fact that the ***sale*** of C-BASS was contemplated by the Radian-MGIC merger.

Plaintiffs have not and cannot allege that C-BASS was part of Radian's core business and, therefore, should not be permitted to cloud this issue.  This Court should decline Plaintiffs' invitation to draw less cogent and compelling inferences on the basis of the "core business" theory.  The Court should grant Defendants' motion, and dismiss the CACAC with prejudice.

### 4. Plaintiffs' New Spin on the Alleged Merger Motive Is Still Unavailing

In their last complaint, Plaintiffs alleged that Defendants were motivated to fraudulently conceal information regarding C-BASS in order to consummate Radian's pending merger with MGIC.  *See* CCAC ¶¶ 121, 164.  This Court rejected this logic outright, finding that "the desire to complete a merger and realize the attendant gains on company stock . . . is among the motives that have been found to be generally possessed by most corporate directors." *Radian*, 612 F. Supp. 2d at 609 (citing *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237-38 (3d Cir. 2004)).

Now, Plaintiffs dress up that same contention and argue that there would be "the concrete and personal benefit to Defendants Ibrahim and Casale of gaining lucrative and

13

esteemed positions . . . [for] what would be the largest mortgage insurance company in the United States." (Opp. at 4; *see also* CACAC ¶ 225.) Plaintiffs are simply recycling the same argument–and the Court should again reject it for the same reason. Because many corporate officers contemplating a merger will have a "lucrative and esteemed" position with the new company if the merger is consummated, this motive is "generally possessed by most corporate directors" and cannot support scienter. *Radian*, 612 F. Supp. 2d at 609. Furthermore, considering that one of the Individual Defendants that Plaintiffs accuse of fraud–Mr. Quint–was scheduled to *lose* his job as a result of the merger,[11] this "motive" seems particularly illogical.

Finally, Plaintiffs make the desperate and baseless assertion that Defendants were also allegedly "motivated to hide problems with C-BASS for as long as possible in order to sell Radian's holdings to *unwitting* private investors . . . ." (Opp. at 24) (emphasis added). This is nonsensical. Any "private investor" contemplating the purchase of a company valued at nearly $1 billion is certainly not going to be "unwitting." They would conduct due diligence–which, of course, is exactly what was occurring at C-BASS in late July, 2007. *See* Radian, Current Report (Form 8-K), at A-418 (Aug. 2, 2007) (App. Ex. 8). And, as disclosed by Radian, during the diligence process Radian had received multiple offers above book value. *See id.* So much for Plaintiffs' investigator's claim that Radian would have sold C-BASS at "any price."

The Court should again find allegations of scienter lacking, and dismiss the CACAC with prejudice.

---

[11] *See Radian*, 612 F. Supp. 2d at 612; *see also* Radian, Current Report (Form 8-K), A-303 (Feb. 6, 2007) (App. Ex. 4).

## CONCLUSION

For the foregoing reasons, and for the reasons stated in Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint, this Court should dismiss the CACAC with prejudice.

Pursuant to Local Rule 7.1, Defendants request that the Court hear oral argument on the foregoing motion.

                          RADIAN GROUP, INC., SANFORD A.
IBRAHIM, C. ROBERT QUINT, and
MARK A. CASALE

By:     /s/ Leslie J. Abrams
        Leslie J. Abrams

| | |
|---|---|
| David Smith, Esq. | Richard L. Brusca |
| Theresa E. Loscalzo, Esq. | Leslie J. Abrams |
| Schnader Harrison Segal & Lewis, LLP | Skadden, Arps, Slate, Meagher & Flom LLP |
| 1600 Market Street, Suite 3600 | 1440 New York Ave, NW |
| Philadelphia, PA 19103 | Washington, DC 20005 |
| 215-751-2190 | 202-371-7000 |

*Attorneys for Defendants*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 20th day of November, 2009, a true copy of Defendants' Reply In Support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint was sent to counsel of record as indicated:

(Via Electronic Case Filing and Overnight Delivery)
Deborah R. Gross, Esq.
Robert P. Fruitkin, Esq.
Wanamaker Building, Suite 450
100 Penn Square East
Philadelphia, PA 19107

(Via Electronic Case Filing and Overnight Delivery)
Samuel H. Rudman, Esq.
David A. Rosenfeld, Esq.
Mario Alba, Jr., Esq.
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747

                                                /s/ Leslie J. Abrams
                                                  Leslie J. Abrams