UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re RADIAN SECURITIES LITIGATION | ) | Master File No. 2:07-cv-03375-MAM |
| | ) | |
| | ) | CLASS ACTION |
| This Document Relates To: | ) | |
| | ) | |
| ALL ACTIONS. | ) | |
| | ) | |

CORRECTED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Lead Plaintiffs Iron Workers Local No. 25 Pension Fund and City of Ann Arbor Employees' Retirement System (collectively, the "Lead Plaintiffs" or the "Plaintiffs") allege the following based upon the investigation of Plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Radian Group Inc. ("Radian" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of purchasers of the securities of Radian between January 23, 2007 and August 7, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Defendant Radian offers mortgage insurance and other financial services and products to mortgage lenders and investors in the United States. This case concerns Radian's ownership of Credit Based Asset Servicing and Securitization LLC ("C-BASS"), a mortgage investment and servicing company that specializes in sub-prime single-family residential mortgages. During the Class Period, Radian owned a 46% equity interest in C-BASS.

3.     As detailed further herein, by the start of the Class Period, C-BASS was in dire financial condition as its core assets, collateralized sub-prime mortgages were declining in value at an increasing rate. Many of the loans in C-BASS's portfolio were fraudulent loans that were issued to borrowers who: (i) did not meet the prudent or maximum debt-to-income ratio purportedly required by the lender; (ii) did not provide adequate documentation to support the income and assets required to issue the loans pursuant to the disclosed guidelines; and (iii) did not have the income or assets required by the disclosed guidelines necessary to afford the required mortgage loan payments,

which resulted in a mismatch between the needs and capacity of the borrowers. Moreover, C-BASS purchased these loans from loan originators who were insolvent or on the verge of bankruptcy during the Class Period. By the start of the Class Period it was clear that C-BASS's business had steeply declined and would continue to do so.

4.    Also during the Class Period and unbeknownst to investors, C-BASS was receiving substantial margin calls from its lenders. As the assets that C-BASS had used as collateral for its loans deteriorated in value, C-BASS's lenders were insisting on additional cash collateral to cover the decline in value. Indeed, Defendants have admitted that for the first six months of 2007, C-BASS received and paid $290 million of margin calls. During this same period, Defendants told investors that they "feel good about C-BASS's proposals" and that "C-BASS is expected to return to profitability", among other positive statements.

5.    Furthermore, during the Class Period, Radian maintained the full value of C-BASS on its financial statements and failed to write down its interest in C-BASS, thereby materially overstating its financial results and rendering its financial statements materially false and misleading. As a result of Defendants' false statements, Radian stock traded at artificially inflated prices during the Class Period, reaching a Class Period high of $66.51 per share on February 6, 2007.

6.    Defendants downplayed and concealed the scope of C-BASS's liquidity issues so that Radian could consummate a merger with MGIC Investment Corporation ("MGIC"), a higher rated provider of private mortgage insurance which also held a 46% equity interest in C-BASS. Radian and MGIC announced the merger transaction on February 6, 2007. The Companies desperately needed to merge their operations in order to buttress and fortify their capital base. In 2005 and 2006, Radian and MGIC had recklessly expanded their insurance business and had insured numerous sub-prime mortgages and securities. By the start of the Class Period, it was clear to Radian and MGIC that they were going to get hit with a substantial increase of claims which would require capital.

Accordingly, in connection with the prospective merger, Radian and MGIC knew that they had to sell a substantial portion of their respective interests in C-BASS or they would be forced to recognize C-BASS's debt on their balance sheet, further straining their balance sheets. Thus, Defendants were motivated to conceal the problems with C-BASS for as long as possible in order to unload Radian's holdings in C-BASS to unsuspecting private investors so that the merger could be consummated.

7.    Ultimately, Defendants were unable to conceal the problems at C-BASS. On July 30, 2007, Radian announced that its more than $500 million investment in C-BASS was materially impaired. Then, the very next day, on July 31, 2007, C-BASS disclosed that during the first six months of 2007 it had received and paid $290 million in margin calls and that it had received an additional $260 million in margin calls in the first few weeks of July.

8.    In response to the disclosures about the problems at C-BASS and the impairment of Radian's investment in C-BASS, the price of Radian stock declined by $20.62 per share, representing a 69% decline from the Class Period high just six months prior. Shortly thereafter, MGIC terminated the merger agreement with Radian.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

11.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts and practices complained of herein, including the preparation

and dissemination of materially false and misleading information, occurred in substantial part in this District.

12.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

13.    Lead Plaintiffs Iron Workers Local No. 25 Pension Fund and City of Ann Arbor Employees' Retirement System, as set forth in their certifications, which were previously filed in this litigation and are incorporated by reference herein, purchased the securities of Radian at artificially inflated prices during the Class Period and have been damaged thereby.

14.    Defendant Radian is a credit enhancement company that provides credit protection products and financial services to mortgage lenders and other financial institutions.  Radian's principal executive office is located at 1601 Market Street, Philadelphia, Pennsylvania.

15.    (a)    Defendant S.A. Ibrahim ("Ibrahim"), at all relevant times, served as Radian's Chief Executive Officer ("CEO") and was a member of Radian's Board of Directors.  During the Class Period, Defendant Ibrahim signed the Company's Form 10-K filed with the SEC.  While in possession of material adverse information about Radian's business, Defendant Ibrahim sold 6,135 shares of his personally-held Radian stock, generating proceeds of over $384,000.

(b)    Defendant C. Robert Quint ("Quint"), at all relevant times, served as Radian's Chief Financial Officer ("CFO") and Executive Vice President and signed the Company's Form 10-K and Form 10-Q filed with the SEC during the Class Period.  Quint also sat on C-BASS's Board of Managers.  While in possession of material adverse information about Radian's business, Defendant Quint sold 129,000 shares of his personally-held Radian stock, generating proceeds of over $8.1 million.

(c)     Defendant Mark A. Casale ("Casale") served as President of Radian Guaranty Inc. during the Class Period. Casale also managed Radian's partnership with C-BASS and served as a member of C-BASS's Board of Managers. Casale relinquished his position as President of Radian Guaranty Inc. on October 30, 2007 and left Radian soon after the end of the Class Period.

(d)     Defendants Ibrahim, Quint and Casale are collectively referred to herein as the "Individual Defendants."

16.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

17.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers of Radian, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and

misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

18.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

19.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Radian, each of the Individual Defendants had access to the adverse undisclosed information about Radian's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Radian and its business issued or adopted by the Company materially false and misleading.

20.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class

Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

21.      Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Radian common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Radian's business, operations, management and the intrinsic value of Radian common stock; and (ii) caused Plaintiffs and other members of the Class to purchase Radian common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

22.      Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of Radian during the Class Period, inclusive (the "Class") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

23.      The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Radian common shares were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified

from records maintained by Radian or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

24.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

25.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

26.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Radian;

(c)     whether the price of Radian common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## CONFIDENTIAL SOURCES

28.     Plaintiffs make the allegations herein, except as to allegations specifically pertaining to Plaintiffs and their counsel, based upon the investigation undertaken by Lead Plaintiffs' counsel, which investigation included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about Radian, interviews of former employees of Radian, interviews of former employees of C-BASS, press releases and other public statements issued by the Company, C-BASS and MGIC, and media reports about the Company, C-BASS and MGIC and believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

29.     Moreover, the allegations made herein are supported by the first-hand knowledge of eight (8) confidential witnesses ("CWs"). These informants are former employees of Radian or C-BASS, each of whom was employed by their respective companies during the Class Period. As detailed below, the CWs each served in positions at Radian or C-BASS which provided them with access to the information they are alleged to possess.

30.     CW 1 worked at C-BASS from 2005 to late October 2007 as a Senior Fraud Analyst. CW 1's duties involved examining and writing detailed written reports on the residential mortgage loans purchased by C-BASS.

31.     CW 2 worked at C-BASS from January to October 2007 as a Loan Underwriting Risk Assessment Analyst in C-BASS's Loan Asset Management unit. CW 2 was primarily responsible for evaluating the quality of loans C-BASS acquired.

32.     CW 3 worked at C-BASS from May 2006 to May 2007 and served as an Analyst in the IT Department at C-BASS's New York office. CW 3's duties involved updating C-BASS's website with monthly bond and loan data from internal and external sources.

33.     CW 4 worked at Radian from July 2002 to July 2007 and served in the role of Vice President/Credit Risk and Structured Products for Radian Guaranty, Inc. ("Radian Guaranty"), a Radian company that provides mortgage insurance.

34.     CW 5 worked at Radian from 1998 to January 2007 and served in the role of Vice President/Risk Operations Manager for Radian Guaranty.  As Risk Operations Manager, CW 5 examined customers' residential mortgage loan portfolios, analyzed the risk content, and set up systems to qualify prospective borrowers.

35.     **[THIS PARAGRAPH HAS BEEN INTENTIONALLY LEFT BLANK.]**

36.     CW 7 worked at C-BASS from 2004 until May 2008 and served as a Senior Forensic Underwriting Analyst.  CW 7 was responsible for performing fraud investigations and forensic underwriting on non-performing mortgage loans that were held in C-BASS's portfolio.

37.     CW 8 worked at C-BASS from 1998 through late 2007 as Assistant Vice President of C-BASS's credit surveillance department.  C-BASS's credit surveillance department investigated the delinquent or defaulted loans that C-BASS had purchased.

38.     CW 9 worked at C-BASS as Vice President in the financial analysis area from the late 1990's until late 2007.  CW 9 reported to Robert Weinstein, C-BASS's CFO.

## SUBSTANTIVE ALLEGATIONS
### The Sub-Prime Mortgage Market

39.     The sub-prime mortgage market generally refers to the mortgage loan market associated with borrowers with a higher risk profile than borrowers who qualify for the best available (or "prime") mortgage loan interest rates. The risk level of potential mortgage borrowers is often assessed by reference to their Fair Isaac & Company ("FICO") scores which is used by credit rating companies that look at a variety of factors in a borrower's credit history to determine the borrower's risk of default.

40.     Over the past 30 years, the sub-prime mortgage market has evolved from being just a small percentage of the overall U.S. home mortgage market to one that is currently originating hundreds of billions of dollars of sub-prime loans annually. While several important legislative and regulatory changes have induced such growth, the sub-prime mortgage market would not have experienced such enormous growth without the development of a strong secondary market for home mortgage loans.

41.     Home mortgage loans are commonly sold in the secondary mortgage market in one of two ways: 1) whole loan sales; and 2) securitizations of groups or "pools" of mortgage loans. With respect to whole loans, originators of mortgage loans sell their loans, either individually or in pools. With respect to the process known as a securitization, a large number of mortgage loans are pooled and interests in the mortgage loan pools are then sold to investors. The securitized interests sold to investors are known as mortgage-backed securities ("MBS"). Holders of MBS generally receive all or some portion of the cash flow from the continuing payments on the mortgage loans in the underlying securitized pool of loans.

42.     During the 1980s, credit rating agencies began rating privately-issued MBS, which made them more suitable to a wider range of investors and expanded the market for MBS. By 1988, 52% of outstanding residential mortgage loans had been securitized, up from 23% four years earlier.

43.     This rapid expansion of the secondary mortgage market significantly increased mortgage lenders' access to capital and dramatically reduced the need for loan originators to possess a large deposit base for their liquidity. As a result, non-depository mortgage lenders proliferated, comprising approximately 32% of lenders of home mortgage loans by 1989.

44.     During the early to mid-1990s, rising interest rates decreased the demand for prime mortgage loans. To spur mortgage demand, lenders became more willing to originate sub-prime mortgages. This inclination, coupled with technological advances that helped credit rating

companies accumulate credit information on a greater number of debtors, increased the market for sub-prime mortgage loans. By 1998, approximately $150 billion in sub-prime mortgage loans were originated, up from approximately $35 billion in 1994.

45.     The growth in the sub-prime mortgage loan market during the 1990s was also aided by mechanisms that allocated and/or moderated risk in sub-prime MBS. These mechanisms, called "credit enhancements" allowed issuers to obtain investment-grade ratings on all, or part of, their MBS, despite the higher risk on the sub-prime mortgages upon which the MBS were based.

46.     These credit enhancement mechanisms were primarily:

- Senior/Subordinate MBS structures. This mechanism allocates pools of sub-prime mortgage loans into different "tranches," each designed to possess unique cash flow characteristics. Since certain tranches (the "senior" tranches) are paid before others (the "subordinate" tranches), higher credit ratings can be obtained on at least the more senior tranche portion of the MBS pool.

- Bond insurance. The issuer of the MBS purchases insurance from a third-party insurer that covers some or all of the losses in the underlying mortgage loan pool.

- Over-collateralization. This mechanism increases the collateral of the pool of mortgage loans, which helps to protect the MBS from losses on the underlying sub-prime mortgage loans. For example, an issuer might sell $100 million of MBS and include $105 million in the underlying mortgage pool.

47.     As a result of these credit enhancement mechanisms, MBS were deemed to be suitable to a wider market of investors, and the value of sub-prime MBS sold in the secondary mortgage market grew from $10 billion in 1991 to more than $60 billion in 1997. These sales of MBS provided lenders, including non-depository and mortgage-only companies who were responsible for much of the sub-prime mortgage lending, with ample liquidity to originate new sub-prime loans. By 2005, the amount of new sub-prime mortgage loans that were originated grew to over $620 billion.

48.     Accordingly, more and more individuals in the United States were afforded access to residential mortgage loans. The increase in origination and lending to new homeowners spurred a

rapid increase in the residential mortgage industry. Demand for homes amid lower interest rates fueled a rise in home prices. Rising home prices fueled a building boom in new homes. Inevitably, as lenders attempted to reach ever more potential homebuyers, aggressive, and oftentimes predatory, lending practices by lenders spurred ever increasing loans to borrowers, whose ability to repay their loans became particularly sensitive to interest rate changes. Lenders were willing to take on riskier loans because there were always mortgage purchasers in the secondary market willing to relieve the lender of the risk associated with these loans.

**Radian's Business**

49.     Radian, headquartered in Philadelphia with significant operations in New York and London, describes itself as a leading provider of "credit enhancement" for the global financial and capital markets. According to the Company's website:

> ***Built on a foundation of evaluating credit risk***, the products and services we provide in mortgage insurance, public finance, structured finance, reinsurance and other financial services ***help clients and investors manage risk expertly and prudently***. [Emphasis added.]

50.     The Company's website also states that the Radian enterprise includes a group of companies that share a unified strategic focus on credit enhancement. These companies include:

- Radian Asset Assurance Inc., which provides financial guaranty insurance and reinsurance to U.S. and international issuers of municipal bonds, asset-backed securities and structured finance transactions.

- Radian Asset Assurance Limited, a subsidiary of Radian Asset Assurance Inc., which offers solutions for an array of asset classes including asset-backed securities, collateralized debt obligations and mortgage-backed securities.

- Radian Financial Products Limited, a subsidiary of Radian Asset Assurance Inc., which offers a range of derivatives-based solutions for clients in the United Kingdom and throughout the European Union.

- Radian Guaranty Inc., which provides mortgage insurance to protect lenders against loan default and to enable homebuyers to purchase homes more quickly and with smaller down payments.

- Radian Insurance Inc., a subsidiary of Radian Guaranty Inc., which writes non-traditional mortgage insurance for second and high-loan-to-value mortgages.

51.     During the Class Period, Radian actively managed these subsidiaries and required the employees from the subsidiaries to report directly to Radian executives.

52.     Radian managed the subsidiaries and the Company's operations via three business segments:  1) mortgage insurance; 2) financial guaranty; and 3) financial services.  The following table reflects the contribution of Radian's three business segments to its net income and equity in 2006:

|  | Net Income | Equity |
|---|---|---|
| Mortgage Insurance | 49% | 55% |
| Financial Guaranty | 23% | 34% |
| Financial Services | 28% | 11% |

53.     According to Defendant Ibrahim, during the Class Period "[e]ach of the[] businesses in their own right, Financial Guaranty, Mortgage Insurance, and Financial Services, [wa]s strong.  It is a combination of the three and our ability to leverage insight and expertise across these three businesses that makes us unique."

54.     Radian's mortgage insurance segment provides credit protection to mortgage lenders and other financial services companies on residential mortgages.  This private mortgage insurance ("PMI") is designed to protect mortgage lenders from all or a portion of default-related losses on residential mortgage loans made mostly to home buyers who make down payments of less than 20% of the home's purchase price, thereby facilitating the sale of these mortgage loans in the secondary mortgage market.

55.     Radian insures first and second lien mortgages.  The Company also writes mortgage insurance on an individual loan basis, which is commonly referred to as "flow" business, and insures multiple mortgages in a single transaction, which is commonly referred to as "structured" business. During 2006, Radian's mortgage insurance segment wrote $25.4 billion of flow business and $14.7

billion in structured transactions, compared to $25.6 billion and $17.0 billion of flow business and structured transactions in 2005, respectively.

56.    Radian's financial guaranty insurance segment provides the holder of a financial obligation with an unconditional and irrevocable guaranty for the full and timely payment of the obligation's principal and interest.  This type of insurance can reduce an issuer's cost of borrowing when the premium is less than the value of the spread (commonly referred to as the "credit spread") between the yield on the insured obligation and the yield on the obligation if it were sold without its uninsured credit rating.  In addition, financial guaranty insurance can also help to facilitate the marketability of obligations issued by infrequent or unknown issuers or obligations with complex structures.

57.    Radian's financial services segment consists mainly of its 46% ownership interest in C-BASS and its ownership interest in Sherman Financial Services Group LLC ("Sherman"). Sherman purchases and services charged-off and bankruptcy plan consumer assets at deep discounts from national financial institutions and major retail corporations.  In addition, Sherman originates non-prime credit card receivables through its CreditOne subsidiary.

### Radian's Investment in C-BASS

58.    C-BASS -- a joint venture between Radian and MGIC, with both owning approximately 46% of, and investing approximately $500 million in, the entity -- was predominantly involved in purchasing, servicing and securitizing sub-prime residential mortgages.

59.    Throughout the Class Period, C-BASS was a critical component of Radian's business and earnings.  As Defendant Ibrahim admitted during a conference call held on January 31, 2007, "C-BASS . . . is an important contributor to our earnings.  C-BASS reported very strong results last year."  Indeed, in 2006, C-BASS accounted for 16% of Radian's earnings.

60.     C-BASS has historically invested in and serviced sub-prime, residential mortgage assets and residential mortgage-backed securities that it financed through borrowings and securitization activities.  During the Class Period, C-BASS serviced sub-prime loans through its wholly-owned subsidiary, Litton Loan Servicing, LP ("Litton").  In December 2007, C-BASS announced that it had sold Litton, "a recognized industry leader in mortgage default management," to Goldman Sachs Group Inc.

61.     Radian and MGIC each own approximately 46% of C-BASS, with the remaining interests owned by the current or former members of C-BASS's management.  During 2007, C-BASS ceased purchasing mortgages and mortgage securities and began winding down its operations. C-BASS's website indicates that it is currently liquidating its existing portfolio and returning any proceeds to its creditors.

62.     Prior to and during the Class Period, the MBS securitized by C-BASS were particularly risky because they were backed by sub-prime loans that were so risky they were not even rated.  As a result, C-BASS's assets were extremely unstable and highly volatile and had to be very closely monitored.

63.     For example, *FitchRatings* describes the general business strategy of C-BASS as one that "targeted investment in 'scratch and dent' sub-performing and non-performing whole loans, sub-prime whole loans, subordinate RMBS [Residential Mortgage Backed Securities] and servicing rights. . . ."  Similarly, the *American Banker* describes C-BASS as a "New York firm best known for buying 'scratch-and-dent' home loans."

64.     Concerning scratch-and-dent loans, after a pool of loans is assembled by a loan originator for sale, potential investors generally request that certain loans be removed or "kicked out" of the loan pool because of missing loan data or because a particular loan falls outside of the pool's guidelines.  The deficient loans that are "kicked out" of the pool are then categorized as being

either egregious or non-egregious kick outs. An example of a non-egregious loan kick out is one where a particular investor may object to its being a stated income loan or a loan with a high debt-to-income ratio, as contrasted to an egregious loan kick out that, for example, might be a loan that is non-performing or one that does not comply with applicable underwriting standards.

65.     Generally, non-egregious loan kick outs are transferred to another loan pool for sale to potential investors with a higher risk tolerance, and egregious loan kick-outs are transferred to the so-called "scratch-and-dent" category of the loan inventory.

66.     In addition, the largest proportion of mortgages that C-BASS purchased were generally located in California and Florida. According to an article published in *The New York Times*, on or about March 7, 2008, stated that mortgage defaults particularly increased in California and Florida and although the "two states account for about 21 percent of all mortgages," they represent "30 percent of the new foreclosures."

67.     Compounding the above noted risks, C-BASS did not originate the loans they serviced and securitized, which increased the risk that loans C-BASS securitized were fraudulently originated. In fact, in February 2007, BasePoint Analytics, a leading provider of predictive analytic fraud and risk management solutions for the mortgage and global banking industries, announced the results of its scientific study which indicated that up to 70% of mortgage early payment defaults were linked to significant misrepresentations on loan applications, including inflated borrow income, overvalued appraisals, fictitious employment and falsified tax returns.

68.     Significantly, C-BASS generally retained the first-loss and other subordinated risk securities from the MBS it created with its portfolio of risky, distressed home mortgage loans. According to MGIC's 2005 Form 10-K, "***C-BASS generally retains the first-loss and other subordinate securities created in the securitization***." [Emphasis added.]

69.     Similarly, Litton's website states, "C-BASS retains the subordinate risk in all our securitizations. This means both C-BASS and Litton Loan Servicing LP have a vested, financial interest in ensuring our customers are not only satisfied with the service they receive, but that they are able to continue making their mortgage payments.  This creates a winning situation for everyone."

70.     C-BASS retained the most risky interests in the securitizations it created.  C-BASS then used these very risky, highly volatile assets as collateral for bank financing which it used to purchase additional high risk mortgage loans.

71.     In part, C-BASS was willing to retain such high risk instruments to buttress the securitization's marketability.  As noted in the December 14, 2007, *American Banker*, "[h]aving Litton Loan service the mortgages gave C-BASS control over their performance, and having C-***BASS own the riskiest pieces of the deals was meant to give bond investors confidence.***" [Emphasis added.]

72.     Since such tranches were the lowest grade, they were also the highest yielding and provided C-BASS with attractive returns as long as underlying sub-prime mortgage pools were performing.  By retaining a subordinated interest in its securitizations, C-BASS kept the difference between the cash flows it received on the risky mortgage pool it transfers to an off-balance trust and the interest the trust pays to the holders of the securitization tranches.  Thus, C-BASS provided protection to the holders of the senior securitization tranches by accepting the first risk of payment default.

73.     However, as these tranches were last in line to receive payment from the underlying mortgage pools, these securities were also subject to a precipitous decline in value in the event of increasing defaults by the sub-prime pool borrowers because as payment defaults by the sub-prime borrowers increased, little, if any, remaining cash flow was available for payment on C-BASS

subordinated interest. Accordingly, the value of such interests can, and did, decline precipitously in the event of an increase in the rate of default on the underlying sub-prime mortgage pool.

74.     As detailed below, prior to and during the Class Period, the conditions in the sub-prime market deteriorated significantly. This deterioration gave rise to a material increase in mortgage loan defaults, which significantly impaired the value of C-BASS's subordinated securitized interests. This impairment, as Defendants knew or recklessly ignored, subjected C-BASS to significant liquidity risk because C-BASS used subordinated securitized interests as collateral for bank financing, which it used to purchase additional high risk mortgage loans.

75.     Defendants knew or recklessly ignored that C-BASS faced a monumental liquidity crisis when the value of its subordinated securitized interests collateralizing C-BASS's bank loans evaporated because C-BASS had been heavily dependent on bank credit lines for its liquidity.[1] In fact, C-BASS maintained very high debt levels with its liabilities equaling almost 90% of its assets at December 31, 2006.

### The Sub-prime Mortgage Crisis

76.     Beginning in the summer of 2004, housing price increases began to stall and interest rates began to rise, which adversely affected the sub-prime borrowers' ability to pay their mortgages.

77.     In June 2004, the Federal Reserve signaled that it would begin to increase key short-term interest rates. As a result, the prime rate, which had remained flat at four percent for more than a year, increased to 4.25% in July 2004, 5.25% by mid-December 2004, and climbed steadily throughout 2005 and 2006 before reaching 8.25% in June 2006. As key short-term and prime rates rose, other interest rates rose as well, including those for most residential mortgage loans.

---

[1]     The liquidity crisis was further exacerbated by demands from C-BASS's lenders forcing C-BASS to deposit additional money or securities as a result of a decline in the value of securities collateralizing the loans ("margin calls").

78.    This rise in interest rates made it more difficult for borrowers to meet their payment obligations, particularly since many of the borrowers of the sub-prime mortgage pools purchased by C-BASS held adjustable rate mortgages ("ARMs"), which adjusted to a higher interest rate as interest rates rose.

79.    At the same time that interest rates were rising, property value appreciation began to slow and, in some regions, by 2006, values actually began to decline, which limited the ability of borrowers to refinance loans when they could not meet payment obligations on their existing loans, thereby increasing the risk of default.

80.    The slowing of property appreciation had a serious effect on sub-prime borrowers, because, previously, when property values were increasing, sub-prime borrowers were able to refinance their loans when an ARM adjusted to higher interest rates. However, as property prices leveled, many sub-prime borrowers were unable to pay the higher monthly payments on ARMs, absent a refinance option.

81.    There are three main indicators that are used by industry experts to assess the current state of, and future prospects for, the mortgage market: (1) the Housing Price Index, which measures changes in home prices; (2) interest rates; and (3) delinquency rates, which monitor the percentage of mortgagors who default on their mortgage obligations.

82.    As illustrated in the following chart, U.S. housing prices collapsed in early 2006:



83.     As U.S. housing prices fell, interest rates increased dramatically between 2006 and

2007:



84.     This combination was devastating for U.S. borrowers who over-extended themselves

by purchasing homes that they could not afford without low initial interest rates, called "teaser"

- 21 -

rates, and on ARMs that increased substantially in 2006 and 2007. In the early 2000s, since home values were rising at the time of purchase, and presumably would continue to rise in the future, buyers could refinance their 3, 5, or 7-year ARMs at the time the teaser rate expired, using the additional equity in the homes to support the refinancing.



85.    Beginning in 2005 home values began to decline, interest rates began to rise, and ARM teaser rates expired. As a result, the American homeowners who overextended themselves were faced with new, higher mortgage payments that they could not afford and could not refinance. The result – beginning in the first quarter of 2005 – was that mortgage default rates rose dramatically, particularly for sub-prime loans.

86.    On October 20, 2005 Radian issued a press release commenting on the U.S. housing market, noting that "we are starting to see signs of mortgage rates rising, and there are other signals that the housing market may be softening – slower sales, fewer new housing starts and prices beginning to cool in some markets."

87.    On August 29, 2006, *Dow Jones Newswires* reported that "[m]ore sub-prime borrowers are defaulting in the early months of their home loans, a trend that has led to greater fear among investors and lenders of rising delinquencies and losses."

88.     On September 13, 2006, *CNNMoney.com* noted:

In August, 115,292 properties entered into foreclosure, according to RealtyTrac, an online marketplace for foreclosure sales. That was 24 percent above the level in July and 53 percent higher than a year earlier.

It was the second highest monthly foreclosure total of the year; in February, 117,151 properties entered foreclosure.

Some of the bellwether real estate market states are among the leading foreclosure markets. Florida had more than 16,533 properties in foreclosure in August. That led all states and was 50 percent higher than in July and 62 percent higher than in August 2005.

California foreclosures are increasing at an even faster annual rate, up 160 percent since last year to 12,506. And the formerly red-hot Nevada market recorded a spike of 24 percent compared with July and a whopping 255 percent increase from August 2005.

\*       \*       \*

Usually, foreclosures are a lagging [market] indicator [ ] But we've never had a situation like this with adjustable-rate mortgages amounting to $400 billion to $500 billion coming up for adjustment over the rest of the year.

\*       \*       \*

These exotic mortgages, which have been issued by lenders at much higher numbers the past few years, default at a higher rate than do fixed-rate mortgages. And sub-prime loans, which are much more common than in the past, have a higher default rate as well.

89.     On November 13, 2006, *American Banker* reported:

**UBS Securities issued a report last week that found that sub-prime loans made this year are "going bad" at a rate that is 50% faster than the rate for those made last year.** About 2.4% of sub-prime loans originated this year were more than 60 days delinquent by the sixth month, compared with 1.6% for 2005 loans and 0.9% for 2004 loans, the report said. [Emphasis added.]

90.     On November 30, 2006, the *National Mortgage News* reported:

How bad is 2006 sub-prime collateral is a question I think most of you have an opinion on already," said Mr. Zimmerman [the Executive Director of UBS Securities]. We were a bit surprised at the magnitude and speed at which this vintage year deteriorated.

Mr. Liu [a Director at UBS Securities] pointed out at the conference that *the industry is seeing "a steady increase of delinquencies and that rate has been accelerating over the past two to three months." Not only have there been higher delinquencies but also the delinquency numbers have been showing up earlier in 2006 than they had been in 2005. "2006 is tapped to be the worst vintage ever,"* he said.

Foreclosures have also risen. And the foreclosures, like the delinquency rates, are also happening at earlier dates. [Emphasis added.]

91.    On December 13, 2006, the Associated Press reported:

**U.S. mortgage delinquency rate rises sharply**

Late Mortgage Payments Rose Sharply in Late Summer

Late mortgage payments shot up in the third quarter *as higher interest rates squeezed budgets and made it harder for homeowners -- especially those with weaker credit records --to keep up with their monthly obligations*.

The Mortgage Bankers Association, in its quarterly snapshot of the mortgage market released Wednesday, reported that the percentage of mortgage payments that were 30 or more days past due for all loans tracked jumped to 4.67 percent in the July-to-September quarter.

That marked a sharp rise from the second quarter's delinquency rate of 4.39 percent and was the worst showing since the final quarter of last year, when delinquent payments climbed to a 2 1/2-year high in the aftermath of the devastating Gulf Coast hurricanes.

The association's survey covers 42.6 million loans.

*Delinquency rates in the third quarter were considerably higher for "sub-prime" borrowers* -- people with weaker credit records who are considered higher risks -- *especially those who have adjustable-rate mortgages*.

*Sub-prime borrowers had a delinquency rate of 12.56 percent in the third quarter, the highest in more than three years.* The delinquency rate for these borrowers holding adjustable-rate mortgages was even higher -- at 13.22 percent in the third quarter, also the worst reading in more than three years. [Emphasis added.]

92.    Accordingly, prior to the beginning of the Class Period, it had become readily apparent that the mortgage industry was experiencing the onset of an unprecedented crisis. Indeed,

in 2006, alone, a substantial number of mortgage companies closed or declared bankruptcy, including:

| Mortgage Company[2] | Date of Closure/Bankruptcy |
|---|---|
| Cenex Home Equity | March 2006 |
| Chapel Funding | April 2006 |
| Accoustic Home Loans | April 2006 |
| Aames Investment | May 2006 |
| *Ameriquest Mortgage* | *May 2006* |
| HomEq | June 2006 |
| Mortgage IT | July 2006 |
| Saxon | August 2006 |
| First Franklin | September 2006 |
| Meritage Mortgage | November 2006 |
| Summit Mortgage | November 2006 |
| Sebring Capital | December 2006 |
| Chamption | December 2006 |
| *Ownit Mortgage Solutions* | *December 2006* |
| Harbourton Mortgage | December 2006 |
| Alliance Home Funding | December 2006 |
| Millennium Bankshares | December 2006 |

93.    By early 2007, some of the top mortgage lenders with sub-prime mortgage exposure started to reveal enormous losses and warned of future volatility in the market.  For example, on February 7, 2007, citing trouble with the U.S. sub-prime lending market, HSBC Holdings announced that provisions for bad loans would be 20% higher than analysts expected.  On the same day, New Century Financial Corporation, the second largest sub-prime mortgage originator in the U.S., reported significant problems with loan defaults.

94.    Indications of turmoil in the sub-prime mortgage market continued as other mortgage lenders, including Countrywide Financial and Washington Mutual, reported huge losses.  According

---

[2]    The highlighted mortgage companies represent the loan originators from which C-BASS purchased its loans.

to a February 9, 2007 article published by *The Wall Street Journal*, foreclosure rates on sub-prime mortgage loans in 2006 more than doubled from 2005.

95.    By early March 2007, several lenders, including Fremont General Corporation and New Century Financial, exited the sub-prime residential real estate lending business completely. Then on April 2, 2007, New Century Financial Corporation announced that it was filing for Chapter 11 bankruptcy protection.

96.    Specifically, during 2007, the following mortgage lenders closed or went into bankruptcy protection:

| Mortgage Company[3] | Date of Closure/Bankruptcy |
|---|---|
| EquiFirst | January 2007 |
| ABN Amro Mortgage | January 2007 |
| Popular Financial | January 2007 |
| Bay Capital | January 2007 |
| Equi Banc Mortgage | January 2007 |
| Funding America LLC | January 2007 |
| Deep Green Financial | January 2007 |
| Eagle First Mortgage | January 2007 |
| New York Mortgage | February 2007 |
| Mortgage Lenders Network | February 2007 |
| Lenders Direct Capital | February 2007 |
| ResMae Mortgage | February 2007 |
| Silver State Mortgage | February 2007 |
| Central Pacific Mortgage | March 2007 |
| FMF Capital LLC | March 2007 |
| Ameritrust Mortgage | March 2007 |
| Master Financial | March 2007 |
| Investaid Corp. | March 2007 |
| People's Choice | March 2007 |
| LoanCity | March 2007 |
| Senderra Funding | March 2007 |
| ResMae Mortgage | March 2007 |
| PHH Mortgage | March 2007 |
| SB Financial | March 2007 |
| Mortgage Tree Lending | April 2007 |

---

[3]    The highlighted mortgage companies represent the loan originators from which C-BASS purchased its loans.

| | |
|---|---|
| ***Fremont*** (residential sub-prime unit) | April 2007 |
| Lime Financial Services | April 2007 |
| New Century Servicing | April 2007 |
| ***Option One Mortgage*** | April 2007 |
| ***New Century Financial*** | April 2007 |
| SouthStar Funding | April 2007 |
| Peoples Mortgage | April 2007 |
| WarehouseUSA | April 2007 |
| Copperfield Investments | April 2007 |
| First Horizon National | April 2007 |
| Opteum Financial Wholesale | April 2007 |
| H&R Block Mortgage | April 2007 |
| MILA | April 2007 |
| Texas Capital Bank | April 2007 |
| Pinnacle Financial | May 2007 |
| Opteum Financial Retail | May 2007 |
| Green Tree Servicing | June 2007 |
| Lancaster Mortgage | June 2007 |
| Oak Street Mortgage | June 2007 |
| Starpointe Mortgage | June 2007 |
| Heartwell Mortgage | June 2007 |
| ***Wells Fargo*** (correspondence unit) | June 2007 |
| First NLC Financial | July 2007 |
| Premier Mortgage Funding | July 2007 |
| Alliance Mortgage Investments | July 2007 |
| ***Wells Fargo*** (sub-prime wholesale) | July 2007 |
| Entrust Mortgage | July 2007 |
| Winstar Mortgage | August 2007 |
| ***Ameriquest*** | August 2007 |
| Alternative Financing | August 2007 |
| Trump Mortgage | August 2007 |
| ***American Home Mortgage*** | August 2007 |
| MLSG Home Loans | August 2007 |
| Impac Mortgage | August 2007 |
| Fieldstone | August 2007 |
| HomeBanc Mortgage | August 2007 |
| Aegis Mortgage | August 2007 |
| Regions | August 2007 |
| BNC Mortgage | August 2007 |
| Express Capital Lending | August 2007 |
| Bay Finance | August 2007 |
| First Indiana | August 2007 |
| Guardian Loan | August 2007 |
| Unlimited Loan Resources | August 2007 |
| Pacific American Mortgage | August 2007 |

| | |
|---|---|
| Thornburg Mortgage | August 2007 |
| National Home Equity | August 2007 |
| NovaStar Financial | August 2007 |
| GreenPoint Mortgage | August 2007 |
| First Magnus Financial | August 2007 |
| First National Arizona | August 2007 |
| Quality Home Loans | August 2007 |
| Amstar Mortgage | August 2007 |
| *Accredited Home* | August 2007 |

97.     These announcements, and others like them, were strong indicators as to the severity of the problems being experienced by sub-prime lenders which would adversely affect Radian's investment in C-BASS.

98.     It is in this environment – defined by: (i) the increase in mortgage defaults; (ii) the decline in home values; (iii) the decrease in remittance payments; (iv) severe financial difficulties experienced by mortgage originators and other investment banks – that Radian decided not to disclose that its investment in C-BASS was materially impaired and that C-BASS was receiving hundreds of millions of dollars in margin calls.

**Defendants Knew or Recklessly Ignored That Radian's
Investment in C-BASS Was Impaired**

99.     Defendants knew or recklessly ignored that, prior to the beginning of the Class Period, C-BASS faced an increasingly difficult operating environment that impaired the value of Radian's investment in C-BASS, including, inter alia:

- An increase in early payment defaults ["EPD"] by borrowers indicating that the borrowers of the loans purchased by C-BASS had not been properly qualified;

- An increase in investor rejections of loans that C-BASS sought to securitize (so-called "kickouts" or "fallouts"), which was primarily the result of defective appraisals, incorrect credit reports and missing documentation. This indicated that C-BASS was consistently purchasing loans that failed to meet accepted underwriting standards and investor guidelines. These kickouts were particularly problematic because C-BASS was forced to find other investors, often at less attractive terms for the kicked out loans, or placed the loans in its own portfolio. All loans that were not sold promptly after funding negatively impacted C-BASS's liquidity;

- An increase in mortgage delinquency rates;

- C-BASS's purchases of increasingly risky mortgage products, such as stated income loans (i.e., "Liar Loans" where the borrower did not need to verify that he/she had sufficient income to be able to repay the loan with documentation) and 80/20 loans (i.e., loans representing 100% of the property value, consisting of an 80% first lien and a 20% second lien). These higher risk features often combined together in a single loan through a so-called layering of risks; and

- An increasingly competitive sub-prime market evidenced by shrinking margins between the interest rates on purchased loans and the rates offered to the purchasers of C-BASS's securitizations.

100. Despite these and other red flags, C-BASS continued to purchase risky loans during the Class Period from the very same loan originators that were severely affected by the downturn in the mortgage market and were on the verge of bankruptcy.

101. According to CW 2, a former C-BASS loan Underwriting Analyst who specialized in evaluating the quality of loans that C-BASS acquired, C-BASS purchased loans from the largest loan originators including Countrywide Financial Corp, New Century Financial Corporation, HSBC Mortgage Services, American Home Mortgage, Bear Stearns Mortgage, Wells Fargo, Delta Financial Corp, Option One (H&R Block), Accredited Home Lender, Fremont General Corp and IndyMac. CW 7 and CW 8 confirmed that C-BASS purchased "distressed" or "sub-prime" loans pools from companies like Ameriquest, Option One, Fremont, IndyMac and Countrywide - the very loan originators that experienced huge losses and were going out of business during the Class Period.

102. For example, at the end of 2006, CW 9, who worked at C-BASS as Vice President in the financial analysis area, noted that one of the originators used by C-BASS, called Ownit, "went under." According to CW 9, C-BASS purchased many loans from Ownit that were in default. However, because Ownit did not have the liquidity to buy the defaulting loans back, C-BASS was stuck with them.

103. On December 7, 2006 *Bloomberg.com* published an article entitled, "Ownit Mortgage, Part-Owned by Merrill, Shuts Down This Week" detailing the collapse of Ownit Mortgage Solutions:

Dec. 7 (Bloomberg) -- Ownit Mortgage Solutions Inc., a California-based home lender part-owned by Merrill Lynch & Co., closed this week and told more than 800 workers not to return, a former employee said.

*     *     *

Ownit joins Ameriquest Mortgage Co., Countrywide Financial Corp., H&R Block Inc.'s Option One, BNC Mortgage Inc. and other lenders in shutting operations or laying off employees as the U.S. housing market slows. Delinquencies are rising, home prices are falling and borrowers of adjustable-rate mortgages are facing higher monthly payments.

"There were meetings with top management late in the day on Monday saying, 'Look, we're having some problems with our partners and brace yourselves,'" Panet said. "It's a lousy market right now, and it's heading down not up."

104.    The other loan originators that C-BASS purchased its loans from were in financial trouble as well.  According to *Forbes.com*, in a March 12, 2007 article entitled "More Bad News From New Century," by March 2007, New Century did not have enough liquidity to repurchase its mortgage loans:

> The company, the second-largest subprime mortgage lender in America, told investors on Monday morning that all of its lenders had stopped short-term funding or will do so soon. The Irvine, California-based company said it would require more than $8 billion if it was put in position where it was required to repurchase all its outstanding mortgage loans, but New Century said it doesn't have the liquidity to meet that financial obligation.
>
> The company's shares were suspended from trading on Monday.
>
> On Friday, shares of New Century (nyse: NEW - news - people ) sank more than 17%, a day after the lender said it would stop accepting loan applications from prospective borrowers because it no longer has money to lend. (See: "No More Loans For New Century").
>
> Stifel Nicolaus equity analyst Christopher Brendler was concerned for New Century's future. "They are in huge trouble," Brendler said. "I'm surprised that they haven't already applied for bankruptcy protection." Like other subprime lenders, New Century has been suffering from rising default.

105.    Numerous former C-BASS employees stated that the deteriorating conditions experienced generally by sub-prime market participants prior to and during the Class Period caused the quality of the sub-prime mortgage pools securitized by C-BASS to decline.

106.    For example, CW 3, a former C-BASS Information Technology Analyst who maintained a database of financial statistics about the loan portfolios C-BASS securitized, said default rates increased during 2006 into 2007.  CW 8, C-BASS's Assistant Vice President of the credit surveillance department, confirmed that the number of defaulting loans in C-BASS's portfolio were "definitely increasing" around December 2006 and into 2007.

107.    The deteriorating quality of C-BASS's loan portfolio was confirmed by other former employees.  CW 2 stated that there was a continuous decline in the quality of loans C-BASS purchased beginning in 2005.  CW 2 emphasized that, from 2005 to 2007, C-BASS purchased increasing amounts of high-risk loans, including an increase in the number and proportion of 80/20 loans and stated-income loans (so-called "Liar Loans").  CW 2 recalled daily "I saw zero good loans today" conversations with counterparts.

108.    According to CW 7, a Senior Forensic Underwriting Analyst at C-BASS responsible for finding fraud associated with the underlying loans in C-BASS's portfolio, by December 2006, the "fraud aspect" of C-BASS's loan portfolio "went off the wall."  CW 7 elaborated that fraudulent loans included those where the borrower's income or assets did not match what they put on the mortgage application or loan documents containing incorrect FICO scores, improperly valued properties or any other information that may have been fabricated or exaggerated.  CW 7 noted that of the defaulting loans sent to her department at C-BASS, approximately 75% of the loans were fraudulent.  CW 8 confirmed that most of C-BASS's loans that were delinquent or in default turned out to be fraudulent.

109.    According to CW 8, the "riskiest loans" (called "no-doc loans") were "definitely" on the rise at C-BASS in 2007.  CW 8 elaborated that no-doc loans were provided to borrowers even if the borrowers had no documentation to support the wages or assets they reported on their mortgage loan applications.

110.    C-BASS's management knew exactly how poor its mortgage pools were performing during the Class Period because, as Litton's website states, ***Litton services every C-BASS issued deal.*** [Emphasis added.]

111.    In a November 27, 2006 article, American Banker reported:

*This year Litton Loan Services LP created a team to focus on recently transferred loans whose borrowers have not made their first scheduled payment.* The 40 employees make welcome calls to borrowers, send them letters with payment coupons and information on how to access their accounts online, and follow up regularly. *In some cases, the team members visit the property, with the coupons and brochures in hand.*

*"We're doing things now that I thought we'd never do,* just to try to inform a consumer that a payment is owed," *said Larry B. Litton Jr.*, the Houston servicer's chief operating officer. *The changes at Litton Loan, a unit of New York's C-Bass LLC, are symptomatic of a problem that has dogged the sub-prime mortgage industry this year: loans that go bad only months after closing.* [Emphasis added.]

112.    CW 1 indicated that Radian was knowledgeable about loans in C-BASS's portfolio because it provided mortgage insurance on the loans and because Radian, like other residential mortgage loan insurers, maintained a systematic process for monitoring instances when borrowers defaulted on mortgage loans. CW 1 worked at C-BASS from 2005 to late October 2007 as a Senior Fraud Analyst. CW 1's duties involved examining and writing detailed written reports on the residential mortgage loans purchased by C-BASS.

113.    In fact, CW 4, a former Radian Vice President, stated that beginning in 2006, he/she and other senior members of Radian's management readily witnessed a higher rate of loan delinquencies. By late 2006 and into the first two quarters of 2007, according to CW 4, the situation was dire for C-BASS because there were so many defaulted loans sitting in their portfolio.

114.    This view was confirmed by another former Radian Vice President, CW 5, who also acknowledged an increase in riskier residential mortgage loans in the market in 2006 and stated that Radian was hesitant to insure such loans. CW 5 recalled that defaults and foreclosures began to rise in the 2005-2006 timeframe, which resulted in an increase in claims filed against Radian. CW 5 said

Radian insured loans purchased by C-BASS and later faced having to pay a claim upon loan default and foreclosure of the property.

115.    By at least March 2007, it was clear that Radian's investment in C-BASS was impaired.  At that time, some of C-BASS's mortgage loan asset-backed certificates had been downgraded by Fitch Ratings and others placed on Rating Watch Negative.  According to an article in *National Mortgage News*, issued on March 12, 2007:

**C-BASS Deal Downgraded**

Two classes from Credit Based Asset Servicing and Securitization LLC series 2002-CB6 have been downgraded by Fitch Ratings, and two classes from C-BASS series 2002-CB5 have been placed on Rating Watch Negative.

Class B-2 of series 2002-CB6 was downgraded from BBB-minus to BB-minus, and class B-3 was downgraded from BB to B-plus. Classes B-2 and B-3 of series 2002-CB5 were placed on Rating Watch Negative.

*             *             *

***The negative rating actions reflect a deterioration in the relationship between credit enhancement and loss expectations, the rating agency said***.  [Emphasis added.]

116.    Despite the declining conditions in the sub-prime market, C-BASS, as Defendants knew or recklessly ignored, was intent on securitizing defective mortgages so that it could procure the liquidity necessary to purchase more sub-prime loans.  In fact, CW 1, a former C-BASS Senior Fraud Analyst, explained that C-BASS was so eager to purchase mortgages, that, in many instances, C-BASS would "eat" bad loans it purchased even though it had the right to "put" loans back to the originators out of fear that C-BASS might sully its loan originator relationships and damage its ability to purchase loans in the future.

117.    Even when C-BASS would go back to the loan originators that sold the fraudulent loans to C-BASS, according to CW 8, C-BASS "rarely got the money back."  CW 7, stated that about 10% of the loans were refunded by the institution that originally sold them to C-BASS.  With

approximately 75% fraudulent loans in C-BASS's portfolio and a 10% refund rate, this meant that C-BASS was stuck with holding onto about 65% of the fraudulent/defaulting loans.

118.    CW 1 detailed that C-BASS management went further than simply purchasing loan pools that were "all bad" from its biggest loan originator sources. For example, C-BASS and Countrywide Financial Corp. ("Countrywide"), one of C-BASS's largest loan originators, entered into a "blanket settlement" in 2006, which erased many of the fraud claims that C-BASS had against Countrywide's loan pools. In addition, the blanket settlement contained a loophole, which severely reduced the amount of claims that C-BASS could bring in the future. As a result, CW 1 would find misrepresentations in Countrywide loan pools, but would no longer be able to file a claim pursuant to the blanket settlement. According to CW 1, this situation was very damaging to C-BASS's ability to avoid purchasing poor quality loans and forced C-BASS to maintain a string of very risky loan pools.

119.    Although many of these bad loans were rejected by C-BASS's underwriting loan analysts, CW 2 stated that they were nonetheless included in loan pools that were securitized by C-BASS. These rejected low quality loans invariably ended up in the subordinated securitization tranches that C-BASS purchased and used as collateral for its bank financing.

120.    In addition, CW 2 stated that, during the 2005-2006 timeframe, the volume of loans the analysts at C-BASS were expected to review each day increased 50% to 100%, from about eight loan files per day to between twelve and fifteen per day. As a result, the loan analysts did not have sufficient time to adequately review loan files.

121.    In fact, CW 1, described C-BASS as a "house of cards" whose operating strategy was built on performing alchemy in that it expected to utilize Litton's loan servicing expertise to turn the low grade, non-performing loans into paying loans so that they could be securitized and easily marketed to institutional investors in the U.S. and abroad.

122.    Given the recent lending excesses associated with the sub-prime market, this expectation was wholly unrealistic, especially when property values stopped rising in 2006 and sub-prime borrowers could not refinance their way out of existing mortgages they could not afford.

123.    CW 1 stated that when loan defaults increased, the value of C-BASS's subordinated securitization interests that served as collateral for the financing that C-BASS obtained from its creditors declined, resulting in margin calls by C-BASS's creditors. According to CW 7, it was known that C-BASS would likely not survive the margin calls because it did not have enough liquidity in reserves to pay them all.

124.    As C-BASS's CEO, Bruce Williams, admitted during a conference call with analysts and investors held by MGIC on April 12, 2007, C-BASS had been forced to mark down its sub-prime securities portfolio by $34 million during the first quarter of 2007. According to Williams, "a substantial portion of the first quarter shortfall occurred during the last week of February and March as the market continued to deteriorate due to announcements relating to New Century, Fremont and others."

125.    The adverse sub-prime conditions, coupled with the high risk nature of C-BASS's operations, subjected C-BASS to massive undisclosed margin calls during the Class Period that significantly drained it of liquidity, leaving C-BASS without sufficient cash to operate and further impaired the value of Radian's investment in C-BASS.

126.    Indeed, Defendants knew or recklessly ignored that the adverse sub-prime conditions, coupled with the high risk nature of C-BASS's operations, impaired the value of Radian's investment in C-BASS because Radian and C-BASS maintained a close business relationship. In fact, in his 2005 letter to Radian's shareholders contained in the Company's 2005 Annual Report, Defendant Ibrahim highlighted Radian's involvement in the business activities of C-BASS:

> ***In holding board seats at each company, Radian maintains an active involvement in strategic activities at both C-BASS*** and Sherman Financial. We believe both

- 35 -

companies have outstanding prospects and we are actively exploring new opportunities with each. [Emphasis added.]

127.    Defendant Ibrahim reiterated Radian's involvement in C-BASS's operations in his

2006 letter to Radian's shareholders contained in the Company's 2006 Annual Report:

> As C-BASS participates in the sub-prime mortgage market as an investor in those assets, it has been under pressure in early 2007 as spreads on non-investment grade and non-rated sub-prime mortgage securities have continued to widen, and the industry has experienced increased credit losses. While this impacts short term results, over the long term our involvement in these two companies has delivered a multitude of benefits to Radian, in the areas of earnings, franchise value, and diversified and recurring revenue streams. Additionally, *our relationships with C-BASS* and Sherman *provide timely and valuable insights into the consumer-credit marketplace*, which is useful in shaping the strategy and direction of our [mortgage insurance] and [financial guarantee] businesses. [Emphasis added.]

128.    Moreover, during the Class Period, each of the Defendants were members of Radian's

executive team, which was the decision-making body for all of Radian's business related issues.

129.    **[THIS PARAGRAPH HAS BEEN INTENTIONALLY LEFT BLANK.]**

130.    **[THIS PARAGRAPH HAS BEEN INTENTIONALLY LEFT BLANK.]**

131.    **[THIS PARAGRAPH HAS BEEN INTENTIONALLY LEFT BLANK.]**

132.    In addition, as Defendant Ibrahim noted in his 2005 letter to Radian's shareholders,

Defendant Casale sat on C-BASS's board:

> [Defendant] Mark Casale, previously the head of our strategic investments and then capital markets business, was appointed in March 2006 to President of our domestic [mortgage insurance] business. *Mark, who sits on the boards of C-BASS* and Sherman Financial, *has the additional responsibility of driving growth for the mortgage credit risk business.* [Emphasis added.]

133.    **[THIS PARAGRAPH HAS BEEN INTENTIONALLY LEFT BLANK.]**

134.    Moreover, Litton's website indicated that the operations of Litton, C-BASS and C-

BASS's investor, Radian were "uniquely" integrated:

> The key to C-BASS' success is alignment - *we are committed to ensuring the interests of C-BASS, Litton, Litton's customers, and our investors are aligned. This integration of what were traditionally separate mortgage business lines is what makes us unique in our industry.* C-BASS retains the subordinate risk in all

our securitizations. This means both C-BASS and Litton Loan Servicing LP have a vested, financial interest in ensuring our customers are not only satisfied with the service they receive, but that they are able to continue making their mortgage payments. This creates a winning situation for everyone. [Emphasis added.]

135.    Accordingly, Defendants had sophistication, access to information and the "unique" vantage point from which to observe C-BASS's business operations.

### C-BASS Receives a Debilitating Amount of Margin Calls

136.    As noted herein, during the Class Period, C-BASS experienced significant problems with the rapid decline in value of its investments and increasing margin calls from lenders. Within the first six months of 2007, C-BASS received and paid $290 million in margin calls that left it on the brink of insolvency and further impaired the value of Radian's investment in C-BASS during the Class Period.

137.    According to a Form 8-K filed by Radian with the SEC on August 2, 2007 ("August Radian 8-K"), between July 1 and July 29, 2007, C-BASS received another $362.7 million in margin calls, of which more than $160 million was received in the first 25 days of July – prior to an earnings call with analysts and investors that Radian held on July 25, 2007. However, neither the $290 million, nor the additional $160 million were mentioned by Defendants at any time during the Class Period. These omissions were critical to the market's understanding of C-BASS's liquidity and its ability to continue its operations, as well as the subsequent effect on Radian.

138.    The August Radian 8-K, also noted that as of July 27, 2007, "C-BASS had paid only $263.5 million of the $362.7 million in outstanding margin calls." Radian attributed the "accelerating amount of margin calls" as the basis for the Company's decision on *July 29, 2007* to take an impairment charge on Radian's investment in C-BASS even though C-BASS had purportedly paid $263.5 million in margin calls in July alone.

139.    The August Radian 8-K suggested that Radian's entire $518 million investment in C-BASS was at risk of being written off as impaired:

Radian has not yet determined an estimate of the amount or range of amounts of the potential impairment, although the *impairment charge could be our entire investment in C-BASS*. [Emphasis added.]

140.    MGIC made a similar announcement, filed on Form 8-K with the SEC on August 1, 2007 ("August MGIC 8-K"), noting that from February 1, 2007 – July 31, 2007, C-BASS "used almost $550 million in cash resources to satisfy lenders' margin calls on loans to C-BASS." According to MGIC's announcement, "[a]pproximately $285 million was paid to satisfy the margin calls in July 2007, of which approximately $140 million was paid during the period July 19-July 26, 2007."

141.    The August MGIC 8-K further noted that MGIC concluded that its half a billion dollar investment in C-BASS was impaired on *July 26, 2007*:

> *After considering the accelerating amount of margin calls* to which C-BASS was subject and C-BASS's available resources to meet such margin calls, *on July 26, 2007, the Company's Chief Financial Officer and its Chief Accounting Officer concluded that a material charge for impairment of the Company's investment in C-BASS was required* under generally accepted accounting principles.  These officers did not determine an estimate of the amount or range of amounts of the impairment, although they subsequently determined that the upper boundary of the *impairment charge could be the Company's entire investment in C-BASS*. [Emphasis added.]

142.    The August Radian 8-K also stated that on July 19, 2007, Radian and MGIC each provided C-BASS with $50 million under an unsecured credit facility, "which C-BASS drew fully upon on July 20th and 23rd."  According to a conference call held with analysts and investors on July 25, 2007, Radian suggested that the credit facility was created "[t]o support C-BASS's liquidity position" which because of the "subprime mortgage environment" had "drained cash resources and challenged liquidity for all market participants including C-BASS."  Radian and MGIC provided C-BASS with the $50 million credit facility in order to keep C-BASS afloat long enough for the Radian-MGIC merger to go through.

143.    Despite C-BASS's severe liquidity problems, Defendants failed to disclose during the July 25, 2007 conference call, or any other time during the Class Period, that the value of their investment in C-BASS was materially impaired and that C-BASS had continued to receive hundreds of millions of dollars in margin calls that it was unable to repay.

### The Proposed Merger Between Radian and MGIC

144.    On February 6, 2007, Radian and MGIC jointly issued a press release announcing that they had agreed to a stock-for-stock merger valued at approximately $4.9 billion.  According to the press release:

> The new company, to be called MGIC Radian Financial Group Inc., will have nearly $15 billion in total assets, more than $290 billion of primary mortgage insurance in force and a financial guaranty portfolio approximating $104 billion of net par outstanding.

> The agreement provides for a stock-for-stock merger in which 0.9658 shares of MGIC common stock will be exchanged for each share of Radian common stock. The merger is intended to qualify as a "tax-free reorganization" for U.S. shareholders. Based upon the closing stock prices of both companies on February 5, 2007, the pro forma combined market capitalization of the new institution would be approximately $10 billion.

145.    Radian and MGIC knew that the rating agencies, whose views and assignments of financial strength ratings are critical to their businesses, would view the consolidation of the companies' ownership in C-BASS negatively because C-BASS's debt would significantly impact the balance sheet of the proposed combined entity.  Accordingly, as a condition of the merger transaction, which was expected to be completed in the fourth quarter of 2007, Radian and MGIC agreed to reduce their joint interests in C-BASS so that the merged company would hold less than a 50% interest in C-BASS.  The proceeds from the sale would be used to repurchase shares of the combined company in order to increase the new company's earnings-per-share and render the merger accretive to earnings.  It was, therefore, essential for Radian and MGIC to sell their interests in C-BASS before the companies could merge.

146.    **[THIS PARAGRAPH HAS BEEN INTENTIONALLY LEFT BLANK.]**

147.    The sale of C-BASS as a condition of the Radian-MGIC merger was well received by investment analysts, mainly because of the *perceived* value of C-BASS. For example, the brokerage firm Stifel Nicolaus noted:

> In the short term, we attribute most of the value creation of the transaction to the anticipated divestiture of part of the companies' interest in C-BASS . . . as well as the announced . . . share buyback. We estimate that a partial C-BASS and Sherman divestiture could contribute a possible $6 per share in value creation and the anticipated buy-back $8 per share.

148.    However, shortly after Radian and MGIC publicly announced the impairment of their respective investments in C-BASS, MGIC issued a press release on August 7, 2007 announcing that in light of the C-BASS impairment, "MGIC is not obligated to complete its pending merger with Radian Group Inc." Specifically, MGIC's announcement stated the following:

> MGIC Investment Corporation (NYSE: MTG) ("MGIC") announced that it has advised the New York Insurance Department today that it is the preliminary assessment of MGIC's management that MGIC is not obligated to complete its pending merger with Radian Group Inc. in light of the C-BASS impairment announced last week. Radian has informed MGIC that Radian disagrees with MGIC management's preliminary assessment. MGIC's management is also reviewing other developments that may affect MGIC's obligation to close. Whether MGIC will definitively conclude that it is not obligated to close the merger is a decision that will be made only by the Board of Directors of MGIC, which will not be asked to decide until MGIC's management has completed its analysis. In connection with management's analysis, MGIC is requesting additional information from Radian.

149.    On September 5, 2007, Radian and MGIC jointly announced the termination of the pending merger, stating that "current market conditions have made combining the companies significantly more challenging."

### Radian's Financial Statements Were Materially False and Misleading and Violated GAAP

150.    During the Class Period, Radian represented that its financial results were reported in conformity with Generally Accepted Accounting Principles ("GAAP"). These representations were materially false and misleading because Defendants caused or allowed Radian to issue financial

statements that violated GAAP when they:(a) failed to disclose or misstated the facts, referred to under GAAP as "subsequent events," evidencing the existence of a likely impairment in the value of C-BASS; and (b) failed to timely record an impairment in the value of its investment in C-BASS.[4]

151.   After the end of the Class Period, the SEC commenced an investigation into the Company associated with its investment in C-BASS and, Deloitte and Touche, LLP ("D&T"), the Company's former auditors, declined to stand for reappointment after Radian filed its June 30, 2007 Form 10-Q **prior to** D&T's review of the Company's financial statements contained therein.[5]   In fact, D&T was unable to conduct such review because Defendants had not provided D&T with documentation relating to whether the value of Radian's investment was impaired.

**Radian's False and Misleading**
**Annual Financial Statements**

152.   GAAP, in Emerging Issues Task Force ("EITF") Topic D-86, notes that the staff has indicated that Rule 10b-5 and general instruction C.(3) to Form 10-K specify that financial statements must not be misleading as of the date they are filed with the SEC.  EITF Topic D-86 also provides that:

> A registrant and its independent auditor have responsibilities with regard to post-balance-sheet-date subsequent events, as well as the application of authoritative literature applicable to such events.

---

[4]   Regulation S-X [17 C.F.R. §210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  Generally Accepted Auditing Standard ("GAAS") AU §411.02.

[5]   Regulation S-X [17 C.F.R. §210.10-01(d)] requires that interim financial statements be reviewed by the company's independent public accountant prior to their filing on Forms 10-Q. Additionally, Regulation S-X [17 C.F.R. 210.10-01] also requires that interim financial statements comply with GAAP.

153.    Concerning subsequent events, EITF Topic D-86 makes reference to the American Institute of Certified Public Accountant's ("AICPA") Statement on Auditing Standards ("SAS") No. 1, *Subsequent Events* (or AU §560) which, in pertinent part, states:[6]

> [E]vents or transactions sometimes occur subsequent to the balance-sheet date, but prior to the issuance of the financial statements that have a material effect on the financial statements and therefore require adjustment or disclosure in the statements. These occurrences hereinafter are referred to as "subsequent events."
>
> The first type [of subsequent event] consists of those events that provide additional evidence with respect to conditions that existed at the date of the balance sheet and affect the estimates inherent in the process of preparing financial statements. . . .
>
> The second type [of subsequent event] consists of those events that provide evidence with respect to conditions that did not exist at the date of the balance sheet being reported on but arose subsequent to that date. These events should not result in adjustment of the financial statements. ***Some of these events, however, may be of such a nature that disclosure of them is required to keep the financial statements from being misleading.*** . . . [Emphasis added.]

154.    Radian's financial statements for the year ended December 31, 2006 (the "Annual Financial Statements") were filed with the SEC on Form 10-K or about March 1, 2007. Defendants knew or recklessly ignored that the Annual Financial Statements were falsely represented to have been presented in conformity with GAAP.

155.    As noted in detail above, by the time Radian filed its Annual Financial Statements with the SEC, numerous adverse facts about the viability of C-BASS were in existence. These material "subsequent events," which were required to be disclosed pursuant to GAAP, were knowingly or recklessly omitted from the Annual Financial Statements.

---

[6]    The Sarbanes Oxley Act of 2002 created the Public Company Accounting Oversight Board ("PCAOB") to, among other things, establish or adopt GAAS. Prior to the creation of the PCAOB, the AICPA promulgated GAAS. To the extent they have not been superseded or amended by the PCAOB, the audit standards issued by the AICPA (which are codified and referred to as AU §___) have been adopted by the PCAOB as its interim standards to be used on an initial, transitional basis.

156.    In fact, by the time Radian filed the Annual Financial Statements with the SEC, C-BASS had been in receipt of material margin calls by its lenders.  This highly unusual event adversely impacted C-BASS's liquidity to the extent that it threatened its very existence and required C-BASS to take extreme measures which were known or recklessly ignored by Defendants, especially by Defendants Casale and Quint who sat on C-BASS's Board of Members.

157.    Nonetheless, the Annual Financial Statements failed to disclose the material adverse subsequent events then being experienced by C-BASS.  Accordingly, Radian falsely and misleadingly represented that the Annual Financial Statements were presented in conformity with GAAP.

**Radian's False and Misleading
Interim Financial Statements**

158.    Radian's financial statements for the quarter ended March 31, 2007 (the "Interim Financial Statements") were filed with the SEC on or about May 10, 2007 and falsely represented that "[w]e have presented our condensed consolidated financial statements on the basis of accounting principles generally accepted in the United States of America ("GAAP")."

159.    GAAP, in Article 10 of Regulation S-X [17 C.F.R. §210.10-01(a)(5)], provides, in pertinent part, that:

- [I]nterim financial information shall include disclosure either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim information presented not misleading;

- [D]isclosure shall be provided where events subsequent to the end of the most recent fiscal year have occurred which have a material impact on the registrant; and

- [W]here material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred.

160.    As noted in detail above, by the time Radian filed the Interim Financial Statements, the adverse conditions affecting C-BASS, including the magnitude of margin calls it had received, escalated to the point that C-BASS was on the verge of bankruptcy.  To make matters worse, New

Century Financial Corporation, which owed C-BASS $35 million, filed for bankruptcy in early April of 2007.

161.    Nonetheless, the Interim Financial Statements, failed to disclose the material adverse subsequent events then being experienced by C-BASS.  To the contrary, the Interim Financial Statements deceptively stated that "C-BASS is expected to return to profitability over the balance of the year, assuming the sub-prime mortgage stabilizes at current levels."

162.    In addition, the Interim Financial Statements failed to disclose why C-BASS did not pay Radian a dividend during the quarter.  As Defendants knew or recklessly ignored, Radian, which had routinely received dividends from C-BASS, was not paid a dividend during the quarter because C-BASS's liquidity had diminished to the point that it was insolvent.

163.    In addition to the above-noted violations of GAAP, the Interim Financial Statements were presented in violation of GAAP because they failed to timely recognize the impairment in the value of Radian's investment in C-BASS.

164.    Prior to and during the Class Period, Radian represented in its financial statements that it accounted for its investment in C-BASS utilizing the "equity method" of accounting:

> Companies in which we, or one of our subsidiaries, own interests ranging from 20% to 50%, or companies over which we have significant influence, are accounted for in accordance with the equity method of accounting.

165.    The primary provision of GAAP governing the equity method of accounting is Accounting Principles Board ("APB") Opinion No. 18.  Pursuant to APB No. 18:[7]

> A loss in value of an investment which is other than a temporary decline should be recognized.  Evidence of a loss in value might include, but would not necessarily be limited to, absence of an ability to recover the carrying amount of the investment or inability of the investee to sustain an earnings capacity which would justify the

---

[7]    APB No. 18 also provides that the investor (Radian) record in its income statement its percentage share of the investee's (C-BASS's) earnings or losses.

carrying amount of the investment. A current fair value of an investment that is less than its carrying amount may indicate a loss in value of the investment. However, a decline in the quoted market price below the carrying amount or the existence of operating losses is not necessarily indicative of a loss in value that is other than temporary. All are factors to be evaluated.

166.    Radian's financial statements reported the value of C-BASS at approximately $445 million as of March 31, 2007. As noted herein, the conditions in the sub-prime market caused a precipitous decline in the value of C-BASS's subordinated interests in its securitizations. In fact, by the end of the first quarter of 2007, numerous C-BASS securitizations had been downgraded by the rating agencies, thereby exacerbating a further decline in the value of C-BASS's subordinated interests.

167.    The decline in the value of these assets, which collateralized C-BASS's loans, resulted in massive margin calls that left C-BASS on the verge of bankruptcy by March 31, 2007. As a result, the fair value of Radian's investment in C-BASS was materially less than its reported $445 million carrying value, thereby requiring Radian to recognize a loss on an impairment in that value of C-BASS in its Interim Financial Statements. In failing to record an impairment in the value that Radian attributed to C-BASS on March 31, 2007, Defendants deemed the fair value of C-BASS to be greater than $967 million at March 31, 2007.[8]

168.    As result of Defendant's failure to timely record an impairment in the value of C-BASS, Radian falsely represented that its Interim Financial Statements were presented in conformity with GAAP.

169.    Ultimately, on July 30, 2007, Radian issued a press release announcing, "that the

---

[8]    Radian owned 46% of C-BASS. $445 million represents 46% of $967 million.

value of [its] investment in" C-BASS had been "materially impaired."[9]  In fact, the indicators that

caused Radian to conclude the value of C-BASS was materially impaired were in existence at March

31, 2007.

170.    Indeed, Defendants improperly delayed the recognition of an impairment in the value

of its investment in C-BASS because they knew in doing so would they derail Radian's impending

merger with MGIC.  When Radian and MGIC announced that they had agreed to merge, they also

announced that they had agreed to sell half of their combined interest in C-BASS.  According to CW

1, the sale of C-BASS would add greatly to the value of MGIC and Radian shares because C-

BASS's financial statements would not have to be consolidated with the combined entity, thereby

excluding its debt from the combined entity's balance sheet.  Thus, by concealing the problems at C-

BASS until Radian completed its merger with MGIC, both companies would be able to sell their

holdings in C-BASS to unsuspecting private investors.

171.    Rather than disclosing C-BASS's margin calls and massive liquidity problems,

however, Defendants highlighted C-BASS's "expected return to profitability" and compared C-

BASS to others in the market, noting that as "one of the most respected players in the market [C-

BASS] enjoy[s] better executions than the others."  However, at the very time that Defendants' were

making positive statements regarding C-BASS's business and profitability, C-BASS was receiving

hundreds of millions of dollars in margin calls that would soon cause the company to collapse.

172.    After Radian announced that the value of its investment in C-BASS was materially

impaired, MGIC announced that it "has advised the New York Insurance Department today that it is

the preliminary assessment of MGIC's management that MGIC is not obligated to complete its

---

[9]    Radian's September 30, 2007 Form 10-Q discloses that on "July 29, 2007, we concluded that
there were indicators that a material charge for impairment of our investment in C-BASS was
required under GAAP."

pending merger with Radian Group Inc. in light of the C-BASS impairment announced last week."
Several weeks later, MGIC and Radian terminated their merger agreement.

173.    As a result of the wrongful accounting practices alleged herein, Defendants disseminated financial statements of Radian that were materially false and misleading. Nonetheless, the Defendants have failed to restate Radian's financial statements issued during the Class Period that were materially false and misleading due to its improper accounting and reporting of its investment in C-BASS.[10]

174.    In addition to the violations of GAAP noted above, Radian's financial statements during the Class Period were presented in violation of at least the following provisions of GAAP:

(a)    The principle that financial statements disclose loss contingencies when it is reasonably likely that a loss has been incurred. (Statement of Financial Accounting Standards No. 5);

(b)    The principle that financial statements disclose certain significant risks and uncertainties. (Statement of Position No. 94-6);

(c)    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. (Statement of Concepts ("Concepts Statement") No. 1, ¶34);

(d)    The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources. (Concepts Statement No. 1, ¶40);

---

[10]    GAAP, in Statement of Financial Accounting Standards No. 154, provides that previously issued financial statements that are erroneous due to an error or a misapplication of accounting principles are to be retroactively restated.

(e)    The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general.  (Concepts Statement No. 1, ¶50);

(f)    The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (Concepts Statement No. 1, ¶42);

(g)    The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. (Concepts Statement No. 2, ¶79); and

(h)    The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (Concepts Statement No. 2, ¶¶95, 97).

175.    In failing to file financial statements with the SEC that conformed to the requirements of GAAP, Radian disseminated financial statements that were presumptively false and misleading. The Company's Class Period Forms 10-K and 10-Q filed with the SEC were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's

liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

### Radian's False and Misleading Reporting and Certifications of Disclosure and Internal Controls

176.   Congress enacted the Sarbanes-Oxley Act in 2002, in part to heighten the responsibility of public company directors and senior managers associated with the quality of financial reporting and disclosures made by their companies. The SEC revised Item 307 and added Item 308 of Regulation S-K [17. C.F.R. §§229.307 and 308] to require companies to disclose the conclusions of its principal executive and principal financial officer on the effectiveness of a company's disclosure controls and procedures and disclose a report by management on its internal control over its financial reporting.

177.   Concerning the Company's internal and disclosure controls, Defendants Ibrahim and Quint signed the following report, which was included in the Company's March 1, 2007 Form 10-K:

Disclosure Controls and Procedures

We are committed to providing accurate and timely disclosure in satisfaction of our SEC reporting obligations. In 2002, we established a disclosure committee and formalized its disclosure controls and procedures. Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective in ensuring that the information required to be disclosed by us in our reports filed or submitted under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported on a timely basis, and that this information is accumulated and communicated to management as appropriate to allow for timely decisions regarding required disclosures.

Internal Control Over Financial Reporting

Management's Annual Report on Internal Control Over Financial Reporting and the attestation report of Deloitte & Touche LLP, independent registered public accounting firm, appear in Part II, Item 8 of this report and are incorporated into this Item 9A as if fully set forth herein.

There was no change in our internal control over financial reporting that occurred during the fourth quarter of 2006 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

178.    Similarly, Defendants Ibrahim and Quint signed the Company's Forms 10-Q during the Class Period, which included, in all material respects, the following report on the Company's internal and disclosure controls:

Disclosure Controls and Procedures

Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective in ensuring that the information we are required to disclose in the reports we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported on a timely basis, and that this information is accumulated and communicated to management as appropriate to allow timely decisions regarding required disclosures.

Internal Control Over Financial Reporting

There was no change in our internal control over financial reporting that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

179.    The Company's representations, which were materially false and misleading for the reasons alleged herein, were then wrongfully certified by Defendants Ibrahim and Quint and included as part of the Company's Forms 10-K and 10-Q filed with the SEC:

I, . . . , certify that:

1.      I have reviewed this . . . on Form . . . of Radian Group Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

180.    The certifications above were materially false and misleading when made for the reasons alleged herein.

- 51 -

**Materially False and Misleading**
**Statements Made During the Class Period**

181.    The Class Period commences on January 23, 2007.  On that date, Radian issued a

press release announcing its financial results for the fourth quarter and fiscal year of 2006, the

periods ending December 31, 2006.  For fiscal year 2006, the Company reported "record" net

income of $582.2 million and diluted net income of $7.08 per share.  Defendant Ibrahim commented

on the announcement and represented that the Company was "well positioned" to "benefit" from

"both cyclical and structural opportunities in the mortgage market," stating in pertinent part as

follows:

> Radian delivered record net income and grew book value by 16.1 percent, despite a
> challenging operating environment for our businesses including tight credit-spreads
> and competition from alternative products.  This performance demonstrates that our
> strategy to focus on diversification while maintaining a strict risk management
> culture continues to deliver long-term value.
>
> *            *            *
>
> Forecasts for interest rate stability, strong employment and improved persistency
> bode well for the mortgage insurance industry.  In this environment, we believe we
> are well positioned to benefit over the long term from both cyclical and structural
> opportunities in the mortgage market.

With regard to C-BASS, the Company stated as follows:

> In the Financial Services segment, both C-BASS and Sherman continued to be
> important and steady contributors to Radian's results.

182.    Following the earnings press release, on January 24, 2007, Radian held a conference

call with analysts and investors to discuss the Company's earnings and operations.  During the call,

Defendant Quint made positive remarks regarding the outlook for C-BASS, stating in relevant part,

as follows:

> During the fourth quarter, C-BASS recovered most of the hedge losses that had been
> booked in prior quarters.  ***While the subprime origination business is in a state of***
> ***uncertainty, an environment like this typically creates opportunities for C-BASS to***
> ***purchase mispriced assets.  We feel good about C-BASS's prospects for 2007,***

although there is clearly some uncertainty around these expectations.  [Emphasis added.]

183.    In response to the Company's earnings release and the conference call, the price of Radian's stock rose 5.8% to close at $60.18 per share, on heavier than normal trading volume.

184.    On March 1, 2007, Radian filed its Form 10-K for the fiscal year ended December 31, 2006, with the SEC, which was signed by Defendants Ibrahim and Quint, and confirmed the Company's previously-released financial results (the "2006 10-K").  The 2006 10-K reported that Radian's "net income attributable to the financial services segment" increased to $163.3 million and "[e]quity in net income of affiliates was $257.0 million for 2006," of which C-BASS accounted for $133.9 million.  The 2006 10-K provided the following guidance for fiscal 2007:

Overview of Business Results

As a holder of credit risk, our results are subject to macroeconomic conditions and specific events that impact the credit performance of the underlying insured assets. We experienced generally positive results throughout the business for the year ended December 31, 2006, led by strong credit performance and good production despite the challenging business production environment for mortgage insurance and financial guaranty insurance.

\*       \*       \*

For 2006, the financial services segment showed another year of strong earnings and return on investment, which was, in part, a result of the relatively low interest rate and favorable credit environment and a strong demand from investors in asset-backed securities, which were issued at more favorable rates.  In addition, both C-BASS and Sherman were positively impacted in the fourth quarter of 2006 by certain items – Sherman incurred a significant gain on sold portfolios during the quarter and C-BASS recovered most of the hedge losses that had been incurred in prior quarters. *Despite the significant credit spread widening that has occurred in the subprime mortgage market during the first quarter of 2007, which could produce mark-to-market losses for C-BASS during the first quarter, we expect that both C-BASS's and Sherman's results for 2007 will remain fairly consistent with their 2006 results, as both companies stand to benefit from recurring sources of earnings.* We expect continued growth in Sherman's credit card origination business, and, *while the sub-prime origination business is currently uncertain, C-BASS typically looks for opportunities to purchase mispriced assets in such an environment.* On February 16, 2007, C-BASS entered into an agreement to acquire Fieldstone Investment Corporation, a mortgage banking company that originates, sells, and invests primarily in non-conforming single-family residential mortgage loans with a

- 53 -

current portfolio of over $5.7 billion, for approximately $259 million in cash. The transaction, which is expected to occur in the second quarter of 2007, subject to regulatory and other approvals, supports C-BASS's strategy of aligning with companies that have significant investments in mortgage securities, where C-BASS's wholly-owned subsidiary, Litton Loan Servicing, as servicer, can enhance the underlying value of these securities. In addition, if approved, the transaction will provide C-BASS with a platform for loan originations. [Emphasis added.]

185.    The statements referenced above in ¶¶181, 182 and 184 were each materially false and misleading when made because they misrepresented C-BASS's liquidity and ability to survive the sub-prime mortgage crisis and failed to disclose the following adverse facts: (a) that the Company's $468 million investment in C-BASS was materially impaired, as C-BASS's assets were based on fraudulent loans purchased from loan originators that were either insolvent or on the brink of insolvency and, accordingly, C-BASS's assets were declining in value at a significant rate in the sub-prime mortgage market; (b) that Radian was materially overstating its financial results by failing to properly value its investment in C-BASS and by failing to write-down that investment in a timely fashion; (c) that C-BASS was experiencing an increasing amount of margin calls; and (d) as a result of the foregoing, Radian's financial statements were not prepared in accordance with GAAP and, therefore, were materially false and misleading. In addition, the positive statements concerning C-BASS's outlook for 2007 were materially false and misleading because, given C-BASS's margin calls and the problems with the sub-prime mortgage market, as detailed herein, there was no reasonable basis upon which to state that the Company "feel[s] good about C-BASS's prospects for 2007" and that C-BASS's "results for 2007 will remain fairly consistent with their 2006 results." Moreover, the positive statements about C-BASS, as noted in ¶¶181, 182, and 184, created an obligation to disclose C-BASS's liquidity problems and the significant margin calls that C-BASS had begun to receive.

186.    On April 24, 2007, Radian issued a press release announcing its financial results for its first quarter of 2007, the period ending March 31, 2007. For the quarter, the Company reported

net income of $113.5 million and diluted net income per share of $1.42. Commenting on the results, Defendant Ibrahim stated in pertinent part as follows:

> ***Our primary book was not significantly affected by the disruptions in the sub-prime market in recent months. I believe this is a validation of our long-term approach to risk management in all areas, including sub-prime and Alt A, where we have remained disciplined in diversifying our book of business across geographies, products, clients and origination years***. [Emphasis added.]

With regard to C-BASS, the Company stated:

> ***In the Financial Services segment, net income was $10.8 million, down from the $38.7 million for the same period last year, primarily as a result of an operating loss at C-BASS***. [Emphasis added.]

187.    The statements referenced above in ¶186 concerning the sub-prime market were materially false and misleading because they created the false impression that Radian was unaffected by the sub-prime mortgage crisis. In truth and in fact, as detailed herein, Radian's investment in C-BASS was materially affected by turmoil in the market, as C-BASS had been receiving margin calls that almost entirely depleted its liquidity. In addition, the statement that the net income in Radian's Financial Services segment was $10.8 million was materially false and misleading because the Company's investment in C-BASS was materially impaired due to C-BASS's investment in "bad loans" and increasing margin calls. Therefore, a charge for that impairment should have been taken against the Company's earnings at that time.

188.    Following the earnings press release, on April 25, 2007, Radian held a conference call with analysts and investors. During the call, Defendant Ibrahim downplayed the severity of the losses C-BASS was incurring and represented that C-BASS "expects a return to profitability," stating in pertinent part as follows:

> However, C-BASS reported a disappointing first quarter. As most of you learned from Bruce Williams, co-founder and CEO of C-BASS, who joined the MGIC earnings call earlier this month, C-BASS reported a pre-tax loss for the first quarter. As Bruce mentioned, ***the company expects a return to profitability in the second quarter and a pre-tax return for the year of 15% to 20%, which translates approximately into 150 to $200 million in pre-tax earnings for the full year, of***

- 55 -

*which Radian's share is 46%*. The full transcript of Bruce's remarks is available on our website in the SEC filings. [Emphasis added.]

Similarly, Defendant Quint stated the following:

You have obviously heard a lot about C-BASS's first quarter, along with the expectation for improvement over the rest of the year as they expect the market to stabilize at current levels. *We have started to see some evidence of this stabilization already in the second quarter*. [Emphasis added.]

189.    The statements referenced above in ¶188 that C-BASS "expects a return to profitability" in the second quarter of 2007 and that Radian has started to see evidence of stabilization in the market were materially false and misleading because, as Defendants knew, or recklessly disregarded: (i) C-BASS was materially impaired and had purchased fraudulent loans; (ii) C-BASS was receiving an escalating amount of margin calls from its lenders and was running out of liquidity; and (iii) the sub-prime mortgage crisis was not stabilizing and, in fact, conditions were deteriorating.

190.    During the April 25, 2007 conference call, Defendants also represented that as "one of the most respected players in the market," C-BASS would likely be able to resume profitability, despite the increased volatility in the sub-prime market. With regard to C-BASS's ability to regain profitability in the next quarter, the following exchange took place between Bruce Harting, an analyst from Lehman Brothers, and the Defendants:

BRUCE HARTING: On the C-BASS, understanding that Bruce Williams said that, but is it just simply that the inventory of loans had to be repriced; and now we move forward at a tighter bid? I didn't quite follow the logic on why the immediate return to profitability.

BOB QUINT: The portfolio is marked-to-market based on the changed spread. So at this point, they are comfortable that they can resume profitability.

BRUCE HARTING: Have they seen real-time signs of bid for their securitizations?

MARK CASALE: Oh, yes. Remember, Bruce, they executed securitizations through that, even through that turmoil, which is a testament to their name and reputation in the market. It is just when, at the end of the quarter, when they had to mark this stuff it was at an all-time wide. Spreads were at an all-time wide.

S.A IBRAHIM: Again, Bruce, as you know, ***when these kind of market conditions occur, while everybody gets hurt, the most respected players in the market enjoy better executions than the others***. The differentiation widens. So being the best player in a tough group of peers means you get hurt, but you also get hurt less. [Emphasis added.]

191.    The statement referenced above in ¶190 that "the most respected players in the market enjoy better executions than the others" was materially false and misleading because it downplayed the effect of the declining mortgage market on C-BASS's business and created the false impression that C-BASS was performing well in the adverse market conditions when, in truth and in fact, C-BASS's portfolio consisted of a significant amount of fraudulent mortgage loans purchased from loan originators that were insolvent or on the brink of insolvency. Moreover, C-BASS had already been hurt by margin calls from lenders and would likely face more margin calls because of its risky investments, as detailed herein.

192.    On or about May 10, 2007, Radian filed its Form 10-Q for the first quarter of 2007, the period ended March 31, 2007, with the SEC, which was signed by Defendants Ibrahim and Quint (the "First Quarter 2007 10-Q"). The First Quarter 2007 10-Q reported that Radian's "net income attributable to the financial services segment for the first quarter" was $10.9 million and "equity in net income of affiliates" decreased 61% to $22.8 million for the quarter, which was driven by a $6.8 million loss related to C-BASS. The First Quarter 2007 10-Q continued to represent that C-BASS would "return to profitability" and failed to disclose that Radian's investment in C-BASS was materially impaired, stating in pertinent part as follows:

Overview of Business Results

As a holder of credit risk, our results are subject to macroeconomic conditions and specific events that impact the production environment and credit performance of our underlying insured assets. We experienced mixed results during the first quarter of 2007. Positively, we had strong production in both mortgage insurance and financial guaranty insurance. However, mortgage insurance losses incurred were higher than expected and our financial services segment results were negatively impacted by the subprime mortgage market disruption which significantly affected C-BASS' financial performance in the quarter.

\*    \*    \*

For the quarter ended March 31, 2007, the financial services segment had mixed results. Sherman continued its consistent strong earnings; however, C-BASS incurred a loss of approximately $15 million as credit losses and credit spread widening in the subprime mortgage market impacted their results. Absent any unexpected events, Sherman's results for the balance of 2007 are expected to remain fairly consistent with its first quarter results, *while C-BASS is expected to return to profitability over the balance of the year, assuming the subprime mortgage stabilizes at current levels.* [Emphasis added.]

193. The statements referenced above in ¶192 were materially false and misleading for the reasons set forth in ¶185. In addition, the First Quarter 2007 10-Q materially overstated Radian's financial results by failing to properly value the Company's investment in C-BASS and by failing to write-down that investment in a timely fashion.

194. On May 16, 2007, Radian held a conference call with analysts at Lehman Brothers. During the conference call, Defendant Ibrahim emphasized Radian's "limited exposure to subprime mortgages," stating, in pertinent part, as follows:

As I mentioned, Radian is a diversified company with a portfolio of synergistic businesses. We have broad and flexible product offerings in both mortgage insurance and financial guaranty as well as strategic investments in financial services. *At Radian, we place a strong emphasis on risk management which means we take a long-term approach to managing risk. We have limited exposure to* (inaudible) *subprime mortgages and the 2006 [Vintage] you may have read about.* And additionally, we have protected our diversified book using captive reinsurance and Smart Home securitization.

195. The statements referenced above in ¶194 were materially false and misleading when made because they misrepresented Radian's true exposure to the sub-prime mortgage market through the Company's investment in C-BASS.

196. During the May 16, 2007 conference call, when specifically asked about "the issues at C-BASS," Defendant Ibrahim continued to make positive statements regarding C-BASS's profitability and its ability to survive the sub-prime mortgage crisis:

BRUCE HARTING, ANALYST, LEHMAN BROTHERS: Could you perhaps address some of the issues at C-BASS? You obviously highlighted they were the key

culprit for Q1's return on equity being where it was. Can you perhaps stress some of the changes that have been implemented there which give you the confidence that we will see a return to profitability in Q2 in this business?

S.A. IBRAHIM:  Again, the comments I quoted on C-BASS were from Bruce Williams who is the CEO and co-Founder of C-BASS. In making the points he made, Bruce said that if credit spreads didn't widen further and conditions in the market remain the same, he would expect a return to profitability in the first quarter and he expected to generate a return of 15% to 20% pretax for the year -- in the second quarter -- sorry. And for the full year, 15% to 20%.

If you look at what has happened, what happens in the first quarter, the C-BASS results were a function of widening spread and the [margin something] from it as well as the economic events driven by many of the counterparties going out of existence. *We've seen fewer parties go out of existence in the second quarter and credit spreads have not widened in the second quarter. On the contrary, for certain reputable players in the market we have actually seen -- its like narrowing our spreads have been able to issue securitizations on better terms than they were in the first quarter.*

I don't want to speak for Bruce here. But from my perspective as an investor in that business, *I look at those factors as giving me greater comfort in Bruce's comments* but I still think Bruce and the people closest to C-BASS are the best judges in terms of what exactly they expect the year to be like.  [Emphasis added.]

197.     The statements referenced above in ¶196 were materially false and misleading for the reasons set forth in ¶189.

198.     On July 24, 2007, Radian issued a press release announcing its financial results for its second quarter of 2007, the period ending June 30, 2007.  For the quarter, the Company reported net income of $21.1 million and diluted net income per share of $0.26.  Defendant Ibrahim commented on the announcement, stating, in pertinent part, as follows:

> *Our second quarter results clearly illustrate the credit challenges in today's mortgage market, but I believe they also reflect long-term positive trends for our business.*  Market conditions, particularly in California and Florida, led to an increase in defaults that impacts our results.  [Emphasis added.]

199.     Following the earnings press release, on July 25, 2007, Radian held a conference call with analysts and investors.  During the call, Defendants continued to downplay C-BASS's severe liquidity problems.  The following exchange is illustrative:

MATTHEW ROSWELL, ANALYST, STIFEL NICOLAUS: Yes, good morning. The question is actually on C-BASS. Could you go through the liquidity situation at C-BASS again? I understand you all providing or you and MGIC together providing the credit line to essentially pay for Fieldstone. What sort of lines do they have remaining in terms of unused capacity?

BOB QUINT: We are really, because they are in a -- the sale process that we're in right now it's not really appropriate to discuss the specific liquidity situation. But I think we just should reiterate that the whole market is going through a tough challenge with regard to liquidity and that includes C-BASS.

MATTHEW ROSWELL: Okay. And I guess sort of as a follow-up to that. Do you absolutely have to sell down the stake in C-BASS to close the transaction or is there some way of taking the ownership down?

S.A. IBRAHIM: There is no requirement in our agreement to sell down the interest in C-BASS prior to closing. When we made the determination that we needed to sell down our interest, it was based largely on our achieving certain ratings that will (inaudible) rating agency comfort.

We are in an environment which is pretty unusual. We'd have to deal with the reality of the environment in the best interest of our shareholders and with the right kind of discussions with rating agencies and other parties.

*       *       *

ANDREW BRILL, ANALYST, GOLDMAN SACHS: Thanks, just a couple of questions here. Just hoping if we could circle back up to C-BASS; just wanted to understand this a little bit better. Are they currently in the process of liquidating some of these assets at depressed values? Because if I remember correctly, they did talk about on the call last week that the mark to model effectively assumes that they hold the bonds to maturity. And to the extent they are forced to liquidate that could, I guess, dramatically shift the market values in their portfolio.

BOB QUINT: I don't know where you got that information. I'm not -- I don't think that was ever spoken about.

MARK CASALE: And they are not selling any bonds, Andrew.

ANDREW BRILL: Well, that is what I am asking, because their basic assumption is that they don't sell the bonds. And to the extent they are forced to, to cover margin cost, that obviously poses a big risk. My question to you was, are they in that position right now where they are forced to liquidate some of these positions?

MARK CASALE: *No, they are not.* [Emphasis added.]

200.    The statements referenced above in ¶¶198 and 199 were materially false and

misleading because they minimized the severity of C-BASS's liquidity problems and failed to

- 60 -

disclose that the Company's $468 million investment in C-BASS was materially impaired and that C-BASS had received approximately $160 million in margin calls from July 1-July 25 alone. Moreover, Defendants failed to disclose the impact of C-BASS's liquidity problems on the Radian-MGIC merger and prospects for the sale of Radian's interest in C-BASS. These omissions were misleading because they were essential to investors' understanding of C-BASS's assets and liquidity, and, accordingly, Radian's interest in C-BASS.

### The Truth Begins to Emerge

201.    On July 30, 2007, after the market closed, Radian shocked its investors when it issued a press release announcing that "it has concluded that the value of its investment in" C-BASS has been "materially impaired." According to the press release, ***"Since February 2007, the market for subprime mortgages has experienced significant turmoil . . ."*** [Emphasis added.] The Company further disclosed that its investment in C-BASS consists of approximately $468 million of equity as of June 30, 2007 and an additional $50 million drawn on July 20 and 23, 2007 under a $50 million unsecured credit facility that Radian provided to C-BASS. The Company also represented that although it had not determined the level of the impairment charge it "could be Radian's entire investment, less any associated tax benefit." Defendant Ibrahim commented on the announcement, stating, in pertinent part, as follows:

> While this action clearly reflects the continuing credit challenges in today's mortgage market, we are moving forward, as planned, with our proposed merger with MGIC, which we expect to close late in the current quarter, or early in the next.

202.    MGIC issued a similar announcement on July 30, 2007, stating that the value of its investment in C-BASS has been "materially impaired."

203.    In response to these announcements, the price of Radian common stock declined 18%, from $40.20 per share to close at $33.71 per share, on extremely heavy trading volume.

204.    On July 31, 2007, before the market opened, C-BASS issued a press release concerning Radian's announcement of the impairment charge (and a similar announcement made by MGIC). According to C-BASS, at the beginning of 2007, it had $302 million of liquidity. However, during the first half of 2007, it received $290 million in margin calls, leaving it with virtually no liquidity. While the margin calls from its lenders kept coming into C-BASS, C-BASS did not have the liquidity to meet them. C-BASS made the following statements with regard to its liquidity situation:

> While nothing fundamentally has changed at C-BASS, like many other firms in the industry, the current severe state of disruption in the credit markets has caused C-BASS to be subject to an unprecedented amount of margin calls from our lenders. *The frequency and magnitude of these calls have adversely affected our liquidity.* To address this, C-BASS is in advanced discussions with a number of investors to provide increased liquidity and is exploring all options to mitigate the liquidity risk in this difficult market.
>
> *At the beginning of 2007, we had $302 million of liquidity,* representing greater than 30% of our capital of $926 million. *During the first 6 months of 2007, a very tumultuous time in the subprime mortgage market, C-BASS' disciplined liquidity strategy enabled the company to meet $290 million in lender margin calls.* During the first 24 days of July alone, C-BASS met an additional $260 million of margin calls, representing greater than a 20% decline in the lender's value. We believe that nothing justifies this substantial amount of margin calls received in such a short period of time, particularly as there has been no change in the underlying fundamentals of our portfolio. [Emphasis added.]

205.    In response to this announcement, the price of Radian stock declined another 18% from $33.71 per share to close at $27.51 per share, on extremely heavy trading volume.

206.    On August 1, 2007, MGIC filed a Form 8-K that explained the reasons behind its impairment charge taken for C-BASS on *July 26, 2007* (only one day after Radian held a conference call for investors and analysts). The Form 8-K stated, in relevant part, as follows:

> Beginning in February 2007, the subprime mortgage market experienced significant turmoil, with market dislocations accelerating to unprecedented levels beginning in approximately mid-July 2007. During the period February 1, 2007 — July 31, 2007, the Company understands C-BASS has used almost $550 million in cash resources to satisfy lenders' margin calls on loans to C-BASS for which the collateral is mortgage securities and whole loans. *Approximately $285 million was paid to satisfy such*

*margin calls in July 2007, of which approximately $140 million was paid during the period July 19 — July 26, 2007. Since July 26, 2007, C-BASS has received approximately $330 million in such margin calls, virtually all of which has not been paid.*

\*        \*        \*

After considering the accelerating amount of margin calls to which C-BASS was subject and C-BASS's available resources to meet such margin calls, *on July 26, 2007, the Company's Chief Financial Officer and its Chief Accounting Officer concluded that a material charge for impairment of the Company's investment in C-BASS was required under generally accepted accounting principles.* These officers did not determine an estimate of the amount or range of amounts of the impairment, although they subsequently determined that the upper boundary of the impairment charge could be the Company's entire investment in C-BASS. The Company does not currently anticipate any future cash expenditures associated with the impairment charge. The Company anticipates that it will incur fees for legal and other outside advisors, the amount of which cannot be estimated at this time. [Emphasis added.]

207.    On August 2, 2007, Radian filed a Form 8-K with the SEC, similarly addressing the impairment of Radian's investment in C-BASS:

**Material Impairments.**

\*        \*        \*

Since February 2007, the market for subprime mortgages has experienced significant turmoil, with market dislocations accelerating to unprecedented levels beginning in mid-July 2007. C-BASS reported a loss of $14.7 million in the first quarter of 2007 before returning to profitability in the second quarter as credit spreads briefly stabilized before widening dramatically again in July.

During the five month period from February 1, 2007 through June 30, 2007, C-BASS paid approximately $290.3 million to satisfy lenders' margin calls on loans to C-BASS. *From July 1st though July 29th, C-BASS received an additional $362.7 million in margin calls, most of which (approximately $200 million) was called on July 26th and July 27th. As of the close of business on July 27th, we understand that C-BASS had paid only $263.5 million of the $362.7 million in outstanding margin calls.*

Since February 2007, a number of qualified buyers have shown a strong interest in C-BASS, and both we and MGIC have received multiple preliminary bids above C-BASS's book value. Due diligence was ongoing until July 29th when the increase in margin calls over the prior few days significantly jeopardized C-BASS's liquidity position, resulting in a withdrawal of all interested buyers at that time. *Giving consideration to C-BASS's inability to meet the accelerating amount of margin calls they were receiving, as well as the withdrawal of any potential buyers at the*

*time, Radian concluded on July 29, 2007 that a material charge for impairment of its interest in C-BASS was required.*

Radian has not yet determined an estimate of the amount or range of amounts of the potential impairment, although the impairment charge could be our entire investment in C-BASS. Following our impairment determination, C-BASS faced significant additional margin calls and its liquidity position has continued to deteriorate. C-BASS is continuing to explore opportunities to secure its liquidity position, although it is uncertain to us at this point whether this will be possible or on what terms such liquidity will be obtained. We do not currently anticipate any future cash expenditures associated with the impairment charge. The net impact to Radian of the impairment charge will include any associated tax benefit. [Emphasis added.]

208.    On August 7, 2007, MGIC issued a press release announcing that it advised the New York Insurance Department that, in light of the C-BASS impairment, MGIC was not required to complete its pending merger with Radian. According to the press release, Radian informed MGIC that it disagreed with MGIC's assessment of the merger obligations. MGIC also disclosed that it would not make a definitive decision regarding the merger until MGIC management completed an analysis of developments that may affect MGIC's obligation to close. In connection with its analysis, MGIC said it would be requesting additional information from Radian.

209.    In response to this announcement, the price of Radian common stock declined 11% from $23.23 per share to close at $20.62 per share.

210.    On September 5, 2007, Radian and MGIC jointly announced that both companies agreed to terminate their pending merger. According to the press release, the "current market conditions have made combining the companies significantly more challenging. Both MGIC and Radian believe it is in their best interests to remain independent companies at this time."

211.    On October 2, 2007, Radian filed a Form 8-K with the SEC reporting that its independent auditor, D&T, would be ending its relationship with Radian after the filing of the Company's Form 10-Q for the third quarter of 2007. The Form 8-K stated, in pertinent part, as follows:

Deloitte & Touche LLP ("Deloitte") is the independent registered public accountant for Radian Group Inc. (the "Company"). Deloitte's present engagement with the Company had been expected to terminate on or about the filing of the Company's Quarterly Report on Form 10-Q for the third quarter of 2007 (the "Termination Date") had the Company completed its merger with MGIC Investment Corporation ("MGIC"). As previously disclosed, Radian and MGIC mutually terminated their proposed merger on September 5, 2007. On September 26, 2007, Deloitte declined to stand for reappointment as the Company's independent auditors for the 2007 audit and its engagement will end shortly following the Termination Date.

*     *     *

During the Company's two most recent fiscal years and the subsequent interim periods preceding September 26, 2007: (i) there were no "reportable events" (as defined in Item 304(a)(1)(v) of Regulation S-K) and (ii) there was no "disagreement" (as defined in Item 304(a)(1)(iv) of Regulation S-K and related instructions) between the Company and Deloitte on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreement, if not resolved to the satisfaction of Deloitte, would have caused Deloitte to make reference to the subject matter of the disagreement in connection with its report, except as follows: As previously reported on a Form 10-Q/A dated August 13, 2007 (the "10-Q/A"), on August 9, 2007, *the Company filed its Quarterly Report on Form 10-Q for the quarter ended June 30, 2007 (the "Second Quarter 10-Q"), before Deloitte had completed its review of the interim financial statements included in the Second Quarter 10-Q. As reported in the 10-Q/A, Deloitte needed to review additional documentation supporting the conclusion that the impairment charge relating to the Company's interest in Credit-Based Asset Servicing and Securitization LLC occurred after June 30, 2007.* Members of the Company's management discussed the events surrounding the filing of the Second Quarter 10-Q with Deloitte on August 9, 2007, and the Chairman of the Company's Audit and Risk Committee discussed these events with Deloitte on August 10, 2007. On August 14, 2007, the Company filed a second amendment to its Second Quarter 10-Q to state that the matters related to the impairment had been resolved without changes or amendments to the interim financial statements included in the Second Quarter 10-Q. The Company has authorized Deloitte to respond fully to the inquiries of any successor accountant concerning this matter or any other matter. [Emphasis added.]

212.     On October 3, 2007, Radian and MGIC received letters from the SEC requesting documents relating to their joint venture in C-BASS and the terminated merger agreement. The SEC informed Radian and MGIC that it would be conducting an investigation into the companies.

213.     On November 1, 2007, Radian announced that Defendant Casale, one of the two Radian executives who served on the Board of C-BASS, was leaving the Company.

214.    On May 22, 2008 a class action complaint was filed against MGIC and several of its executives in the United States District Court Eastern District of Wisconsin for violations of Sections 10(b) and 20(a) of the Exchange Act.  The complaint alleged many of the same facts regarding MGIC's failure to disclose C-BASS's ability to withstand the sub-prime mortgage crisis and losses in C-BASS's liquidity.

215.    Since the end of the Class Period, Radian has reported disappointing results and currently trades at $1.84 per share.

216.    The market for Radian's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Radian's common stock traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Radian common stock relying upon the integrity of the market price of Radian's common stock and market information relating to Radian, and have been damaged thereby.

217.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Radian's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

218.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Radian's business, prospects and operations.  These material misstatements and

omissions had the cause and effect of creating in the market an unrealistically positive assessment of Radian and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

219.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Radian, their control over, and/or receipt and/or modification of Radian's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Radian, participated in the fraudulent scheme alleged herein.

220.     Because of their executive and managerial positions with Radian, the Individual Defendants had access to the adverse non-public information about the business, finances, markets and present and future business prospects of Radian particularized herein via access to internal corporate documents, conversations or connections with corporate officers or employees, attendance at management meetings and committees thereof and/or via reports and other information provided to them in connection therewith.

221. In addition, Defendants Casale and Quint had access to the adverse non-public information about the business, finances, markets and present and future business prospects of C-BASS particularized herein via access to internal corporate documents, conversations or connections with corporate officers or employees, attendance at management meetings and committees thereof and/or via reports and other information provided to them in connection therewith.

222. Defendants' scienter is also evidenced by their unusual and suspicious insider trading. Defendants and other high-level Radian insiders took advantage of the inflation in Radian's stock price resulting from their false statements and omissions of material fact and sold 161,804 shares of their Radian stock at artificially inflated prices for insider selling proceeds of approximately $10.2 million as follows:

| Last Name | First Name | Date | Shares | Price | Proceeds | End of CP Stock Holdings | % Sold |
|-----------|-----------|------|--------|-------|----------|--------------------------|--------|
| CALAMARI | JOHN | 2/8/2007 | 14,875 | $63.70 | $947,538 | | |
| | | | 14,875 | | $947,538 | 728 | 95.33% |
| | | | | | | | |
| IBRAHIM | SANFORD | 2/14/2007 | 1,095 | $63.53 | $69,565 | | |
| | | 5/14/2007 | 5,040 | $62.42 | $314,597 | | |
| | | | 6,135 | | $384,162 | 89,197 | 6.44% |
| | | | | | | | |
| KASMAR | ROY | 5/11/2007 | 7,994 | $62.90 | $502,823 | | |
| | | 5/23/2007 | 3,800 | $63.95 | $243,010 | | |
| | | | 11,794 | | $745,833 | 18,255 | 39.25% |
| | | | | | | | |
| QUINT | CARL | 2/8/2007 | 129,000 | $62.83 | $8,105,070 | | |
| | | | 129,000 | | $8,105,070 | 60,727 | 67.99% |
| | | **Total:** | **161,804** | | **$10,182,602** | | |

223. This insider trading was unusual and suspicious for at least the following reasons:

(a)    Calamari,[11] Kasmar[12] and Quint sold 95%, 39% and 68% of their Radian common stock holdings;

(b)    during an approximate three month period during the Class Period, Radian insiders (*i.e.*, Defendant Ibrahim, Defendant Quint, John Calamari and Roy Kasmar) received proceeds from the sale of Radian stock exceeding more than 56% of the stock sale proceeds they received *during the twelve months prior to the beginning of the Class Period*; and

(c)    the proceeds of the sales were substantial relative to the insiders' compensation for 2007;[13] and

(d)    the insider trading occurred at high prices relative to where the price of Radian's stock fell at the end of the Class Period.

224.    Additionally, Defendants were motivated to engage in this course of conduct and to conceal the problems associated with C-BASS as long as possible because the sale of C-BASS was a condition to Radian's contemplated merger with MGIC. Thus, the merger was contingent on C-BASS's perceived financial health.

225.    Defendants Ibrahim and Casale were especially incentivized to make and issue false and misleading statements and to omit material information regarding C-BASS in order to consummate the merger with MGIC because they both had personal stakes in the proposed new company. As disclosed by Radian in a press release on February 6, 2007, Ibrahim and Casale would receive executive or senior management positions in the new merged mortgage guaranty insurance

---

[11]    John Calamari served as Senior Vice President, Corporate Controller for Radian.

[12]    Roy Kasmar served as President and Head of International Mortgage and Strategic Initiatives of Radian.

[13]    For example, in 2007, Defendant Ibrahim's salary was $791,346, Defendant Quint's salary was $370,000 and Roy Kasmar's salary was $455,000.

giant. Ibrahim was to serve as Chief Operating Officer and President and would succeed to Chief Executive Officer in May 2009. Casale was to assume responsibility as head of capital markets. Aside from the pecuniary benefit, these positions would have granted Defendants with significant industry recognition.

226.    The Defendants had a duty to disseminate or cause to be disseminated, accurate and truthful information with respect to Radian's more significant investments, its financial reporting, its disclosure and internal controls and to correct promptly any previously disseminated information that was misleading to the market. As a result of the Defendants' failure to do so, the price of Radian's securities was artificially inflated during the Class Period, damaging Plaintiffs and the Class.

227.    Each of the Defendants is liable as a primary violator in making false and misleading statements, and for participating in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Radian's securities during the Class Period.

228.    The scienter of the Individual Defendants is underscored by the Sarbanes-Oxley mandated certifications of Defendants Ibrahim and Quint which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Radian was made known to them and that such controls were operating effectively.

**Loss Causation/Economic Loss**

229.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of Radian securities and operated as a fraud or deceit on Class Period purchasers of Radian securities by, inter alia: (i) concealing C-BASS's liquidity and investment problems; (ii) failing to disclose that the Company's investment in C-BASS was materially impaired; (iii) failing to timely write down the value of C-BASS; and (iv) overstating the Company's financial results. When Defendants' prior

misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Radian's common stock fell precipitously as the prior artificial inflation came out of the price of Radian common stock. As a result of their purchases of Radian securities during the Class Period, Plaintiffs and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

230.    By failing to disclose the problems with C-BASS and improperly reporting Radian's financial results, among other things, Defendants presented a misleading picture of Radian's business and prospects. Defendants' false and misleading statements had the intended effect and caused Radian's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $66.51 per share on February 6, 2007.

231.    As a direct result of the disclosures on July 30, 2007, July 31, 2007 and August 7, 2007, the price of Radian common stock fell precipitously, falling by 69% from its Class Period high. These drops removed the inflation from the price of Radian common stock, causing real economic loss to investors who had purchased Radian common stock during the Class Period.

232.    The 69% decline in the price of Radian common stock after these disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline in Radian common stock negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Radian common stock and the subsequent significant decline in the value of Radian common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

233.    At all relevant times, the market for Radian's common stock was an efficient market for the following reasons, among others:

(a)    Radian stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Radian filed periodic public reports with the SEC and the NYSE;

(c)    Radian regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Radian was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

234.    As a result of the foregoing, the market for Radian's common stock promptly digested current information regarding Radian from all publicly available sources and reflected such information in Radian's stock price. Under these circumstances, all purchasers of Radian's common stock during the Class Period suffered similar injury through their purchase of Radian's common stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

235.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements"

when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Radian who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act Against and Rule 10b-5
### Promulgated Thereunder Against All Defendants

236.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

237.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

238.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

239.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Radian common stock.  Plaintiffs and the Class

would not have purchased Radian common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

240.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Radian common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

241.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

242.    The Individual Defendants acted as controlling persons of Radian within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Radian, and their ownership of Radian stock, the Individual Defendants had the power and authority to cause Radian to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  January 11, 2010                    LAW OFFICES BERNARD M. GROSS, P.C.
                                            DEBORAH R. GROSS
                                            ROBERT P. FRUTKIN


                                            _____
                                            DEBORAH R. GROSS

                                            Wanamaker Building, Suite 450
                                            100 Penn Square East
                                            Philadelphia, PA 19107
                                            Telephone:  215/561-3600
                                            215/561-3000 (fax)

                                            Liaison Counsel for Plaintiffs

                                            COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
                                            SAMUEL H. RUDMAN
                                            DAVID A. ROSENFELD
                                            MARIO ALBA, JR.
                                            58 South Service Road, Suite 200
                                            Melville, NY  11747
                                            Telephone:  631/367-7100
                                            631/367-1173 (fax)

                                            Lead Counsel for Plaintiffs

                                            SULLIVAN, WARD, ASHER & PATTON, P.C.
                                            CYNTHIA J. BILLINGS
                                            25800 Northwestern Highway
                                            1000 Maccabees Center
                                            Southfield, MI  48075-1000
                                            Telephone:  248/746-0700
                                            248/746-2760 (fax)

VANOVERBEKE MICHAUD
  & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I, Deborah R. Gross, Esquire, hereby certify that a true and correct copy of the Corrected Consolidated Amended Class Action Complaint For Violations of Fedral Securities Laws was served on the below listed counsel via email, on this 11th day of January, 2010.

David Smith, Esquire
**Schnader Attorneys at Law**
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Email: dsmith@schnader.com

Leslie J. Abrams, Esquire
**Skadden Arps Slate, Meagher &
Flom LLP**
1440 New York Ave., N.W.
Washington, DC 20005
Email: Leslie.Abrams@skadden.com

**DEBORAH R. GROSS**