IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re: RADIAN SECURITIES          :          CIVIL ACTION
LITIGATION                        :
                                  :          NO. 07-3375
This document relates to:         :
All Actions                       :          MASTER FILE


MEMORANDUM

McLaughlin, J.                                    April 30, 2010


          Lead plaintiffs Iron Workers Local No. 25 Pension Fund
and City of Ann Arbor Employees' Retirement System brought suit
against the defendants, Radian Group, Inc. ("Radian"), Sanford A.
Ibrhahim, C. Robert Quint, and Mark A. Casale on behalf of
purchasers of Radian securities between January 23, 2007, and
August 7, 2007.  They allege that the defendants made materially
false and misleading statements regarding Radian's investment in
Credit Based Asset Servicing and Securitization L.L.C. ("C-
BASS"), and that this deception caused Radian's shares to decline
in value when Radian revealed that its investment was materially
impaired.  The plaintiffs bring suit under § 10(b) and § 20(a) of
the Securities Exchange Act of 1934, and Rule 10b-5 promulgated
by the Securities and Exchange Commission.

          On June 2, 2008, the defendants moved to dismiss the
consolidated class action complaint ("CCAC").  The Court granted
their motion on April 9, 2009, holding that the plaintiffs failed
to carry their burden of demonstrating a strong inference of

scienter.  In re Radian Securities Litigation, 612 F. Supp. 2d
594 (E.D. Pa. 2009).  The plaintiffs then filed a consolidated
amended class action complaint ("CACAC"),[1] which the defendants
move to dismiss.  Because the Court finds that the plaintiffs
have once again failed to demonstrate a strong inference of
scienter, the Court will grant the defendants' motion and dismiss
this case with prejudice.

I.   The Court's Earlier Decision[2]

        Radian is a credit enhancement company that offers
mortgage insurance and other financial services and products to
financial institutions, including mortgage lenders.[3]  Sanford A.

---

    [1] Some of the new allegations in the plaintiffs' CACAC were
premised on statements made by a confidential witness that the
plaintiffs have since agreed to strike.  The plaintiffs filed a
corrected consolidated amended class action complaint, and the
Court's decision is based on this corrected amended complaint.

    [2] The Court incorporates its earlier decision herein.

    [3] As stated in the Court's April 9 memorandum, in deciding a
motion to dismiss, a court must consider the complaint in its
entirety, as well as other sources courts ordinarily examine when
ruling on motions to dismiss, including documents incorporated
into the complaint by reference and matters of which a court may
take judicial notice.  Tellabs, Inc. v. Makor Issues & Rights,
Ltd., 551 U.S. 308, 322-23 (2007).  The United States Court of
Appeals for the Third Circuit has decided that courts may take
judicial notice of properly authenticated public disclosure
documents filed with the SEC.  Oran v. Stafford, 226 F.3d 275,
289 (3d Cir. 2000).

    The Court's April 9 memorandum took judicial notice of
several publicly filed documents.  The plaintiffs argue that the
Court's consideration of public documents was inconsistent with
Tellabs and Institutional Investors Group v. Avaya, 564 F.3d 242

2

Ibrahim, at all relevant times, was Radian's CEO, and a member of Radian's Board of Directors.  Mark A. Casale served as President of Radian Guaranty, Inc., a Radian subsidiary, and was a member of C-BASS's Board of Managers.  C. Robert Quint was Radian's CFO and Executive Vice President.  CCAC ¶¶ 2, 13.[4]

During the class period, Radian engaged in three business segments:  (1) mortgage insurance, (2) financial guaranty, and (3) financial services.  In 2006, the financial

---

(3d Cir. 2009), which requires Courts to "consider competing inferences from the allegations, but [] nonetheless assume the truth of the specific facts alleged."  Avaya, 564 F. 3d at 260 n.31 (emphasis in original).  The plaintiffs claim that the Court went beyond considering the defendants' competing inferences by accepting the defendants' interpretation of the facts as the truth.  Pls.' Opp. 27 n.16.

The Court does not believe it did so.  As established by Tellabs, the Court considered the complaint in its entirety, including the publically filed documents, and took account of plausible opposing inferences to the uncontested facts.  See Tellabs, 551 U.S. at 322-23.  The Court found that not only did the facts alleged fail to give rise to a strong inference of scienter, but that the plaintiffs' explanation of the facts was not cogent or at least as compelling as the defendants' explanation.

The Court will continue to consider publically filed documents, whose truth is uncontested.  Many of these documents were attached to the defendants' first motion to dismiss.  The Court will refer to these attached documents as "Defs.' 1st M. Ex. ___."  It will also use the defendants' page numbering system to provide citations to these documents (e.g., "A-___").

[4] The CCAC and CACAC treats the individual defendants as a group for pleading purposes, and "presume[s] that the false, misleading and incomplete information conveyed in the company's public filings, press releases and other publications as alleged herein are the collective actions" of the individual defendants. CCAC ¶ 15; CACAC ¶ 17.

services segment represented 28% of Radian's net income, and 11% of its equity.  This segment consisted mainly of interests held in Sherman Financial Services Group, LLC ("Sherman"), and C-BASS. Id. ¶¶ 44, 48.

C-BASS is a mortgage investment and servicing company that specializes in subprime residential mortgage assets and mortgage-backed securities.  It was a joint venture between Radian and MGIC Investment Corporation ("MGIC"), another provider of private mortgage insurance.  Both Radian and MGIC held a 46% equity interest in C-BASS.[5]  Radian and MGIC announced on February 6, 2007, that they intended to merge, and as part of the merger, they agreed to sell half of their combined interest in C-BASS.  Id. ¶¶ 4, 49, 51, 121.

The plaintiffs alleged in their CCAC that the subprime mortgage crisis, coupled by C-BASS's business model, impaired the value of Radian's investment in C-BASS.  Before the class period, interest rates began to rise nationally, which adversely affected subprime borrowers' ability to make their loan payments and increased the default risk of subprime mortgages.  C-BASS suffered because of the increase in payment defaults, investor rejections, and mortgage delinquency rates.  Its business model exacerbated the problems because C-BASS did not originate the

---

[5] The remaining 8% of C-BASS was owned by current or former members of C-BASS's management.  CCAC ¶ 51.

loans it serviced and securitized, and it accepted the first risk of nonpayment.  Within the first six months of 2007, C-BASS received and paid $290 million in margin calls that allegedly left it on the brink of insolvency.  Id. ¶¶ 52, 56-58, 61-78, 93, 99, 149.

The plaintiffs alleged that despite C-BASS's troubles, Radian issued positive statements about C-BASS up until it announced that its investment in C-BASS was impaired, and these statements were false and misleading.  The statements related to Radian's fourth quarter and fiscal year results of 2006, and its first and second quarter results for 2007.  The plaintiffs also alleged that Radian's financial statements were not in conformity with Generally Accepted Accounting Principles ("GAAP").  Id. ¶¶ 101-46.

On July 30, 2007, Radian issued a press release announcing that the value of its investment in C-BASS had been materially impaired.  On July 31, 2007, C-BASS issued a press release that it met $290 million in lender margin calls during the first six months of 2007, and an additional $260 million in margin calls during the first 25 days of July.  MGIC issued a press release on August 7, 2007, that in light of C-BASS's impairment, and despite Radian's disagreement, MGIC was not

required to complete the pending merger with Radian.[6]  The
plaintiffs alleged that as a direct result of these disclosures,
Radian common stock fell by 69% from its class period high.  Id.
¶¶ 147-52, 170.

      The plaintiffs pointed to certain confidential witness
statements and a close business relationship between Radian and
C-BASS to claim that Radian knew of the problems at C-BASS.  A
former C-BASS employee stated that Radian had a systematic
process to monitor defaults.  One former Radian Guaranty employee
said that in 2006, Radian witnessed a higher rate of loan
delinquencies and that Radian was hesitant to insure such loans.
Another former Radian Guaranty employee recalled that defaults
and foreclosures began to rise in 2005-2006, resulting in an
increase in claims filed against Radian.  Id. ¶¶ 79-93.

      With respect to the alleged close business relationship
between Radian and C-BASS, the plaintiffs referred to: (1) a
letter from Ibrahim to Radian's shareholders in the Company's
2005 Annual Report, which stated that "Radian maintains an active
involvement in strategic activities at both C-BASS and Sherman
Financial"; (2) another statement in the 2005 letter, noting that
Casale sits on the boards of C-BASS and Sherman Financial; (3) a
statement by Ibrahim in the Company's 2006 Annual Report that

---

    [6] On September 5, 2007, Radian and MGIC jointly announced
the termination of their pending merger.  CCAC ¶ 153.

Radian's "relationships with C-BASS and Sherman . . . provide timely and valuable insights into the consumer-credit marketplace"; and (4) a statement on the website of Litton Loan Servicing, LP ("Litton"), C-BASS's wholly owned subsidiary that serviced all of its loans, that Litton aims to "ensur[e] the interests of C-BASS, Litton, Litton's customers, and . . . investors are aligned." Id. ¶¶ 94-97.

The plaintiffs alleged that the defendants had a motive to delay in recognizing the C-BASS impairment because doing so would jeopardize the merger between Radian and MGIC. They claim that because part of the merger required MGIC and Radian to sell half of their combined interest in C-BASS, the sale of C-BASS would increase the value of MGIC and Radian shares; C-BASS's debt would not be included in the combined entity's balance sheet. Id. ¶¶ 4, 121, 164.

The plaintiffs also claimed that the defendants had the motive to commit fraud in order to allow the defendants and "other insiders" to sell off approximately $10.2 million of their personal holdings in Radian. According to the CCAC, throughout the class period, the defendants sold 161,804 shares of their Radian stock. Defendant Ibrahim is alleged to have sold 1,095 shares on February 14, 2007, and 5,040 shares on May 14, 2007, representing a total of $384,162 in stock sales. Defendant Quint is alleged to have sold 129,000 shares of Radian stock on

February 8, 2007, representing a sale of $8,105,070.  Id. ¶ 162-63.   The CCAC did not suggest any sales on the part of Defendant Casale.  It did claim sales on the part of individuals named "John Calamari" and "Roy Kasmar," but it did not further identify these individuals.  CCAC ¶¶ 162-63.

        The Court granted the defendants' motion to dismiss and found that the plaintiffs failed to demonstrate a strong inference of scienter.  The Court examined the defendants' motive and opportunity to commit fraud,[7] and it found that the motives alleged, consummating the merger with MGIC and alleged insider trading, were insufficient to establish a strong inference of scienter.  With respect to the merger, the Court held that such a motive was one found to be commonly possessed by most corporate directors.  It further held that the plaintiffs failed to allege any concrete and personal benefit to the individual defendants stemming from the merger, as required by the Private Securities Litigation Reform Act ("PSLRA").  In re Radian, 612 F. Supp. 2d at 608-10.

        With respect to the insider trading allegations, the Court found that the plaintiffs' allegations failed to demonstrate sales that were "unusual in scope or timing" to

_____

        [7] The Court decided the defendants' motion to dismiss prior to Institutional Investors Group v. Avaya, 564 F.3d 242 (3d Cir. 2009), which held that motive and opportunity is no longer an independent means to establish scienter.

support an inference of scienter.  First, the plaintiffs failed to allege any insider trading facts as to Defendant Casale, and public filings demonstrated that Casale more than tripled his investment in Radian stock over the course of the class period. Second, Defendant Ibrahim's stock sales were minimal, representing less than 1% and approximately 2.7% of his total shares; the stocks were a portion of his overall compensation; and one sale was meant to cover tax liabilities.  Third, although Defendant Quint sold 68% of his stock holdings, the plaintiffs failed to allege any facts as to how this sale was unusual. Further, the defendants offered a more compelling, nonculpable reason for Quint's sale: Quint was to lose his position upon the merger between Radian and MGIC, and he sold his stock because of his impending departure.  Fourth, considering the stock sales collectively, the defendants retained a combined 88.6% of their securities during the class period, undermining a strong inference of scienter.  Id. at 610-13.

       The Court also found that alleged stock sales by the two non-defendants did not add to a strong inference of scienter because the CCAC lacked any allegations to put the stock sales in context.  For example, the CCAC did not identify the non-defendants or their roles at Radian, nor did it identify their prior trading practices or compare their sales to their overall compensation.  Id. at 610 n.14.

9

The Court next determined whether the plaintiffs' allegations that the defendants failed to take an earlier impairment charge on their C-BASS investment demonstrated conscious misbehavior or recklessness to support a strong inference of scienter.  The Court found the plaintiffs' allegations lacking.

First, the Court evaluated the plaintiffs' claim that Radian violated GAAP for failing to reported an impairment charge by March 31, 2007, and that this constituted conscious misbehavior or recklessness.  The Court found that the CCAC and public record countered the plaintiffs' bald assertion that C-BASS was on the brink of insolvency in March; C-BASS continued to meet $290 million in lender margin calls during the first six months of 2007 and $260 million in margin calls during the first twenty-four days of July.  The Court also found that even if an impairment occurred prior to Radian's announcement, the plaintiffs failed to allege facts that this act constituted an extreme departure from the range of reasonable business treatments permitted under GAAP:  Radian's auditor, Deloitte, did not dispute Radian's decision to write down its investment when it did; MGIC also reported an impairment as a third-quarter event; and the CCAC failed to allege with particularity when the write-down should have occurred.  Id. at 613-16.

Second, the Court determined that the plaintiffs failed

to sufficiently allege that the defendants knew or must have known that their statements or omissions presented a danger of misleading buyers or sellers.  To the extent that the plaintiffs relied on the defendants' positions as corporate officers, such generalized imputations of knowledge did not establish scienter. Id. at 616.

Allegations about Radian's business relationship with C-BASS were also insufficient to demonstrate that the defendants knew of any accounting irregularities at C-BASS.  Although some courts allow knowledge of "core activities" to be imputed to a company's highest officials, the plaintiffs failed to demonstrate how C-BASS was a "core activity" of Radian.  Id. at 616-17.

The plaintiffs' generalized allegations about the subprime industry and C-BASS's business model also did not help to establish scienter.  The Court found this particularly true because the defendants were one step removed from C-BASS itself: they were officers of a corporation that invested in the corporation that is alleged to have pursued a risky business strategy.  Further, although the subprime market suffered during the class period, these facts were known by the plaintiffs and the market at large.  In fact, the CCAC established that Radian publicly disclosed its knowledge of these facts when it discussed the uncertainty of the subprime market, the significant credit spread widening, and C-BASS's disappointing first quarter

11

results.  Id. at 617-19.

The Court next determined that statements from the confidential witnesses were not particularized evidence of what the defendants knew or must have known.  None of the witnesses was an employee of Radian Group, Inc., and none stated that he or she was in a position to know anything about Radian's accounting for its C-BASS investment.  Id. at 619-20.

The Court also noted that the mere representation that a filing was not prepared in compliance with GAAP or that a Sarbanes-Oxley certificate contributed to scienter was insufficient in itself to satisfy the PSLRA.  Both required additional evidence of recklessness or conscious misbehavior, which was lacking in the CCAC.  Id. at 620.

Third, the Court rejected the plaintiffs' reliance on "after-the-fact" evidence to demonstrate scienter, including the size of the impairment, Defendant Casale's resignation from Radian, and Deloitte's decision not to stand for reappointment. The size of the impairment was insufficient to demonstrate scienter because C-BASS was able to meet margin calls through the end of July.  In addition, both Radian and MGIC provided an additional $50 million to C-BASS in mid-July, which would be unusual if Radian had knowledge that C-BASS would fold.  Casale's resignation did not demonstrate scienter because he resigned three months after the class period, and the CCAC lacked any

12

allegations linking this resignation to fraud.  Finally,
Deloitte's decision to not stand for reappointment did not evince
scienter because the plaintiffs put forward no evidence to
suggest this decision was due to Radian's conscious misbehavior
or recklessness.  Further, the fact that Deloitte was to end its
relationship with Radian upon the Radian-MGIC merger demonstrated
a more compelling, nonculpable inference compared to an inference
of scienter.  Id. at 621-22.

        In view of the CCAC's failure to establish motive and
opportunity or circumstantial evidence of conscious misbehavior
or recklessness, the Court dismissed the plaintiffs' § 10(b)
claim.  Because § 10(b) liability is a necessary predicate for §
20(a) claims, the Court dismissed the plaintiffs' §20(a) claim,
too.  Id. at 622.

## II.  New Allegations in the Plaintiffs' CACAC

        The plaintiffs provide several pages of new allegations
in their CACAC, consisting of: (1) more information regarding the
defendants' knowledge of C-BASS's troubles, (2) more details
regarding the merger between Radian and MGIC, and (3) more
details to bolster their allegations of insider trading.

### A.  The Defendants' Knowledge

        The CACAC adds several allegations meant to demonstrate
that the defendants knew in the beginning of 2007 that C-BASS's

business was devastated.  First, it adds numerous paragraphs further detailing the subprime mortgage crisis at large.  These include graphs detailing the collapse of the housing market in 2006; facts regarding an increase in the interest rates for adjustable-rate mortgages; and a list of mortgage companies, some of which were loan originators from which C-BASS purchased its loans, that closed or declared bankruptcy in 2006 and 2007.  It asserts that in this environment of mortgage defaults, declining home values, decreasing remittance payments, and financial difficulties experienced by mortgage originators, Radian knew or should have known about C-BASS's financial troubles prior to July 30.  CACAC ¶¶ 48, 76, 81-86, 88, 92, 96-98.[8]

Second, it adds statements from three confidential witnesses ("CWs") who are former C-BASS employees.[9]  The three new CWs note that C-BASS purchased distressed loans from companies that were experiencing huge losses and going out of

---

[8] The plaintiffs' opposition to the defendants' motion to dismiss states that the amended complaint clarifies with new allegations that the defendants' misrepresentations were an extreme departure from the standards of ordinary care because of the circumstances of C-BASS's business and the failing subprime market.  Pls.' Opp. Br. 6-8.  Almost all of the citations to the CACAC in this section of the plaintiffs' brief, however, are to paragraphs from the CCAC, which the Court already found infirm.  Compare CACAC ¶¶ 68, 70, 72-75, 105-107, 119, 123, 125, 136, 166, 204, with CCAC ¶¶ 59, 61, 63-66, 79-81, 88, 92, 93, 99, 117, 149.

[9] CW 7 served as a Senior Forensic Underwriting Analyst at C-BASS, CW 8 was an assistant vice president of C-BASS's credit surveillance department, and CW 9 was a Vice President in C-BASS's financial analysis area.  CACAC ¶¶ 36-38.

14

business during the class period.  C-BASS's portfolio
demonstrated an increase in defaulting and fraudulent loans
without hope of a refund.  With respect to margin calls from C-
BASS creditors, CW 7 states that "it was known that C-BASS would
likely not survive the margin calls because it did not have
enough liquidity in reserves to pay them all."  Id. ¶¶ 36-38,
101-02, 106, 108-09, 117-18, 123.

     The CACAC also adds statements from the CWs named in
the CCAC.  CW 4, a vice president of Radian Guaranty, states that
in late 2006 and into the first two quarters of 2007, C-BASS's
situation was "dire" because "there were so many defaulting loans
sitting in their portfolio."  Id. ¶ 101, 113.

     Third, the CACAC adds allegations regarding the
relationship between Radian and C-BASS.  It asserts that not only
was Defendant Casale a member of C-BASS's Board of Managers, but
so too was Defendant Quint.  It also adds a statement during a
conference call on January 31, 2007, where Defendant Ibrahim
stated: "C-BASS is an important contributor to our earnings.  C-
BASS reported very strong results last year."  It also asserts
that in 2006, C-BASS accounted for 16% of Radian's earnings.  Id.
¶¶ 15(b), 59.

     Fourth, the CACAC adds specific allegations regarding
C-BASS's margin calls to demonstrate that the defendants must
have known that C-BASS was severely affected by the subprime

market.  These include Radian's Form 8-K submitted to the SEC on
August 2, 2007, which states that, besides receiving $290 million
in margin calls during the first six months of 2007, which C-BASS
met, from July 1 through July 29, 2007, C-BASS received $362.7
million in margin calls.  Of these, approximately $200 million
were received on July 26 and 27.[10]  C-BASS paid only $263.5 of
the $362.7 million in margin calls received in July.  The CACAC
alleges that these July margin calls were not mentioned by the
defendants during the class period and specifically during the
July 25, 2007 conference call.  Id. ¶¶ 137-38, 142-43, 207.

Radian announced in the Form 8-K that it concluded on
July 29, 2007, that a material impairment of its interest in C-
BASS had occurred.  MGIC made a similar announcement on its Form
8-K filed on August 1, 2007.  MGIC stated that approximately $285
million was paid to satisfy July 2007 margin calls, of which
approximately $140 million was paid between July 19-26, 2007.
MGIC announced that its investment in C-BASS was impaired on July
26, 2007.  Id. ¶¶ 139-141, 202, 206.

---

[10] At times, the CACAC alleges that C-BASS received $160
million in margin calls from July 1 - 25, 2007.  See, e.g., CACAC
¶ 137.  At other times, the CACAC alleges that C-BASS received
$260 million in margin calls during this time period. See, e.g.,
id. ¶ 204.  C-BASS's press release confirms the figure as $260
million.  See Defs.' 1st M. Ex. 29, at A-859; CACAC ¶ 204.  The
Court acknowledges, however, that the breakdown of margin calls,
$260 million from July 1-25, and $200 million from July 26-27,
does not match the allegation that C-BASS received $362.7 million
in margin calls from July 1-29, 2007.

B.    The MGIC Merger

The plaintiffs added several paragraphs to their complaint to bolster their claims of motive based on the MGIC merger.  The CACAC again recognizes that Radian and MGIC agreed to reduce their joint interests in C-BASS as a condition of the merger, and it alleges again that this was to avoid recognizing C-BASS's debt on the balance sheet.  It adds that on July 19, 2007, both Radian and MGIC provided C-BASS with $50 million in unsecured credit, which C-BASS drew fully upon on July 20 and 23, 2007.  The plaintiffs claim that this credit was to "keep C-BASS afloat long enough for the Radian-MGIC merger to go through."  It also alleges that Defendants Ibrahim and Casale were especially incentivized to issue false and misleading statements because they were to receive executive or senior management positions in the new merged company.  Id. ¶¶ 6, 142, 144-49, 170-71, 225.

C.    Insider Trading

Lastly, the CACAC adds statements to bolster the plaintiffs' insider trading allegations.  It adds the employment positions of non-defendants Calamari and Kasmar, who were Radian's Senior Vice President, Corporate Controller, and President and Head of International Mortgage and Strategic Initiatives, respectively.  It also clarifies that the "Radian insiders" who allegedly engaged in insider trading are Calamari, Kasmar, and Defendants Ibrahim and Quint.  It then compares the

17

salaries of Ibrahim, Quint and Kasmar to the proceeds from their stock sales.  Specifically, Ibrahim's salary was $791,346 and his stock proceeds were $384,162; Quint's salary was $370,000, and his proceeds were $8,105,070; and Kasmar's salary was $455,000, and his proceeds were $745,833.  Id. ¶¶ 222-225 & n.11-13.

III. <u>Analysis</u>

The Court finds that, upon consideration of the CACAC as a whole, the plaintiffs have failed to sufficiently amend their complaint to allege facts that give rise to a strong inference of scienter.  The Court will dismiss the plaintiffs' § 10(b) claim, accordingly.  The Court will also dismiss the plaintiffs' § 20(a) claim for failure to allege an independent violation of the securities laws.

A.   <u>Section 10(b) Claim</u>

Section 10(b) of the Securities Exchange Act forbids the use or employment of any deceptive device in connection with the purchase or sale of any security.  15 U.S.C. § 78j(b).  Rule 10b-5, promulgated by the Securities and Exchange Commission, makes it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading."  17 C.F.R. § 240.10b-5.

The basic elements of a § 10(b) claim are: (1) a

material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance on the misrepresentation, (5) economic loss, and (6) loss causation. <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 341-42 (2005).

Pursuant to the PSLRA, plaintiffs bringing suit under § 10(b) and Rule 10b-5 must satisfy a heightened pleading standard. <u>Inst'l Investors Group v. Avaya</u>, 564 F.3d 242, 252 (3d Cir. 2009). Their complaint must: (1) specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity; and (2) with respect to each act or omission alleged, state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind. <u>Id.</u> at 253 (referencing 15 U.S.C. § 78u-4(b)(1), (b)(2)). Where there are multiple defendants, the plaintiffs must specify the role of each defendant, demonstrating each defendant's connection to the misstatements or omissions. <u>Winer Family Trust v. Queen</u>, 503 F.3d 319, 335-36 (3d Cir. 2007).

On a motion to dismiss a § 10(b) action, a court must: (1) accept all factual allegations in the complaint as true; (2) consider the complaint in its entirety, as well as documents incorporated into the complaint by reference and matters of which

the court may take judicial notice; and (3) consider plausible opposing inferences, in determining whether the pleaded facts give rise to a strong inference of scienter.  <u>Tellabs, Inc. v. Makor Issues & Rights, L.T.D.</u>, 551 U.S. 308, 322-23 (2007). Scienter is a "mental state embracing intent to deceive, manipulate, or defraud."  <u>Avaya</u>, 546 F.3d at 252 (quoting <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 194 n.12 (1976)).

Prior to the Supreme Court decision in <u>Tellabs, Inc. v. Makor Issues & Rights, L.T.D.</u>, 551 U.S. 308 (2007), the United States Court of Appeals for the Third Circuit held that a complaint can establish a strong inference of scienter by alleging either (1) facts to show that the defendants had the motive and opportunity to commit fraud, or (2) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.  <u>In re Suprema Specialities, Inc. Sec. Litig.</u>, 438 F.3d 256, 276 (3d Cir. 2006); <u>In re Alpharma Sec. Litig.</u>, 372 F.3d 137, 148 (3d Cir. 2004).

In light of <u>Tellabs</u>, and after the Court issued its decision granting the defendants' first motion to dismiss, the Court of Appeals for the Third Circuit held that a showing of motive and opportunity is no longer an independent ground for establishing scienter.  <u>Avaya</u>, 564 F.3d at 276.  Instead, plaintiffs must allege facts that give rise to a strong inference of either reckless or conscious misbehavior.  <u>Avaya</u>, 564 F.3d at

20

267-68.  Courts should consider motive and opportunity along with all of the other allegations in the complaint to decide whether collectively they establish a strong inference of scienter.  Id. at 276-77.

The Court incorporates the analysis from its prior decision with respect to the plaintiffs' failure to meet the pleading requirements of the PSLRA.  Upon a consideration of the old allegations and the new allegations as stated in the CACAC, the Court finds that collectively, these allegations fail to raise a strong inference of scienter.

1.    The Defendants' Knowledge

The plaintiffs' new allegations meant to demonstrate that the defendants knew in the beginning of 2007 that C-BASS's business was devastated fail to add to a strong inference of scienter.  First, the new allegations and charts detailing the subprime market industry and C-BASS's general business model do not support a finding of conscious misbehavior and recklessness.  Instead, they serve to establish that the market at large knew of the subprime industry's downward trend.  See First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 2004) ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases.").

Indeed, this is not the first action to arise from the subprime mortgage crisis, nor the first to be dismissed.  See, e.g., In re 2007 Novastar Fin. Inc., 579 F.3d 878 (8th Cir. 2009); Ashland Inc. v. Morgan Stanley & Co., No. 09 CV 5415, 2010 U.S. Dist. LEXIS 31231 (S.D.N.Y. Mar. 30, 2010); Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, No. 08 Civ. 8143, 2010 U.S. Dist. LEXIS 25041 (S.D.N.Y. Mar. 17, 2010); Fulton County Employees' Ret. Sys. v. MGIC Inv. Corp., No. 08-C-0458, 2010 U.S. Dist. LEXIS 14037 (E.D. Wis. Feb. 18, 2010) (dismissing comparable suit against MGIC for its investment in C-BASS).

Radian itself acknowledged the market trend in its various conference calls, releases, and public filings.  It explained on January 24, 2007, that "the subprime origination business is in a state of uncertainty," and on March 1, 2007, that "[a]s a holder of credit risk, our results are subject to macroeconomic conditions and specific events that impact the credit performance of the underlying insured assets."  CACAC ¶¶ 182, 184.  In April 2007, Radian reported "disruptions in the subprime market in recent months" and C-BASS's operating losses during the first quarter.  Id. at ¶¶ 186, 188.  In May 2007, Radian disclosed that its first quarter results were "negatively impacted by the subprime mortgage disruption," and that "C-BASS incurred a loss of approximately $15 million as credit losses and

credit spread widening in the subprime mortgage market impacted their results."  Id. at ¶ 192.

Second, the allegations relating to three new CWs and the additional allegations from the previous CWs do not add to a strong inference of scienter.  The new allegations consist merely of additional details regarding C-BASS's loan portfolio.  The new CWs themselves are all employees of C-BASS.  None of the new allegations purports to demonstrate information regarding the defendants' knowledge during the class period.

CWs need not have actual knowledge of a defendants' state of mind if their particularized allegations help create a strong inference of scienter.  See Avaya, 564 F.3d at 268-70. Here, however, the CWs' allegations lack the required particularity to demonstrate how the defendants knew or should have known that their statements were false or misleading. First, their allegations all relate to C-BASS's general financial state.  Second, they do not contradict statements made by the defendants, particularly because the defendants acknowledged the subprime mortgage market and its impact on C-BASS, as noted above.  See Avaya, 564 F.3d at 264, 269 (noting that CWs' statements directly contradicted the defendant's repeated assurances and added to a strong inference of scienter).

Third, the new paragraphs meant to bolster claims of a close business relationship between Radian and C-BASS prove

23

uncompelling to add to a strong inference of scienter.  The fact that Defendant Quint was a C-BASS board member along with Defendant Casale, and that C-BASS accounted for 16% of Radian's earnings in 2006 are not particularized allegations about the defendants' knowledge, nor do they create circumstantial evidence that the defendants engaged in conscious misbehavior or recklessness by failing to announce an impairment at some point prior to July 30, 2007.

        To the extent that these allegations are meant to demonstrate that C-BASS was a "core activity" of Radian, they fail.  One more board membership and the 16% earnings do not make C-BASS a core activity of Radian.  C-BASS, of which Radian held only a 46% interest, was only one part of Radian's smallest business segment, which comprised only 11% of Radian's total equity.  See In re Stonepath Group, Inc. Sec. Litig., No. 04-4515, 2006 U.S. Dist. LEXIS 15808, at *34-36 (E.D. Pa. Apr. 3, 2006) (finding no scienter based on accounting irregularities in company's dominant subsidiary).  Contra In re Tel-Save Sec. Litig., No. 98-CV-3145, 1999 U.S. Dist. LEXIS 16800, at *14-15 (E.D. Pa. Oct. 19, 1999) (finding scienter because defendant CEO solely negotiated core business transactions and participated in many of the transactions that involved misstatements).

        Fourth, the additional details of C-BASS's July margin calls do not add to a strong inference of scienter.  As a

preliminary matter, the plaintiffs' incorrectly state that the defendants failed to mention the July margin calls during the class period, particularly since Radian filed it's Form 8-K announcing the margin calls on August 2, 2007, before the class period end date.  Further, the July 25, 2007 conference call makes reference to C-BASS's margin calls:

> Radian and MGIC each provided C-BASS with a $50 million credit line, $100 in total, which was fully drawn over the last week.  The current subprime mortgage environment with continuing margin calls has drained cash resources and challenged liquidity for all market participants including C-BASS which is currently pursuing a number of options to help strengthen its liquidity position.

Defs.' 1st M. Ex. 27 at A-836.  During the call, the defendants also noted the "difficult market conditions" that C-BASS was facing, and they stated that "[t]here is no denying that today's environment is more difficult than anticipated, perhaps the most challenging environment we have seen in a long time."  Id. at A-833.  As of the July 25 conference call, C-BASS had met all of its margin calls, having paid $263.5 million by the end of July.[11]  See CACAC ¶¶ 137, 207.

---

[11] In their opposition brief, the plaintiffs write that the defendants made "incriminating statements" during the July 25 conference call when responding to investors' questions.  Pls.' Opp. 15.  The plaintiffs, however, do not allege with particularity that specific responses during this conference call were actually false.  Nor do they acknowledge the defendants' statements that report on C-BASS's liquidity and incoming margin

The plaintiffs stress that omissions and misstatements during the July 25 conference call give rise to a strong inference of scienter because Radian wrote down its investment in C-BASS only four days after the call.  Putting aside any alleged falseness of the statements made or alleged omissions during the call, the plaintiffs cannot rest their case on this four-day window.  C-BASS received approximately $200 million in margin calls, over two-thirds of the amount it received and met during the entire first six months of the year, between July 25 - 29, such that it is unsurprising that Radian announced its impairment days after July 25.  Further, this window does not add to a strong inference of the defendants' scienter on January 23, 2007, the start of the class period.  This is particularly true since during the class period, C-BASS returned to profitability, as noted by its second quarter profits.  Defs.' 1st M. Ex. 8 at A-418, Ex. 29 at A-860.

        2.   <u>Merger</u>

The allegations regarding the merger between Radian and MGIC, also fail to support a strong inference of scienter. First, taking the allegations as true, they still do not establish whether or when the defendants should have written off their investment in C-BASS, such that the defendants' statements

---

calls.

were false.  Second, the plaintiffs still allege that the
defendants' motivation in selling their interest and in providing
the $50 million line of credit was simply to complete the merger.
Such a motive is found to be generally possessed by corporate
directors and therefore insufficient to raise a strong inference
of scienter.  See GSC Partners CDO Fund v. Washington, 368 F.3d
228, 237-38 (3d Cir. 2004).

Third, the new positions in the merged company for
Defendants Ibrahim and Casale do not enhance any inference of
scienter.  New positions in a merged company are also general
motivations of most corporate directors, particularly of officers
like Ibrahim and Casale who already held high positions and were
promised high positions in the merged entity.  See GSC Partners,
368 F.3d at 237-38; Phillips v. LCI Int'l, Inc., 190 F.3d 609,
623 (4th Cir. 1999) ("[A]llowing a plaintiff to prove a motive to
defraud by simply alleging a corporate defendant's desire to
retain his position with its attendant salary . . . would force
the directors of virtually every company to defend securities
fraud actions.").

Fourth, although the new allegations provide assertions
specific to the individual motivations of Defendants Ibrahim and
Casale, they fail to provide any motivation for Defendant Quint.
This omission raises doubt as to whether the merger was motivated
by an intent "to conceal the problems at C-BASS for as long as

possible."  <u>See</u> CACAC ¶ 6; <u>Tellabs</u>, 551 U.S. at 326 (counting omissions and ambiguities in the complaint against an inference of scienter).  Defendant Quint's motivation is further undermined because he was to lose his job upon the merger.  Defs.' 1st M. Ex. 4 at A-305.

    3.  <u>Insider Trading</u>

    The CACAC's additional allegations with respect to insider trading also fail to add to a strong inference of scienter.  First, the new allegations do not refute the Court's prior findings of more compelling, nonculpable explanations for the stock sales.  They do not include information regarding Defendant Casale's trading history, and the plaintiffs do not refute that Casale more than tripled his Radian investment.  They also do not refute that Defendant Ibrahim's sales were consistent with his prior trading history and small in relation to his remaining holdings.  Nor do the new allegations refute the defendants' nonculpable explanation for Defendant Quint's sales based on Quint's expected departure from Radian after the MGIC merger.

    Second, although the plaintiffs added allegations about non-defendants Calamari and Kasmar that the Court identified as absent from the CCAC, the new allegations are insufficient to add to a strong inference of the defendants' scienter.  The plaintiffs identify the employment positions of Calamari and

Kasmar and compare Kasmar's stock sales relative to his
compensation.  Calamari and Kasmar, however, are still not named
as defendants, there are no allegations about Calamari's
compensation relative to his sales, there are no allegations
about Calamari and Kasmar's trading histories, and there are no
allegations about their knowledge of C-BASS or how their
knowledge impacted the defendants' knowledge.  See In re Lexmark
Int'l Sec. Litig., 234 F. Supp. 2d 680, 685 & n.1 (E.D. Ky. 2002)
(finding allegations regarding trading by non-defendant insiders
irrelevant when evaluating defendants' scienter); Plevy v.
Haggerty, 38 F. Supp. 2d 816, 834 n.12 (C.D. Cal. 1998)
("[Unnamed insiders'] transactions are irrelevant to alleging
scienter against the five named Defendants.  In evaluating
defendants' scienter, the PSLRA requires the Court to consider
each defendant's sales separately.") (internal quotes omitted).

        Also, both of the non-defendants resigned from their
positions at Radian early into the class period, undermining the
suspicion of their sales.  Defs.' Reply Br. Exs. A, B; see
Greebel v. FTP Software, Inc., 194 F.3d 185, 206 (1st Cir. 1999)
("It is not unusual for individuals leaving a company . . . to
sell shares.").

        Just as the Court still finds that none of the
individual stock sales adds to a strong inference of scienter, it
reaches the same conclusion with respect to the collective sales

alleged.  It is undisputed that the defendants retained 88.6% of their Radian securities during the class period, and to infer fraud from their trading history "would be to assume that the defendants intentionally defrauded the plaintiffs to their own ultimate detriment."  Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co., 652 F. Supp. 2d 576, 590 (E.D. Pa. 2009).  Courts reject such an inference that makes little economic sense.  In re Digital Island Sec. Litig., 357 F.3d 322, 331 (3d Cir. 2004).

Taken collectively, the allegations in the CACAC fail to give rise to a strong inference of scienter.  The Court finds this particularly true because the CACAC does not cure the basic flaws that the Court highlighted in its earlier opinion, namely that the plaintiffs fail to allege with particularity how and when the defendants knew that their investment in C-BASS was impaired.  It is undisputed that C-BASS met $290 million in margin calls during the first six months of 2007, and an additional $260 million in margin calls from July 1 through July 25, 2007.  It is also undisputed that MGIC took its impairment on July 26, 2007,[12] and that both Deloitte, Radian's old auditor,[13]

---

[12] See CACAC ¶ 206.  The plaintiffs note in the CACAC that investors filed a suit against MGIC in May 2008, alleging similar claims against MGIC officials due to their investment in C-BASS. CACAC ¶ 214.  To the extent that this allegation was to demonstrate that MGIC was "in on" a scheme to defraud investors, it proves weak.  In that suit, the court granted the defendants' motion to dismiss for similar reasons stated herein, finding that the plaintiffs failed to adequately plead falsity and scienter. Fulton County Employees' Ret. Sys. v. MGIC Inv. Corp., 08-C-458,

and PricewaterhouseCoopers, Radian's new auditor,[14] certified
Radian's impairment as a third quarter event.  It too is
undisputed that Radian made statements about the downward trend
of the market and C-BASS's margin calls during the class period,
and that C-BASS experienced profits during its second quarter.
Considering all the evidence as a whole, including the CACAC and
the publically filed documents of which the Court takes judicial
notice, the Court finds that the plaintiffs once again fail to
demonstrate that the defendants acted with conscious misbehavior
or recklessness.

   B.   Section 20(b) Claim

      Section 20(a) of the Securities and Exchange Act
imposes joint and several liability on any person who controls
any person liable under any provision of the Exchange Act.  In re
Alpharma, 372 F.3d at 153.  A necessary predicate for § 20(a)
liability is an independent violation of the federal securities
laws.  Because the Court has found that the plaintiffs have not

_____

2010 U.S. Dist. LEXIS 14037 (E.D. Wis. Feb. 18, 2010).

   [13] In its earlier decision, the Court addressed Deloitte's
choice to decline reappointment as Radian's auditor and found
that it did not add to a strong inference of scienter.  The
plaintiffs did not allege that Deloitte's decision was due to
accounting irregularities, and Deloitte's engagement with Radian
was expected to terminate upon the merger with MGIC.  612 F.
Supp. 2d at 621-22.

   [14] See Defs.' 1st M. Ex. 30 at A-1017, 1018.

31

stated a claim under § 10(b), there is also no § 20(a) violation.
This claim will be dismissed.

IV.   Conclusion

        For the reasons herein stated, the defendants' motion
to dismiss the consolidated amended class action complaint is
granted.  Because the plaintiffs already filed original
complaints, a consolidated class action complaint, and a
consolidated amended class action complaint, and because the
plaintiffs had three months to amend their complaint that the
Court previously dismissed, the plaintiffs' case is dismissed
with prejudice.

        An appropriate order follows.